United States District Court

For the Northern District of California

1
2
3
4
5                          UNITED STATES DISTRICT COURT
6                         NORTHERN DISTRICT OF CALIFORNIA
7
8    BARNES & NOBLE, INC., *et al.*,                No. C-11-2709 EMC
9              Plaintiffs,
                                                   **ORDER GRANTING IN PART AND**
10         v.                                       **DENYING IN PART DEFENDANTS'**
                                                   **MOTION TO STRIKE**
11   LSI CORPORATION, *et al.*,
                                                   **(Docket No. 71)**
12             Defendants.
     _____/
13
14
15         Pending before the Court is Defendants' motion to strike Plaintiff Barnes & Noble's ("BN")

16   affirmative defenses.  Docket No. 71.  After considering the parties' submissions and oral argument,

17   the Court hereby enters the following order.

18                    **I.    FACTUAL & PROCEDURAL BACKGROUND**

19         Plaintiffs BN and BN.com are manufacturers and sellers of the Nook e-reader.  On June 6,

20   2011, Plaintiffs filed this declaratory judgment action for non-infringement of patents related to

21   Nook's 3G, WiFi, and audio technology.  Docket No. 1.  The operative First Amended Complaint

22   ("FAC") alleges non-infringement and invalidity of eleven patents held by Defendants LSI and

23   Agere.  Docket No. 25.  Defendants moved to dismiss Plaintiffs' complaints, which this Court

24   denied on October 18, 2011.  Docket No. 61.  Defendants then filed an answer asserting

25   counterclaims against Plaintiffs for infringement of one or more (unspecified) claims of each of the

26   ///

27   ///

28   ///

United States District Court

For the Northern District of California

eleven patents-in-suit.[1]  Docket No. 62 ("D's Answer").  Plaintiffs answered those counterclaims, asserting eight affirmative defenses:

    1.     Non-Infringement

    2.     Invalidity

    3.     Unenforceability due to standards-setting misconduct (on the grounds of estoppel, fraud, laches, waiver, implied waiver, unclean hands, patent exhaustion, implied license, and/or other equitable doctrines)

    4.     Prosecution History Estoppel/Judicial Estoppel

    5.     No Injunctive Relief

    6.     License

    7.     35 U.S.C. §§ 287 & 288

    8.     Failure to State a Claim

Docket No. 66 ("P's Answer").  Defendants now move to strike Plaintiffs' third, fourth, fifth, sixth, and eighth affirmative defenses.

## II.   DISCUSSION

A.    Motion to Strike

    1.    Legal Standard

       Under Federal Rule of Civil Procedure 8(b)(1), a party is required to "state in short and plain terms its defenses to each claim asserted against it."  Fed. R. Civ. P. 8(b)(1).  The purpose of such a requirement is to give the plaintiff fair notice of the defense.  *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 827 (9th Cir.1979).  Under Rule 12(f), "[a] court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Most courts have held that the *Ashcroft/Twombly* pleading standards apply to affirmative defenses, such that they must state a plausible claim for relief.  *See, e.g., Barnes v. AT & T Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1171-72 (N.D. Cal. 2010) (Patel, J.) ("While

---

    [1] Six patents fall within the WiFi Patent category ('867, '182, '732, '958, '582, and '633); three patents fall within the 3G Patents category ('420, '552, '073); and two patents fall within the Multimedia Patent category ('730, '091).  *See* Mot. at 2-3.

**United States District Court**

For the Northern District of California

1   neither the Ninth Circuit nor any other Circuit Courts of Appeals has ruled on this issue, the vast

2   majority of courts presented with the issue have extended *Twombly's* heightened pleading standard

3   to affirmative defenses."); *J & J Sports Productions, Inc. v. Mendoza-Govan*, No. C 10-05123

4   WHA, 2011 WL 1544886, at *1 (N.D. Cal. Apr. 25, 2011) ("*Twombly* 's heightened pleading

5   standard applies to affirmative defenses."); *Bottoni v. Sallie Mae, Inc.*, No. C 10-03602 LB, 2011

6   WL 3678878, at *1 (N.D. Cal. Aug. 22, 2011) ("[C]ourts in this district consistently have applied

7   the *Twombly-Iqbal* pleading standard to the pleading of affirmative defenses, requiring a defendant

8   to allege enough facts to state a claim to relief that is plausible on its face.").

9          Aside from insufficiency, "[i]mmaterial matter is that which has no essential or important

10  relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc. v. Fogerty*, 984 F.2d

11  1524, 1527 (9th Cir. 1993) (internal quotation marks omitted), *overruled on other grounds*, *Fogerty*

12  *v. Fantasy, Inc.*, 510 U.S. 517 (1994).  As indicated by the language of the rule, "'[t]he function of a

13  12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating

14  spurious issues by dispensing with those issues prior to trial. . . .'" *Id.*  When ruling on a motion to

15  strike, a court views the pleading under attack in the light most favorable to the nonmoving party.

16  *See RDF Media Ltd. v. Fox Broad. Co.*, 372 F. Supp. 2d 556, 561 (C.D. Cal. 2005).

17         Plaintiffs argue that the *Twombly/Iqbal* standard should not apply to affirmative defenses.

18  *See* Opp. at 2 & n.1.  Plaintiffs contend that there is no reason to subject them to a heightened

19  pleading requirement at such an early stage of the litigation, when Defendants can explore the bases

20  for their affirmative defense through discovery.  *See* Opp. at 4; *see also Saeedi v. M.R.S. Associates,*

21  *Inc.*, No. C 07-01584(RS), 2007 WL 1875975, at *1 (N.D. Cal. Jun. 28, 2007) ("No rule or policy

22  weighs against requiring Saeedi to use the discovery process to explore what, if any, factual and

23  evidentiary basis M.R.S. may have to support th[e] averment [that it acted according to a bona fide

24  error].").[2]  However, *Twombly's* rationale of giving fair notice to the opposing party would seem to

25  apply as well to affirmative defenses given the purpose of Rule 8(b)'s requirements for defenses.

26  *Barnes*, 718 F. Supp. 2d at 1172.  "Applying the same standard will also serve to weed out the

27  ─────────────────────

28         [2]  It should be noted that *Saeedi* was decided just after *Twombly* and does not cite to it.

United States District Court

For the Northern District of California

1  boilerplate listing of affirmative defenses which is commonplace in most defendants' pleadings

2  where many of the defenses alleged are irrelevant to the claims asserted." *Id.*  While some courts

3  declined to apply *Twombly* and *Iqbal* to defenses, they appear to be in the minority.  *Id.*; *see also J &*

4  *J Sports Prods. v. Coyne*, No. C 10-04206 CRB, 2011 U.S. Dist. LEXIS 6623, at *4-6 & n.2 (N.D.

5  Cal. Jan. 24, 2011) ( striking defenses for failure to provide sufficient notice to the opposing party,

6  even without applying the heightened plausibility standard).

7       On the other hand, there is much uncertainty as to the applicability of *Twombly* and *Iqbal* to

8  patent litigation generally, at least where, as here, the local rules prescribe a detailed process

9  requiring prompt disclosure of specific bases for claims and defenses.  *See, e.g.*, *ASUSTeK*

10  *Computer Inc. v. AFTG-TG LLC*, No. 5:CV 11-00192-EJD, 2011 WL 6845791, at *13 (N.D. Cal.

11  Dec. 29, 2011) ("[R]equiring a heightened pleading of invalidity would circumvent this Court's

12  Patent Local Rules which require detailed disclosures as to invalidity contentions soon after the suit

13  is filed."); *Xilinx, Inc. v. Invention Inv. Fund I LP*, No. C 11-0671 SI, 2011 WL 3206686, at *6

14  (N.D. Cal. July 27, 2011) (noting examples of conflict between local rules and *Twombly/Iqbal* in

15  certain circumstances, but finding that a "bare-bones recitation of statutes does not meet the

16  requirements of *Twombly* and *Iqbal* and does not put defendants on notice of the basis of Xilinx's

17  claims of invalidity").

18       Moreover, Plaintiffs' cite *Vistan*, in which the court concluded that detailed affirmative

19  defenses were unnecessary where, as here, the opposing party had not yet identified which claims of

20  the patents-in-suit were allegedly infringed.  *Vistan Corp. v. Fadei USA, Inc.*, No. C-10-4862 JCS,

21  2011 WL 1544796, at *7 (N.D. Cal. Apr. 25, 2011) ("These affirmative defenses, while boilerplate,

22  are standard affirmative defenses, appropriate at the outset of the case before discovery has

23  commenced.").  It is unreasonable to expect a party to detail affirmative defenses which depend on

24  the nature of the infringement claims when such claims are not detailed in the complaint or

25  counterclaim.  What is good for the goose's complaint should be good for the gander's answer.

26       Therefore, the Court will address each disputed defense below, keeping in mind the fact that

27  Defendants have yet to reveal which claims of each patent they allege is infringed by Plaintiffs and

28  given the practical needs of the litigation in view of the Patent Local Rules.

2.      Third Affirmative Defense - Unenforceability[3]

Defendants argue that Plaintiffs fail to plead facts sufficient to state a claim for relief under any of their grounds for unenforceability, which include "estoppel, fraud, waiver, implied waiver, unclean hands, patent exhaustion, implied license, and/or other equitable doctrines." P's Answer ¶ 93. Specifically, Defendants raise the following arguments:

a.      Failure to Allege Facts Sufficient to Impute Acts of Predecessor Entity to the Defendants

Defendants argue that Plaintiffs fail to plead facts sufficient to impute the acts of Lucent, a predecessor entity, to Defendants. Plaintiffs allege that based "[o]n information and belief supported by publicly available documents," Lucent is a predecessor-in-interest to LSI/Agere. *See, e.g.*, P's Answer at 15 ¶ 11, 20 ¶ 60. Plaintiffs' third affirmative defense of unenforceability includes numerous factual allegations of misconduct by Lucent, including misrepresentations to, and failure to follow the disclosure rules of, various standard-setting organizations ("SSOs") of which Lucent (and, in certain cases, Defendants) were members. Specifically, Plaintiffs allege that Lucent "intentionally and knowingly made material misrepresentations and/or omissions in connection with standards-setting organizations," *e.g.*, by failing to report that certain of its patents – now implicated in this suit – were applicable or essential to the proposed standards those SSOs later adopted. *See, e.g.*, FAC ¶¶ 35-40.

Defendants claim these allegations are insufficient to connect them to any conduct by Lucent. While not entirely clear, Defendants appear to be making a two-part argument: (1) that Plaintiffs have not alleged facts sufficient to demonstrate that Lucent was a predecessor-in-interest; and (2) that, even assuming Lucent is a predecessor, its conduct may not be imputed to Defendants for purposes of Plaintiffs' defenses. Plaintiffs respond that in the context of their defenses, any conduct by a predecessor patentee is imputed to the subsequent assignee. Plaintiffs also claim they

---

[3] P's Answer ¶ 93 ("[T]he Asserted Patents are unenforceable against BN on the grounds of estoppel, fraud, waiver, implied waiver, unclean hands, patent exhaustion, implied license, and/or other equitable doctrines."). Paragraph 93 is only a summary of this affirmative defense; Plaintiffs have included substantial accompanying factual allegations.

United States District Court

For the Northern District of California

1    have adequately alleged that Lucent was a predecessor-in-interest.  Accordingly, Plaintiffs argue,

2    Lucent's conduct may be imputed to Defendants.

3            With respect to the first part of Defendants' argument, Defendants cite to *Palestini* for the

4    proposition that merely alleging on information and belief that an entity is a successor in interest is

5    insufficient.  *See* Reply at 10 (citing *Palestini v. Homecoming Fin., LLC*, 2010 WL 3339459, at *2

6    (S.D. Cal. Aug. 23, 2010) ("Plaintiffs assert that they are 'informed and believe, and thereon allege,

7    that GMAC has assumed ownership and control of Homecomings and is liable for Homecomings'

8    acts and omissions as a successor in interest.' . . . Plaintiffs' allegations that GMAC has assumed

9    "ownership and control" over Homecomings appear to be based on pure speculation and do not

10   appear to be based on facts.").  However, *Palestini* is not directly on point because it does not

11   address patent law or the imputation of conduct from assignors to assignees of a patent.  Moreover,

12   Plaintiffs' allegation is supported by a judicially-noticeable SEC filing from Agere explaining that

13   Lucent created Agere in 2000.  Anderson Decl., Ex. A, at 3 (Agere's Form 10-K); *see In re Toyota*

14   *Motor Corp.*, 785 F. Supp. 2d 883, 903 (C.D. Cal. 2011) (taking judicial notice of a Form 10-K

15   filing in addressing a motion to dismiss); Fed. R. Evid. 201.  Four of the patents-in-suit, attached to

16   the FAC, also list Lucent as the original assignee of the patent.  *See* FAC, Docket No. 25 (listing

17   Lucent as the assignee for the '730, '182, '552, and '073 patents).  Accordingly, Plaintiffs have

18   sufficiently pled that Lucent is a predecessor of Defendants.

19           As for the second part of their argument, Defendants claim that Lucent's conduct may not be

20   imputed to them because its conduct does not run with the patent.  Defendants rely primarily on

21   *Vizio, Inc. v. Funai Elec. Co. Ltd.*, No. 09-0174, 2010 WL 7762624 (C.D. Cal. Feb. 3, 2010), an

22   antitrust case in which the court considered the relevance of a predecessor patent-holder's

23   membership in an SSO and commitment to that SSO to license its patent on a FRAND[4] basis.  *See*

24   *id.* at *4-6.  Vizio sought to hold Funai liable under antitrust laws for its predecessor patentee's

25

26           [4] FRAND describes a commitment to license patents which are essential to an SSO's
     adopted standard on fair, reasonable, and nondiscriminatory terms.  As *Vizio* explains, "FRAND
27   commitments are not required by law, but are required by the standard-setting organizations . . .
     before they will issue a standard that requires the utilization of a patent."  *Vizio*, 2010 WL 7762624
28   at *1 n.3.

**United States District Court**
For the Northern District of California

commitments to the SSO, arguing that Funai's conduct in repudiating the predecessor's FRAND commitments caused harm to competition. The court held that, while some courts had found harm to competition when a patent holder deceived an SSO and the SSO relied on that deception, Vizio had not alleged an antitrust claim against Funai because only "[Funai's predecessor] – not Funai – participated in the standard-setting process and entered into the FRAND agreement with the [SSO]." *Vizio*, 2010 WL 7762624 at *6. Since Funai had not participated in the SSO, the court found that there could be no antitrust claim for reneging on promises its predecessor made to that SSO.

*Vizio* is inapposite. *Vizio* does not resolve the question at issue here because it does not consider patent law or any defenses to the enforceability of a patent. Rather it concerned culpability and liability for an anti-trust violation. Imposing liability for tort-like conduct of a predecessor is an entirely different proposition than assessing the validity and enforceability of a property right obtained from a predecessor. *Vizio* says nothing about the issue presented here. The case at bar involves property rights other than liability for tortious personal conduct at issue in *Vizio*.

In contrast to *Vizio*, there are a number of cases that are more on point suggest that Lucent's conduct may be imputed to Defendants for at least some theories of unenforceability of patent rights, including laches, estoppel, and inequitable conduct. *See Eastman Kodak Co. v. Goodyear Tire, & Rubber Co.*, 114 F.3d 1547, 1559 (Fed. Cir. 1997) ("Zimmer's actions prior to the assignment of the patent rights are imputed to Eastman. A patentee cannot avoid the consequences of his laches by transferring the patent."), *abrogated on other grounds by Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448 (Fed. Cir. 1998); *Teradyne, Inc. v. Hewlett-Packard Co.*, No. C-91-0344 MHP, 1994 WL 327213, at *3-7 (N.D. Cal. June 24, 1994) (treating allegedly misleading conduct of Zehntel, predecessor entity to Teradyne, as equivalent to Teradyne's conduct for purposes of equitable estoppel defense to patent infringement claim); *In re Novon Int'l., Inc.*, No. 98-CV-0677E, 2000 WL 432848, at *5 (W.D.N.Y. Mar. 31, 2000) ("While the assignee of a patent becomes vested with the rights of the patentee, he also takes subject to the legal consequences of the patentee's previous acts, and subject to the licenses previously granted by assignor.") (quoting 5 E. Lipscomb, Walker on Patents § 19:22 (1986)); *In re Access Beyond Technologies, Inc.*, 237 B.R. 32, 38 n.5 (Bankr. D. Del. 1999) ("3Com acknowledges that federal law regarding the assignment of patents makes patent

1    assignments subject to the conditions of any licenses or other rights previously conferred by the

2    patent holders.") (citing *Waterman v. Mackenzie*, 138 U.S. 252, 256 (1891); *American Dirigold*

3    *Corp. v. Dirigold Metals Corp.*, 125 F.2d 446, 452 (6th Cir. 1942)); *ISCO Int'l., Inc. v. Conductus,*

4    *Inc.*, 279 F. Supp. 2d 489, 502-04 (D. Del. 2003) (adopting jury's findings that a patent was

5    unenforceable due to inequitable conduct based on actions of a previous assignee of the patent);

6    *Tompkins v. St. Regis Paper Co.*, 236 F. 221 (2d. Cir. 1916) (stating, in the context of laches, "that

7    the negligence or acquiescence of a former owner has the same effect upon the assignee's rights as

8    his own neglect or acquiescence").  *See also Sanofi-Aventis v. Apotex Inc.*, 659 F.3d 1171 (Fed. Cir.

9    2011) (though not directly addressing the question, considering conduct by non-party corporate

10   owner of plaintiff in context of a patent misuse defense and alleged disclosure violations to SSOs).

11        Defendants attempt to distinguish these cases on three bases.  First, Defendants assert that

12   cases holding that certain rights (*e.g.*, licenses) run with the patent, such as *In re Novon*, do not

13   apply here because, unlike in *Novon*, here there was and is no license between the parties.  *In re*

14   *Novon*, 2000 WL 432848 at *5.  However, Plaintiffs' unenforceability defenses do not rest solely on

15   the scope of an express or implied license.  Instead, their allegations rest on theories of

16   misrepresentation and reliance, independent of any license agreement.  More importantly, *Novon*

17   states that not only licensing agreements, but also any of "the patentee's previous acts" that have

18   "legal consequences," flow to the new assignee of a patent.  *Id.* at *5.  *Novon* is thus broader than

19   Defendants acknowledge and covers more than licensing agreements alone.  Furthermore, it defies

20   logic to suggest that where a predecessor's conduct renders a patent unenforceable, the successor's

21   rights are enlarged so long as patent rights are transferred by a mechanism other than a license.

22        Defendants further assert that the inequitable conduct cases are inapposite to Plaintiffs'

23   allegations of standards-setting misconduct because "inequitable conduct concerns fraud committed

24   by persons owing a duty of candor to the USPTO[5] in which the fraud concerns matters material to

25   patentability itself."  Reply at 11.  It is not entirely clear what Defendants mean by this argument,

26   but they seem to distinguish between fraud prior to issuance of the patent (*e.g.*, inequitable conduct)

27

28        [5] U.S. Patent and Trademark Office.

United States District Court

For the Northern District of California

and fraud subsequent to its issuance.  Yet Defendants are unable to articulate why this distinction matters, as both kinds of misconduct can render a patent unenforceable.  For example, courts have found patents unenforceable based on misrepresentations to SSOs that are similar to Plaintiffs' allegations.  *See, e.g.*, *Stambler v. Diebold, Inc.*, No. 85-CV-3014, 1988 WL 95479, at *6 (E.D.N.Y. Sept. 2, 1988) (finding estoppel and laches barred infringement claim based on plaintiff's failure to disclose patent to SSO because "Plaintiff could not remain silent while an entire industry implemented the proposed standard and then when the standards were adopted assert that his patent covered what manufacturers believed to be an open and available standard").  With respect to the question of whether Defendants are accountable for Lucent's conduct, there is no salient distinction between the type of equitable defense asserted in *Stambler* and one based on inequitable conduct before the Patent Office.  Both types of conduct could render a patent unenforceable, and a patentee cannot revive the enforceability of her patent merely by assigning it to a new assignee.  *See Eastman*, 114 F.3d at 1559 ("A patentee cannot avoid the consequences of his [conduct] by transferring the patent.").  Indeed, a contrary holding would result in a perverse policy outcome – a culpable patentee would effectively immunize itself by selling the patent to an assignee free of any encumbrance which would otherwise attach – and obtain full value therefor.

Finally, Defendants argue that the laches and equitable estoppel cases to which Plaintiffs cite – namely, *Eastman* and *Teradyne* – are distinguishable because both *Eastman* and *Teradyne* involve defenses that are "personal in nature and do not run with the conveyance of a patent" because they "involve conduct directed towards a known defendant."  Reply at 11.  However, such a rationale does not appear in either *Eastman* or *Teradyne* and it is not clear how such a distinction is salient.  While laches is, in some sense, inherently "personal" insofar as it requires an inquiry into when a patentee knew (or should have known) of a particular defendant's infringement, *see Eastman*, 114 F.3d at 1559, nothing in *Eastman* suggests that a defense such as laches could not apply in the context of, *e.g.*, a patentee's public conduct indicating that it would not enforce a patent as against a category of entities practicing an SSO-adopted standard.  *See id.* (describing the two elements of laches as requiring the following: "First, Goodyear must prove that Eastman [or its predecessor] delayed filing suit an unreasonable and inexcusable length of time.  Second, Goodyear must also

United States District Court

For the Northern District of California

prove that the delay caused it prejudice or injury") (citing *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992) (en banc).  In addition, equitable estoppel need not involve "personal" conduct between the parties.  *Compare Teradyne*, 1994 WL 327213 at *3-7 (considering patentee's and predecessor's allegedly misleading conduct toward defendant for purposes of equitable estoppel analysis), *with Stambler*, 1988 WL 95479 at *6 (finding equitable estoppel based in part on patentee's misleading failure to inform an SSO that certain standards infringed its patent).  Neither *Eastman* nor *Teradyne* based its finding that a predecessor's conduct was imputed to the current patentee on the fact that the predecessor had directly engaged with the defendant.  Rather, the courts simply considered the patentee's and its predecessor's conduct together to determine whether such conduct satisfied the elements of the relevant defenses.  Defendants' argument is therefore unpersuasive.

Defendants' motion to strike Plaintiffs' affirmative defenses insofar as they are based on Lucent's conduct (and not Defendants') is **DENIED**.

> b.   Failure to State a Claim of Unenforceability

Defendants next contend that Plaintiffs fail to sufficiently plead the elements of each theory of unenforceability raised.  Plaintiffs acknowledged in their briefing and at oral argument that this defense does not apply to the Multimedia Patents ('730 and '091).  *See* Opp. at 14 n.3.

> i.   Fraud

To make out a fraud claim, Plaintiffs must demonstrate the following elements: "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, *i.e.*, to induce reliance; (4) justifiable reliance; and (5) resulting damage."  *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1099 (N.D. Cal. 2007) (citing *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004)).  Rule 9(b) requires that a claim for fraud be pled with particularity.  More specifically, the rule "demands that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong. . . . Accordingly, [t]o avoid dismissal for inadequacy under Rule 9(b), [the] complaint would need to state the time, place, and specific content of the false representations as

well as the identities of the parties to the misrepresentation." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010) (internal quotation marks omitted); *In re BP Lubricants USA Inc.*, 637 F.3d 1307, 1327 (Fed. Cir. 2011) ("Rule 9(b) requires a plaintiff to plead in detail the specific who, what, when, where, and how of the alleged fraud.") (internal citations and quotation marks omitted). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be averred generally." Fed. R. Civ. P. 9(b). Defendants argue that Plaintiffs fail to sufficiently plead fraud for five reasons, set forth below.

As a preliminary matter, one issue the parties have failed to address is whether Ninth Circuit or Federal Circuit law controls in determining whether Plaintiffs' allegations satisfy the Rule 9(b) standards for alleging fraud. "[T]he Federal Circuit [] review[s] procedural matters, that are not unique to patent issues, under the law of the particular regional circuit court where appeals from the district court would normally lie." *Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1574-75 (Fed. Cir. 1984), *overruled on other grounds by Richardson-Merrell Inc. v. Koller*, 472 U.S. 424 (1985); *see also Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1360 (Fed. Cir. 2001) ("We apply regional circuit law to procedural questions that are not themselves substantive patent law issues so long as they do not: (1) pertain to patent law; (2) bear an essential relationship to matters committed to our exclusive control by statute; or (3) clearly implicate the jurisprudential responsibilities of this court in a field within its exclusive jurisdiction.") (internal citations and quotations omitted); *Flex-Foot, Inc., v. CRP, Inc.*, 238 F.3d 1362, 1365 (Fed. Cir. 2001) ("[W]e will apply our own law to both substantive and procedural issues 'intimately involved in the substance of enforcement of the patent right'" (citation omitted)).

The Federal Circuit has expressly held that its law controls over the question of whether inequitable conduct has been pleaded with particularity under Rule 9(b).[6] *Central Admixture*

---

[6] The Federal Circuit's holding contradicted virtually every prior district court decision, which had applied regional circuit law. *See, e.g.*, *Stowe Woodward, L.L.C. v. Sensor Products, Inc.*, 230 F.R.D. 463, 466 (W.D. Va. 2005) ("Utilization of Fourth Circuit law regarding what constitutes particularity in pleading fraud is appropriate. . . . The requirements of particularity under Rule 9(b) are not unique to patent issues.") (citing *Panduit*, 744 F.2d at 1574-75); *Davidson v. Cao*, 211 F. Supp. 2d 264, 285 (D. Mass. Apr 11, 2002) (concluding that regional circuit law applied to analysis of Rule 9(b) requirements in the context of an inequitable conduct claim) (citing *Systemation, Inc. v. Engel Industries, Inc.*, 183 F.R.D. 49, 51 (D. Mass. Oct 30, 1998) (same)); *see also Optical Coating*

United States District Court

For the Northern District of California

1   *Pharmacy Svcs., Inc. v. Adv. Cardiac Solutions, P.C.*, 482 F.3d 1347, 1356 (Fed. Cir. 2007)

2   ("Whether inequitable conduct has been adequately pled is a procedural matter, but since it bears on

3   an issue that pertains to or is unique to patent law, we will apply our own law to the question of

4   whether the pleadings were adequate.") (internal citations and quotation marks omitted); *Exergen*

5   *Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1326-1327 (Fed. Cir. 2009) ("[W]e apply our own

6   law, not the law of the regional circuit, to the question of whether inequitable conduct has been

7   pleaded with particularity under Rule 9(b)."). Recent Federal Circuit case law suggests that its law

8   may apply across the board to fraud claims in patent cases. *See In re BP Lubricants*, 637 F.3d at

9   1311 (applying *Exergen* to a false marking claim and stating that "*Exergen*'s pleading requirements

10   apply to all claims under Rule 9(b), not just inequitable conduct cases.").

11          On the other hand, both *BP Lubricants* and *Exergen* are distinguishable on the basis that they

12   consider fraud claims specific to the patent context, inequitable conduct and false marking. By

13   contrast, in this case Plaintiffs raise a general fraud defense, which would suggest that Ninth Circuit

14   law should control on the question of what constitutes sufficient pleading. Indeed, the elements of

15   their fraud claim do not derive from any patent-specific context; both parties cite to California law

16   for the elements of fraud. *See* Mot. at 6; Opp. at 7. The sufficiency of Plaintiffs' allegations do not

17   appear to be unique to patent issues, as they merely concern what level of detail Plaintiffs' must

18   include in their pleadings. However, given the broad language in *BP Lubricants*, the Court will refer

19   to both Ninth Circuit and Federal Circuit law where necessary in the following sections.

20                          (a)        Identifying False/Misleading Statements/Omissions

21          Defendants first contend that Plaintiffs have failed to identify any false or misleading

22   statements or omissions and have failed to explain why they were misleading or false. Mot. at 7.

23   However, Plaintiffs' answer identifies numerous misrepresentations Defendants and Lucent

24   allegedly made to SSOs related to the patents-in-suit. Plaintiffs identify specific individual

25   employees of Defendants and Lucent who attended specific SSO meetings; they also identify

26   ─────────────────

27   *Lab., Inc. v. Applied Vision Ltd.*, No. C-92-4689 MHP, 1995 WL 150513, at *3 (N.D. Cal. March
      20, 1995) (applying Ninth Circuit standards to inequitable conduct pleading without addressing the

28   question); *Intex Recreation Corp. v. Team Worldwide Corp.*, 390 F.Supp.2d 21, 24 (D.D.C. 2005)
      (applying DC Circuit law to 9(b) analysis of inequitable conduct claim).

**United States District Court**

For the Northern District of California

specific statements that they allege were false or misleading, or omissions they say those persons intentionally made. *See, e.g.*, P's Answer at 18 ¶ 30 - 20 ¶ 46 (setting forth who allegedly attended IEEE meetings, the dates on which those meetings took place and their location, and the allegedly false statements made by those present at the meetings that no patents were related to the standards under consideration); *id.* at 23 ¶ 78 - 25 ¶ 87 (setting forth who allegedly attended ETSI[7]/3GPP[8] meetings, the dates of certain meetings, and the fact that Defendants allegedly failed to disclose that any of the 3G Patents were or may be essential to the standards considered at those meetings). Plaintiffs allege that Defendants' statements and omissions were misleading/false because despite statements to the contrary and the failure to disclose, Defendants in fact had already submitted the relevant patent applications and because Defendants now claim that their patents are indeed infringed by the standards. *See* Opp. at 11-12; *see, e.g.*, P's Answer at 15 ¶ 4 (explaining that Defendants allege products compliant with the IEEE 802.11 standards infringe the WiFi Coding Patents); ¶¶ 40, 43, 46 (alleging that Defendants represented that there were no patents applicable to the 802.11 standards).

While Defendants may dispute the falsity of their statements (and, as discussed more below, the scope of their duty to disclose), these allegations are sufficient at this stage to render Plaintiffs' claims plausible and give Defendants particularized notice of the allegedly misleading statements and omissions. *Cf. Central Admixture Pharmacy Svcs.*, 482 F.3d at 1356-57 (finding allegation that "patentee failed to disclose all of the relevant prior art known to it" insufficient because it did not "identify what relevant and undisclosed prior art was known to the patentee"). Some of Defendants' qualms are more suited to a factual inquiry and further development after discovery. For example, the parties seem to dispute whether the date of the patents' issuance or the date of its application is relevant for purposes of determining whether Defendants made false statements to the SSOs; this is relevant because many of the patent applications were filed before the allegedly false statements but the patents were issued after those statements. *Compare, e.g.*, Mot. at 10 ("The Answer on file in

---

[7] European Telecommunications Standards Institute.

[8] Third Generation Partnership Project.

1   this Action shows that the '182 Patent was issued on January 19, 1999."), *with* P's Answer at 15 ¶ 6

2   ("The '182 patent issued from Application No. 08/688,574, filed on June 30, 1996."), *and id.* ¶¶ 29-

3   46 (alleging fraudulent conduct occurring in the spring and summer of 1998, after the '182 patent

4   application was filed but before the patent was issued).  The parties also dispute whether

5   Defendants' alleged standards-setting misconduct would render certain continuation patents

6   unenforceable because they refer back to the original patents Defendants allegedly failed to disclose,

7   even though Defendants did not actually apply for these continuation patents until *after* the alleged

8   misconduct.  *See, e.g.*, P's Answer at 15 ¶ 10 (listing a patent for which an application was filed in

9   2006 as among the patents rendered unenforceable due to previous misconduct before the IEEE

10  because it referred back to a previous patent).  At this stage of the litigation, resolving these disputes

11  without factual development and context would be premature.

12                                  (b)      Duty to Disclose

13          Where a fraud claim is based on the omission of information, a party must generally

14  demonstrate that there was a duty to disclose such information.  *See Chamberlan v. Ford Motor Co.*,

15  369 F. Supp. 2d 1138, 1144 (N.D. Cal. 2005) ("To establish a fraud tort claim based on failure to

16  disclose a material fact, a plaintiff must prove, among other things, the existence of a duty of

17  reasonable care and an intentional breach of that duty") (citing *LiMandri v. Judkins*, 52 Cal. App.

18  4th 326, 336 (1997)).  The exception to this rule is where a party volunteers information, in which

19  case "the telling of a half-truth calculated to deceive is fraud."  *Vega v. Jones, Day, Reavis & Pogue*,

20  121 Cal. App. 4th 282, 292 (2004) ("Even where no duty to disclose would otherwise exist, where

21  one does speak he must speak the whole truth to the end that he does not conceal any facts which

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

14

United States District Court

For the Northern District of California

1  materially qualify those stated.") (internal citations and quotation marks omitted).[9]  Defendants

2  argue that Plaintiffs have failed to adequately allege a duty to disclose.

3      A duty to disclose may arise out of membership in an SSO.  *See Rambus Inc. v. Infineon*

4  *Technologies Ag*, 318 F.3d 1081, 1096 (Fed. Cir. 2003); *Qualcomm Inc. v. Broadcom Corp.*, 548

5  F.3d 1004, 1012 (Fed. Cir. 2008).  Plaintiffs allege that Defendants had a duty to disclose based on

6  their membership in two SSOs, the IEEE[10] and the ETSI[11]/3GPP.[12]  P's Answer at 16 ¶ 15, 22 ¶¶ 64-

7  72.  Defendants contend that the policies of these SSOs do not impose a duty to disclose.  Mot. at 7.

8  However, the language Defendants cite implies such a duty.  For example, the IEEE bylaws provide

9  that the IEEE may only include patents in standards if it "receives assurance from the patent holder

10  that it will license applicants under reasonable terms and conditions for the purpose of implementing

11  the standard.  This assurance shall be provided without coercion and prior to approval of the

12  standard . . . ."  Ranganath Decl., Ex. A ¶ 6.  Such language implies that patent holders must disclose

13  any patents that would be included in standards under consideration so that the IEEE can ensure

14  compliance with its criteria.  The other SSO's policy language is even more specific.  *See* P's

15  Answer at 22 ¶ 69 ("[E]ach member shall use its reasonable endeavours, in particular during the

16  development of a standard or technical specification where it participates, to inform ETSI of

17  essential [Intellectual Property Rights] in a timely fashion.").  Thus, there is at least a factual dispute

18  over the nature and scope of the duty imposed by these SSO policies, which would require further

19  _____

20      [9]  Defendants argue in their Reply that "fraudulent concealment" is a different claim from
   "fraud," and that Plaintiffs have not pled fraudulent concealment.  However, while fraud based on
21  concealment typically requires a duty to disclose, as discussed above, the cases on which Defendants
   rely acknowledge that these claims are merely two iterations of the same general cause of action.
22  *See Vega*, 121 Cal. App. 4th at 292 ("Active concealment or suppression of facts by a nonfiduciary
   'is the equivalent of a false representation, i.e., actual fraud.'") (quoting 5 Witkin, Cal. Procedure
23  Pleading, § 678 (4th ed. 1997)); *Kaldenbach v. Mutual of Omaha Life Ins. Co.*, 178 Cal. App. 4th
   830, 850 (2009) (tweaking the fraud elements for the "more specific[]" cause of action for fraud
24  based on concealment).  Moreover, Plaintiffs' pleadings indicate that they have included facts
   touching on the duty to disclose.  Defendants' contention that Plaintiffs have not pled fraud based on
25  concealment therefore lacks merit.

26      [10]  Institute for Electrical and Electronics Engineers.

27      [11]  European Telecommunications Standards Institute.

28      [12]  Third Generation Partnership Project.

United States District Court
For the Northern District of California

1    inquiry unsuited for a motion to strike. *See Qualcomm*, 548 F.3d at 1012 ("The existence of a

2    disclosure duty is a legal question with factual underpinnings.") (citations omitted).

3            Moreover, as Plaintiffs point out, a disclosure duty may be implied by the conduct of the

4    SSO and its members, not merely from the SSO's written policies. *See Rambus*, 318 F.3d at 1098

5    ("[T]his court finds no language-in the membership application or manual excerpts-expressly

6    requiring members to disclose information. . . . Nevertheless, because JEDEC members treated the

7    language of Appendix E as imposing a disclosure duty, this court likewise treats this language as

8    imposing a disclosure duty."); *Qualcomm*, 548 F.3d at 1012 ("[T]o the extent the written [SSO]

9    policies are ambiguous, we must determine whether the [SSO] participants understood the policies

10   as imposing such obligations."). Plaintiffs allege that Defendants were present at certain SSO

11   meetings at which the duty to disclose was explained. *See* P's Answer at 18 ¶¶ 32, 35; 24 ¶ 81; 25 ¶

12   86. At this stage of the litigation, then, it would be premature to determine the full scope of the

13   disclosure duty imposed on Defendants. *See Qualcomm*, 548 F.3d at 1012 ("[O]ne such factual

14   underpinning [to the legal question of whether there is a duty to disclose] is the [SSO] participants'

15   understanding of the meaning of the [SSO's] policies."). Rather, Plaintiffs' allegations that

16   Defendants were members of the relevant SSOs, and that those SSOs required disclosure based on

17   their policies and practices, are sufficient to plead a duty. Furthermore, as noted above, Plaintiffs

18   allege Defendants made an affirmative misrepresentation to the IEEE.

19                              (c)      Essentiality of the Patents

20           Defendants argue that Plaintiffs have not sufficiently pled that the patents-in-suit are

21   essential to the SSO standards, such that any of Defendants' statements to the contrary would be

22   misleading or false. However, as Plaintiffs point out, Defendants themselves so plead in their

23   counterclaims, as they use the fact that Plaintiffs practice certain SSO standards as the basis for their

24   infringement claims. *See* Opp. at 10 (citing D's Answer ¶¶ 25-26, 37-38, 49-50, 61-62, 73-74,

25   85-86, 97-98, 109-110, 120-121). Thus, it is unclear why Plaintiffs would need to separately plead

26   the essentiality of the patents to these standards, as the whole premise of their defense is to respond

27   to Defendants' counterclaim allegations. Re-pleading facts the opposing party has already pled is

28   not necessary to put Defendants on notice of Plaintiffs' defenses. *See Baum v. Faith Technologies,*

United States District Court

For the Northern District of California

*Inc.*, No. 10-CV-0144 CVE TLW, 2010 WL 2365451, at *3 (N.D. Okla. June 9, 2010) ("The factual allegations contained in the complaint and answer are necessarily incorporated into a defendant's recitation of affirmative defenses.  It would be absurd to require a defendant to re-plead every fact relevant to an affirmative defense.")

(d)   <u>Intent</u>

Defendants next contend that Plaintiffs have failed to sufficiently plead intent.  Unlike the factual context of the alleged fraud, intent may be pleaded generally.  *See* Fed. R. Civ. P. 9(b).  In the instant case, Plaintiffs allege that Defendants, after knowing the disclosure requirements of the SSOs, intentionally misrepresented and concealed the fact that certain of their patents related to the standards those SSOs were considering so that the SSOs would adopt the standards Defendants proposed.  *See* P's Answer at 20 ¶¶ 48-51 (alleging intentional and knowing misrepresentation to the IEEE in bad faith, with the intent to induce reliance); *id.* at 25 ¶¶ 87-89 (alleging same with respect to the ETSI/3GPP).

Although prevailing Ninth Circuit law permits a plaintiff to allege the mere existence of intent, the Federal Circuit requires parties to allege facts sufficient to raise the inference of intent. *Compare Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007) ("While the factual circumstances of the fraud itself must be alleged with particularity, the state of mind-or scienter-of the defendants may be alleged generally.") (citing *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547 (9th Cir.1994) (en banc) ("We conclude that plaintiffs may aver scienter generally, just as the rule states-that is, *simply by saying that scienter existed.*") (emphasis added), *superseded on other grounds as stated in Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)); *Just Film, Inc. v. Merchant Services, Inc.*, No. C 10-1993 CW, 2011 WL 3809908, at *10 (N.D. Cal. Aug. 29, 2011) ("Scienter may be averred generally, simply by saying that it existed.") (citing *GlenFed*, 42 F.3d at 1547), *with Exergen*, 575 F.3d at 1327  ("Although 'knowledge' and 'intent' may be averred generally, our precedent, like that of several regional circuits, requires that the pleadings allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind.").

United States District Court

For the Northern District of California

1   Even under the Federal Circuit's more exacting standard, however, Plaintiffs' allegations are

2   sufficient.  For example, with respect to the WiFi Coding Patents at issue in the IEEE standards,

3   Plaintiffs allege that three of the patent applications were filed before the relevant IEEE meetings,

4   that Lucent employees (including inventors of each of the four patents) were present at specifically

5   listed IEEE meetings, that the IEEE informed meeting attendees of its disclosure policy and

6   requested the relevant disclosures, that certain Lucent employees proposed a standard for

7   consideration, that Lucent employees represented their were no applicable patents to their proposed

8   standard, and that this representation was knowingly and intentionally false.  P's Answer at 15 ¶ 4 -

9   21 ¶ 53.  These allegations are sufficient to "allege facts that would support a reasonable inference

10  that a relevant individual knew of the allegedly material information contained in" those patents.

11  *Exergen*, 575 F.3d at 1330.  Plaintiffs' second set of allegations related to the 3G Patents and the

12  ETSI/3GPP SSO are similarly sufficient to infer intent.  Plaintiffs list a large number of Lucent, LSI,

13  and Agere employees who were present at the SSO meetings, *see* P's Answer at 23 ¶ 78 - 25 ¶ 85,

14  and they allege that those attendees failed to disclose the 3G Patents at those meetings, *see id.* at 25

15  ¶¶ 87-88.  Given the level of detail Plaintiffs have provided with respect to specific meetings and

16  decision-making processes during which they allege Defendants made misrepresentations regarding

17  specific patents relevant to those processes, it is reasonable at this stage of the litigation to infer that

18  Defendants acted with the requisite state of mind.

19  Defendants also argue that Plaintiffs have failed to allege any intent to deceive *Plaintiffs*

20  specifically.  *See* Mot. at 14 (citing *Shapiro v. Sutherland*, 64 Cal. App. 4th 1534, 1548 (1998)

21  ("[F]or a defendant to be liable for fraud, he or she must intend that a particular representation (or

22  concealment) be relied upon by a specific person or persons.").  However, Plaintiffs have raised the

23  reasonable inference that Defendants intended to deceive not only the SSO's specifically, but all

24  entities that would adopt the SSO's standards and rely on the SSO's proceedings.  Indeed, Plaintiffs

25  state specifically that Defendants intended their communications "to be further communicated to the

26  IEEE, its members, and others who rely on 802.11 activities, including the public and relevant third-

27  parties."  P's Answer at 20 ¶ 49.  It is reasonable to infer that the "persons" to be deceived were

28  those entities that relied on and were bound by the SSO's adopted standards, because deceiving the

United States District Court
For the Northern District of California

1   SSO on its own would have no value unless other entities relied on and adopted the SSO's

2   standards.  Further pleading clarity is not necessary on this point.

3                              (e)      Reliance

4          Finally, Defendants argue that Plaintiffs have failed to plead reliance.  With respect to the

5   IEEE's activities, Plaintiffs plead "on information and belief supported by publicly available

6   documents, [that] the IEEE, its members, their successors, and customers throughout the supply

7   chain who rely on 802.11 activities, including BN and relevant third-parties, reasonably and

8   justifiably relied on the foregoing misrepresentations and/or omissions in adopting 802.11 standards

9   and by investing substantial resources designing, developing, and marketing products accused of

10  alleged infringement in this action."  P's Answer at 20 ¶ 52.  Plaintiffs' allegations regarding the

11  ETSI/3GPP activities are similar.  *See id.* at 25 ¶ 90.

12         While the Federal Circuit requires parties to explain the basis of their "information and

13  belief," *Exergen*, 575 F.3d at 1330,  Plaintiffs' detailed factual allegations throughout the

14  unenforceability section of their answer (described above) provide the necessary context from which

15  to infer reliance.  For example, it is reasonable to infer reliance by the IEEE based on the IEEE's

16  policies requiring disclosure and requiring it to obtain assurances regarding any patents relevant to

17  proposed standards before adopting them.  *See* P's Answer at 16 ¶ 15 ("IEEE standards may include

18  the known use of patent(s), including patent applications, if there is technical justification in the

19  opinion of the standards-developing committee and provided the IEEE receives assurance from the

20  patent holder that it will license applicants under reasonable terms and conditions for the purpose of

21  implementing the standard.").  Similarly, Plaintiffs allege that ETSI/3GPP also require disclosure,

22  suggesting that the information provided – or not provided – by SSO members during the standards-

23  setting process bears on the SSO's decision-making process.  Indeed, the fact that letters of

24  assurance were allegedly required from, and provided by, patentees in which patentees committed to

25  licensing any relevant patents on a FRAND basis necessarily anticipates reliance on those

26  commitments.  Otherwise, the process of acquiring LOAs would be a meaningless exercise.

27         Finally, Plaintiffs allege that they designed their products to comply with the relevant

28  standards, *see* P's Answer at 20 ¶ 52; 25 ¶ 95.  Although Plaintiffs do not provide additional detail

1   as to how and when they knew of the relevant standards and Defendants' purportedly misleading

2   statements, the allegation that they adopted the standards in question is sufficient to infer reliance on

3   the propriety of the standards-setting process itself.  *See Stambler*, 1988 WL 95479 at *5-6 (noting

4   in the context of estoppel that an industry, by adopting an SSO's standard, has a reliance interest

5   with respect to patentee's conduct before the SSO); *Lucas Aerospace, Ltd. v. Unison Industries,*

6   *L.P.*, 899 F.Supp. 1268, 1294 (D. Del. 1995) (noting that reliance can be found based on misleading

7   statements to an SSO "because once the industry standard was established, all members of the

8   industry had to conform their purchases to that standard").

9           Accordingly, Defendants' motion to strike Plaintiffs' claim for unenforceability based on

10  fraud is **DENIED**.

                              ii.       Equitable Estoppel

12          Defendants next argue that Plaintiffs have failed to adequately plead unenforceability based

13  on equitable estoppel.  Plaintiffs's equitable estoppel claim – and all of their remaining theories of

14  unenforceability – are based on the same facts alleged above; they do not plead them separately from

15  fraud.  An equitable estoppel claim requires an alleged infringer to demonstrate the following:

16          a.      The patentee, through misleading conduct, leads the alleged
                    infringer to reasonably infer that the patentee does not intend
17                  to enforce its patent against the alleged infringer. "Conduct"
                    may include specific statements, action, inaction, or silence
18                  where there was an obligation to speak.

19          b.      The alleged infringer relies on that conduct.

20          c.      Due to its reliance, the alleged infringer will be materially
                    prejudiced if the patentee is allowed to proceed with its claim.

21

22  *Aukerman*, 960 F.2d at 1028.  The parties do not address whether Rule 9(b) applies to an equitable

23  estoppel claim, but it is likely that it does.  *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-

24  04 (9th Cir. 2003) (holding that when claims are "grounded in fraud" or [] sound in fraud, [] the

25  pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)"); *Bayer*

26  *CropScience AG v. Dow AgroSciences LLC*, No. 10-1045 RMB/JS, 2011 WL 6934557, at *3 (D.

27  Del. Dec. 30, 2011) ("Because equitable estoppel has misleading conduct by the patent holder as one

28  of its elements, Defendant was required to plead this affirmative defense with particularity under

Rule 9(b).") (citing *Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1310 (Fed. Cir. 2010)); *Bild v. Konig*, No. 09-CV-5576, 2011 WL 666259, at *6 (E.D.N.Y. Feb. 14, 2011) (finding Rule 9(b) generally applicable to claims of equitable estoppel).

Based on the discussion above with respect to fraud, Plaintiffs have adequately alleged each element of equitable estoppel. Defendants' motion to strike the equitable estoppel defense is therefore **DENIED**.

### iii.   Laches

Defendants next contend that Plaintiffs have failed to adequately plead laches. "The application of the defense of laches is committed to the sound discretion of the district court." *Aukerman*, 960 F.2d at 1032. A laches claim requires proof of the following elements:

> 1.   the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant, and
>
> 2.   the delay operated to the prejudice or injury of the defendant.

*Id.* (citing *Costello v. United States*, 365 U.S. 265, 282 (1961)).

Plaintiffs concede that they have not alleged any facts specific to laches at this time, but contend that Defendants are on notice of the defense and that discovery is appropriate before any motion to strike the defense or motion for summary judgment on the defense. Opp. at 16-17. However, some factual support for their laches claim is both necessary and within Plaintiffs' ability to plead even absent discovery. *See Raychem Corp. v. PSI Telecommunications, Inc.*, Civ. No. C-93-20920 RPA, 1995 WL 108193, at *4 (N.D. Cal. 1995) (striking laches defense where, "[a]lthough PSI's opposition to this motion provides specific dates demonstrating Raychem's purported delay in bringing suit, there are no facts stated in PSI's Answer which support a laches defense"), *and Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905 RMW, 2007 WL 4062845, at *2 (N.D. Cal. Nov. 15, 2007) (defending utility of striking affirmative defenses in patent cases where no facts are alleged, to ensure that defendant has fair notice of the claims). Unlike other defenses which may turn on the nature of particular infringement claims, the laches defense need not await articulation of the infringement claims. Moreover, many facts relevant to laches should be

1    within Plaintiffs' knowledge.  Simply put, there is no excuse not to allege this defense with some

2    degree of specificity.  Indeed, at the argument herein, Plaintiffs admitted this defense was asserted

3    only as a placeholder.  Accordingly, Defendants' motion to strike Plaintiffs' laches defense is

4    **GRANTED** with leave to amend.

5                                    iv.    Waiver

6           Defendants next claim that Plaintiffs fail to allege unenforceability due to waiver.  A defense

7    of waiver requires a showing of "intentional relinquishment or abandonment of a known right."

8    *United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997).  Plaintiffs claim they have adequately pled

9    waiver because they allege Defendants have submitted LOAs to the IEEE and ETSI/3GPP that either

10   disclaim their rights or commit to license the WiFi Coding and 3G Patents.  Opp. at 17.  Plaintiffs

11   argue that the parties dispute whether Defendants' letters operate to disclaim or commit to license

12   their patents, and whether Defendants have met any commitment to license on a FRAND basis.

13   Although Defendants point out that some of the LOAs state specifically that Lucent did not intend to

14   relinquish its patent rights, it is not clear at this stage whether its commitment to license could

15   operate as a waiver of its rights to sue for infringement.  Given the parties' factual dispute over the

16   meaning of Defendants' letters to and conduct before the SSOs, striking this defense is premature.

17   Defendants' motion to strike is **DENIED** as to the waiver defense.

18                                    v.    Implied Waiver

19          Implied waiver in the context of standard-setting organizations requires a showing that "(1)

20   the patentee had a duty of disclosure to the standard setting organization, and (2) the patentee

21   breached that duty."  *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1348 (Fed. Cir.

22   2011).  As discussed above, Plaintiffs have adequately alleged a duty to disclose the relevant patents

23   to the SSOs, and they have alleged a failure to disclose.  Although Defendants argue that the

24   disclosure duty *can* be satisfied by LOAs, which were provided, that merely begs the question

25   whether these *particular* LOAs, and Defendants' subsequent conduct, actually satisfied the

26   disclosure duty.  *See* Mot. at 18-19.  That is an inquiry unsuited to this early stage of the litigation.

27   Defendants' motion to strike the implied waiver defense is **DENIED**.

28

vi.     Unclean Hands

A defense of unclean hands requires a showing "that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims." *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1313 (9th Cir. 1997) (citations omitted).  In the instant case, Plaintiffs' allegations regarding Defendants' misleading conduct before the SSOs are sufficient at this stage to render their defense plausible and put Defendants on notice of the claim.  Defendants' motion to strike the unclean hands defense is **DENIED**.

vii.     Patent Exhaustion

"The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item."  *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 625 (2008).  Defendants point out that Plaintiffs have not alleged any particular facts regarding an initial authorized sale (to, *e.g.*, any of Plaintiffs' component suppliers).  Plaintiffs argue in response that they believe they either have a license or an irrevocable right to license the WiFi Coding and 3G Patents.  They argue further that discovery will reveal whether their "component suppliers may be licensed under such patents," which would render Defendants' patent rights exhausted with respect to Plaintiffs' subsequent purchase of products from those suppliers Opp. at 20; *see also* 6 Moy's Walker on Patents § 19:33 (4th ed. 2011) (describing patent exhaustion as "focus[ing] on the right to control the specific article under patent law, and particularly whether that right of control is no longer with the patent owner, but rather has passed to the purchaser (and subsequent repurchasers) along with the article's physical possession").

The question of whether an authorized sale has taken place is information that is in the hands of Defendants and appropriate for discovery, especially given Defendants' failure to identify which claims of each patent they allege Plaintiffs have infringed.  In addition, Plaintiffs' detailed allegations that Defendants committed to the SSOs that they would license their patents make it plausible that such a license has in fact been granted to one or more of Plaintiffs' suppliers.  Accordingly, despite the dearth of facts in the answer, striking this defense is not warranted.  Defendants' motion to strike the patent exhaustion defense is **DENIED**.

United States District Court

For the Northern District of California

viii.    <u>Implied License</u>

"[A]n implied license [] signifies a patentee's waiver of the statutory right to exclude others from making, using, or selling the patented invention." *Wang Labs., Inc. v. Mitsubishi Electronics America, Inc.*, 103 F.3d 1571, 1580 (Fed. Cir. 1997). As the Supreme Court has explained, "Any language used by the owner of the patent, or any conduct on his part exhibited to another from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license and a defense to an action for a tort." *De Forest Radio Tel. Co. v. United States*, 273 U.S. 236, 241 (1927). "[I]mplied licenses arise by acquiescence, by conduct, by equitable estoppel (estoppel in pais), or by legal estoppel." *Wang*, 103 F.3d at 1580 (citations omitted).

Since, as noted above, Plaintiffs have adequately pled waiver and implied waiver at this stage, they have also pled implied license. *See Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 988, 1030 (N.D. Cal. 2009) ("[An implied license] is asserted on the theory that Rambus either waived its right to assert the patents-in-suit or that it is equitably estopped from doing so."). Defendants' motion to strike the implied license defense is **DENIED**.

3.    <u>Fourth Affirmative Defense - Prosecution History Estoppel / Judicial Estoppel</u>[13]

Defendants argue that Plaintiffs' Fourth Affirmative Defense – the entirety of which is included in the footnote below – is devoid of facts. Plaintiffs fail to identify any facts that would indicate these affirmative defenses apply to the case at bar.

With respect to the judicial estoppel claim, Defendants are correct that Plaintiffs must identify a factual basis for their defense so as to give Defendants fair notice of the claim. Such a claim would be based on public statements made to a court. There is no reason why Plaintiffs should not allege such facts.

---

[13] P's Answer ¶ 94 ("Counterclaimants are estopped from construing the claims in the Asserted Patents in such a way as to cover BN.s activities because of prior statements made in or to this Court or any other court, prior rulings of this or any other court, Counterclaimants. prior conduct, the amendment, cancellation, or abandonment of claims before the United States Patent and Trademark Office, and/or admissions or other statements made to the United States Patent and Trademark Office.").

1    However, with respect to the prosecution history defense, Defendants' failure to identify

2    which claims of each patent Plaintiffs have allegedly infringed makes it impossible for Plaintiffs to

3    plead facts supporting this defense at this stage of the litigation.  *See Vistan*, 2011 WL 1544796 at

4    *7.  Accordingly, Defendants' motion to strike the judicial estoppel defense is **GRANTED** with

5    leave to amend, and their motion to strike the prosecution history estoppel defense is **DENIED**.

6            4.    Fifth Affirmative Defense - No Injunctive Relief[14]

7            Defendants assert that Plaintiffs have failed to plead a defense of no injunctive relief.

8    However, as Plaintiffs point out and as discussed above, they have alleged that Defendants made

9    commitments to SSOs to either relinquish their rights or to grant irrevocable licenses to all

10   applicants on a FRAND basis.  Such a commitment would render injunctive relief unavailable.  This

11   defense has been asserted in this district with similar allegations.  *See, e.g.*, *Apple Inc. v. Samsung*

12   *Electronics Co.*, No. 11-1846 LHK, Docket No. 124, at 26 ("To the extent that Samsung seeks

13   injunctive relief for alleged infringement, the relief it seeks is unavailable because seeking injunctive

14   relief is contrary to its commitment to SSOs to license the Declared-Essential Patents on FRAND

15   terms and Apple's resulting license or, in the alternative, irrevocable right to obtain a license by

16   virtue of Samsung's FRAND commitments; the alleged injury to Samsung is not immediate or

17   irreparable; and Samsung has an adequate remedy at law for any alleged injury.").  Defendants

18   contend that there would be no bar to injunctive relief if Plaintiffs simply refused Defendants'

19   FRAND license proposal, but that merely begs a question in dispute between the parties, which is

20   whether Defendants in fact fulfilled their (alleged) commitment to offer licenses on a FRAND basis.

21   Accordingly, Defendants' motion to strike the no injunctive relief defense is **DENIED**.

22   ///

23   ///

24   ///

25

26          [14]  P's Answer ¶ 95 ("Counterclaimants are not entitled to injunctive relief because of
27   commitments made by them and/or their predecessors-in-interest to standards-setting organizations
     to license one or more of the Asserted Patents on fair, reasonable, and nondiscriminatory terms.
     Counterclaimants are further not entitled to injunctive relief because any alleged injury is not
28   immediate or irreparable, and Counterclaimants have an adequate remedy at law.").

United States District Court

For the Northern District of California

5.    <u>Sixth Affirmative Defense - License</u>[15]

As Defendants point out, Plaintiffs do not allege the existence of an express, direct license between themselves and Defendants.  Defendants therefore contend that the defense should be stricken.  Plaintiffs respond that their allegations regarding Defendants' FRAND commitments and potential licenses to component suppliers form the basis of their license defense.  They also argue that they are a third-party beneficiary of Defendants' commitments to license its patents.  *See* Opp. at 22 (citing *Prouty v. Gores Technology Group*, 121 Cal. App. 4th 1225, 1232 (2004) ("If the terms of the contract necessarily require the promisor to confer a benefit on a third person, then the contract

. . . may be enforced by him at any time before the parties thereto rescind it.") (internal citations and quotation marks omitted); *see also Hynix Semiconductor Inc. v. Rambus Inc.*, 441 F. Supp. 2d 1066, 1073 (N.D. Cal. 2006) (considering on motion for summary judgment a claim that accused infringer was the third-party beneficiary of a contract between the patentee and an SSO); *Competitive Technologies v. Fujitsu Ltd.*, 286 F. Supp. 2d 1118, 1138-39 (N.D. Cal. 2003) (discussing a claim of third-party beneficiary status and right to a license due to a contract in which a patentee had agreed to license its patents on a non-exclusive basis).  As Defendants' own cited authority indicates, a license may be either express or implied; thus, Plaintiffs' failure to plead an express license directly between the parties does not doom their claim.  *See McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920 (Fed. Cir. 1995) (explaining that both express and implied licenses are "contract[s] governed by ordinary principles of state contract law") (internal citations and quotation marks omitted).  Other cases in this district have included a similar defense.  *See, e.g.*, *Apple Inc. v. Samsung Electronics Co.*, No. 11-1846 LHK, Docket No. 124, at 25 ("To the extent that the Declared-Essential Patents are essential to any ETSI standard and to the extent any of the alleged inventions described in and allegedly covered by the Declared-Essential Patents are used, manufactured, or sold by or for Apple, its suppliers, and/or its customers, Apple is licensed to the

---

[15] P's Answer ¶ 96 ("To the extent that any of the Asserted Patents are essential to an IEEE, 3GPP, Standards Committee T1 Telecommunications ("T1"), ETSI, or Alliance for Telecommunications Industry Solutions ("ATIS") standard, BN has an irrevocable right to a license under such patents.")

United States District Court

For the Northern District of California

1  Declared-Essential Patents pursuant to Samsung's commitments to license its Declared-Essential

2  Patents on FRAND terms; or, in the alternative, Apple has the irrevocable right to be licensed on

3  FRAND terms under those patents. In addition, to the extent that Apple is licensed, expressly,

4  impliedly, or by operation of law, by virtue of any agreement between Samsung and an Apple

5  supplier, Apple is licensed.").

6          Accordingly, Defendants' motion to strike the license defense is **DENIED**..

7          6.      Eighth Affirmative Defense - Failure to State a Claim[16]

8          Defendants argue that the Eighth Affirmative Defense, for failure to state a claim, is not an

9  affirmative defense.  *See Scott v. Fed. Bond & Collection Serv., Inc.*, No. 10-CV-02825-LHK, 2011

10  WL 176846, at *6 (N.D. Cal. Jan. 19, 2011) ("Defendant's first affirmative defense, based on failure

11  to state facts sufficient to constitute a claim or cause of action, is better understood as a denial of

12  Plaintiff's allegations rather than an affirmative defense.").  Although such a defense is permitted by

13  Fed. R. Civ. P. 12(h)(2), there is a split of authority in this District as to whether it is simply a denial

14  of the complaint's allegations and not a separate affirmative defense.  *Compare J & J Sports Prods.*

15  *v. Coyne*, No. C 10-04206 CRB, 2011 U.S. Dist. LEXIS 6623, at *6 (N.D. Cal. Jan. 24, 2011)

16  (striking failure-to-state-a-claim affirmative defense "with prejudice because this defense is another

17  way of denying liability"), *with Valley Community Bank v. Progressive Cas. Ins. Co.*, No. 5:11-cv-

18  00574-JF, 2011 WL 1833116, at *3 (N.D. Cal. May 13, 2011) (pointing out that the Federal Rules

19  allow for this affirmative defense and denying motion to strike).  Because the Federal Rules

20  expressly allow it, Defendants' motion to strike the failure to state a claim defense is **DENIED**.

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  _____

28          [16]  P's Answer ¶ 98 ("The Counterclaims fail to state a claim upon which relief can be granted.").

### III.   CONCLUSION

For the foregoing reasons, Defendants' motion to strike is **GRANTED** with leave to amend as to Plaintiffs' affirmative defenses for laches and judicial estoppel, and **DENIED** as to all other affirmative defenses.

This order disposes of Docket No. 71.


IT IS SO ORDERED.


Dated:  February 2, 2012

_____
EDWARD M. CHEN
United States District Judge