UNITED STATES DISTRICT COURT

Northern District of California

Oakland Division

| | |
|---|---|
| BARNES AND NOBLE, INC., et al., | No. C 11-02709 EMC (LB) |
| Plaintiffs, | **ORDER REGARDING THE PARTIES' JOINT DISCOVERY LETTER DATED JANUARY 10, 2012** |
| v. | |
| LSI CORPORATION, et al., | [Re: ECF No. 78] |
| Defendants. | |

## I. BACKGROUND

Plaintiffs Barnes & Noble, Inc. and barnesandnoble.com LLC (collectively, "B&N") filed the instant action seeking a declaratory judgment of non-infringement and patent invalidity against defendants LSI Corporation and Agere Systems, Inc. (collectively, "Defendants"). Original Complaint, ECF No. 1.[1] Defendants answered B&N's First Amended Complaint and brought counterclaims against B&N for patent infringement. Answer and Counterclaims, ECF No. 62. The current discovery dispute arose when the parties could not reach agreement on the terms of a protective order. Joint Letter, ECF No. 78.[2]

---

[1] Citations are to the Electronic Case File ("ECF") with pin cites to the electronic page number at the top of the document, not the pages at the bottom.

[2] On November 30, 2011, Defendants filed a motion for a protective order and noticed it for hearing before Judge Chen. Motion, ECF No. 67. Judge Chen referred the motion to a magistrate judge undersigned on December 13, 2011. Referral Order, ECF No. 69. The next day, this court denied Defendants' motion without prejudice and ordered the parties to comply with the

While the parties agree that a protective order is warranted, they disagree on its terms and have submitted competing proposed protective orders for the court's selection. B&N's proposed protective order would allow two of its in-house attorneys – Eugene DeFelice, Vice President, General Counsel and Corporate Secretary, and Brad Feuer, Vice President and Assistant General Counsel – access to most material designated by Defendants as "Highly Confidential – Attorneys' Eyes Only" ("AEO"). B&N's Revised Proposed Protective Order, ECF No. 85-2 at 12, § 7.3(b).[3] Defendants oppose such access, so their proposed protective order prohibits B&N's in-house attorneys from having access to any material designated as such.[4] Defendants' Revised Proposed Protective Order, ECF No. 85-1 at 11-12, § 7.3. The court heard oral argument from the parties on February 10, 2012.

## II. LEGAL STANDARD

Upon a showing of "good cause," a court may "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" in discovery by "requiring that trade secret or other confidential . . . commercial information not be revealed, or be revealed only in a specified way." Fed. R. Civ. P. 26(c); s*ee In re Violation of Rule 28(D)*, 635 F.3d 1352, 1357 (Fed. Cir. 2011). The party seeking a protective order has the burden of showing that the protection is warranted. *Id.* Generally, good cause requires the moving party to show that specific prejudice or harm will result if the protective order is not issued. *Rivera v. NIBCO, Inc.*, 384 F.3d 822, 826 (9th Cir. 2004). And, in this context, the courts administer a balancing test of the conflicting interests between the protection of Rule 26(c) of the Federal Rules of Civil Procedure and the broad mandate

---

undersigned's procedures related to discovery disputes. Notice of Referral, ECF No. 70. The parties did so and, accordingly, filed the instant joint discovery letter on January 10, 2012. Joint Letter, ECF No. 78.

[3] To be fair, B&N's proposed protective order also would allow two of Defendants' in-house counsel to have access to B&N's AEO material as well. B&N's Revised Proposed Protective Order, ECF No. 85-2 at 12, § 7.3(b).

[4] Both parties' proposed protective orders would bar in-house attorneys from having access to material designated as "Highly Confidential – Source Code." *See* B&N's Revised Proposed Protective Order, ECF No. 85-2 at 14-15, § 7.5; Defendants' Revised Proposed Protective Order, ECF No. 85-1 at 12-13, § 7.4.

UNITED STATES DISTRICT COURT
For the Northern District of California

1  of the admissibility of information in discovery conferred by Rule 26(b)(1).  *See*, *e.g.*, *Brown Bag*
2  *Software v. Symantec Corp.*, 960 F.2d 1465, 1472 (9th Cir. 1992).
3      This District's model protective order, upon which the parties have based their own proposed
4  protective orders, has been approved by the court and governs discovery unless the court enters a
5  different protective owner.  *See* United States District Court for the Northern District of California's
6  Stipulated Protective Orders webpage, *at* http://cand.uscourts.gov/stipprotectorder ("The protective
7  orders on this page are court-approved model forms to which counsel may stipulate in a particular
8  case."); N.D. Cal. Patent L.R. 2-2 ("The Protective Order authorized by the Northern District of
9  California shall govern discovery unless the Court enters a different protective order."); *see*
10 *generally Acer America Corp. v. Technology Properties*, Nos. C08-00877 JF (HRL), 08-00882-JF,
11 08-00884-JF, 2009 WL 1363551, at *1 (N.D. Cal. May 14, 2009).  Accordingly, the court treats the
12 model protective order as setting forth presumptively reasonable conditions regarding the treatment
13 of highly confidential information.

### IV. DISCUSSION

15     Under this District's model "Stipulated Protective Order for Litigation Involving Patents, Highly
16 Sensitive Confidential Information and/or Trade Secrets," parties may designate "extremely
17 sensitive" information or items as "Highly Confidential – Attorneys' Eyes Only" when the
18 disclosure of it "would create a substantial risk of serious harm that could not be avoided by less
19 restrictive means."  *See* United States District Court for the Northern District of California's
20 Stipulated Protective Orders webpage, *at* http://cand.uscourts.gov/stipprotectorder.
21     B&N's proposed protective order would create two classes of AEO-designated material.  The
22 first class, to which their two in-house attorneys <u>would</u> have access, would include at least the
23 following:
24 • business plans;
25 • business development;
26 • research and development;
27 • product designs;
28 • engineering or technical information;

1 • product specifications;
2 • software;
3 • trade secrets;
4 • market analysis;
5 • competitor analysis;
6 • customer information;
7 • vendor information;
8 • internal financial/accounting information;
9 • operations information;
10 • production information;
11 • distributor agreements;
12 • license agreements;
13 • development agreements;
14 • sales agreements;
15 • pricing information;
16 • cost information; and
17 • information regarding business relationships with third parties.

B&N's Revised Proposed Protective Order, ECF No. 85-2 at 3-4, § 2.5.[5] The second class, to which its in-house attorneys <u>would not</u> have access, would include:

• future business plans;
• source code;
• technical documentation related to source code; and
• technical information related to in-process research and development.

*Id.* at 4, § 2.6.

In resolving this dispute, the court is guided by *Brown Bag Software v. Symantec Corp.*, 960

---

[5] Defendants' proposed protective order would include all of the above as AEO but would not allow B&N's in-house attorneys to have access to any of it. *See* Defendants' Revised Proposed Protective Order, ECF No. 85-1 at 3-4, § 2.5; id. at 11-12, § 7.3

F.2d 1465 (9th Cir. 1992). As the Ninth Circuit explained in that case, to determine whether a party's in-house attorney should be permitted to view an opposing party's confidential information, courts must balance (1) the risk to the party opposing disclosure of the inadvertent disclosure of its confidential information against (2) the risk to the party seeking disclosure that protection of the confidential information would impair the prosecution of its claims. *See id*. at 1470.

**A. The Risk to Defendants of Inadvertent Disclosure**

A risk of inadvertent disclosure that cannot be adequately mitigated by a protective order is a factor in limiting access to confidential information. *See U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 (Fed. Cir. 1984). And while courts are to look to the facts of each individual case, the "crucial factor" in this determination is whether the in-house counsel engages in "competitive decisionmaking," *Brown Bag*, 960 F.2d at 1470 (citing *U.S. Steel*, 730 F.2d at 1468 n.3), which refers to "a counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor," *U.S. Steel*, 730 F.2d at 1468 n.3. This is the crucial factor because it is difficult "for the human mind to compartmentalize and selectively suppress information once learned, no matter how well-intentioned the effort may be to do so." *In re Deutsche Bank Trust Co. Americas*, 605 F.3d 1373, 1378 (Fed. Cir. 2010).

In their declarations, B&N's in-house attorneys each state that they do not engage in competitive decisionmaking. They each state that: B&N is not in the business of licensing patents and has no patent licensing department or patent licensing program and they are not directly involved in patent prosecution; B&N's in-house counsel (including themselves) are responsible for managing litigation (which includes managing the activities of its outside counsel); they only provide other legal guidance and advice to B&N and that this advice does not include advice about business strategy, pricing, marketing strategies, product design and development, or competitive analysis; and they do not participate in any of B&N's competitive decisions made in light of similar or corresponding information about B&N's competitors (such as decisions about pricing, marketing strategies, product design and development, and competitive analysis). *See* DeFelice Declaration, ECF No. 78-5 at 3, ¶¶ 3-9; Feuer Declaration, ECF No. 78-6 at 2, ¶¶ 3-9.

1  Defendants challenge Mr. DeFelice's and Mr. Feuer's statements.  They note that "Mr. Feuer 2 was one of B[&]N's two representatives in the pre-litigation licensing negotiations with LSI, and 3 B[&]N has listed him as a potential fact witness in this case." Joint Letter, ECF No. 78 at 1. 4 Defendants also point to Mr. DeFelice's twin "legal and business role[s]" at B&N, as his B&N 5 website profile "indicates that he provides guidance to [B&N] and its board on a wide range of 6 business decision, has in the past held sales and marketing executive positions, and is a business 7 school graduate." *Id.* at 2.  In addition, Mr. DeFelice "has made statements on behalf of [B&N] 8 regarding high-profile litigation matters with significant business implications and has lobbied 9 United States antitrust authorities (regarding patent matters) on B[&]N's behalf." *Id*.

10  Defendants' arguments fail to convince the court that Mr. DeFelice and Mr. Freur engage in 11 competitive decisionmaking.  Defendants characterize Mr. DeFelice's duties to include giving 12 advice on "business decisions," but his B&N web profile actually states that he provides guidance 13 on "corporate governance and Securities and Exchange Commission matters, complex litigation, 14 mergers & acquisitions, and other significant *legal* matters."  B&N Website Profile of Eugene 15 DeFelice, ECF No. 78-2 at 1 (emphasis added).  In addition, the court fails to see how Mr. 16 DeFelice's public statements regarding B&N's then-current litigation or its antitrust concerns 17 constitute, or suggest his participation in, competitive decisionmaking.  *See* "Barnes and Noble, 18 Spring Design Settle Lawsuit over Nook, Alex E-Readers," PCMag.com, Mar. 2, 2011, ECF No. 78-19 2 at 2; "B&N Sought Microsoft Inquiry," Wall Street Journal, Nov. 9, 2011, ECF No. 78-2 at 3-4; 20 *see also ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 274 F.R.D. 576, 580 (E.D. Va. 21 2010).  Indeed, making such comments about pending litigation strikes the court as a 22 quintessentially legal responsibility.  And while Mr. Freuer may have been a participant in the pre-23 litigation licensing negotiations that took place with respect to the patents at issue in this case, it is 24 difficult to characterize this conduct as "competitive decisionmaking" when B&N and Defendants 25 are not competitors in the same market.  Depending on context, parties may become adversaries in a 26 business negotiation without becoming business competitors.

27  Nor does Mr. DeFelice's proximity to competitive decisionmakers necessarily confer that status 28 on him.  *See ActiveVideo*, 274 F.R.D. at 581 ("Mere correspondence with competitive

decisionmakers or attendance at competitive decisionmaking meets does not itself constitute competitive decisionmaking."); *but see Intel*, 198 F.R.D. at 530 (citing *Matsushita*, 929 F.2d at 1579) (suggesting that such contact with competitive decisionmakers increases the risk of inadvertent disclosure). Mr. DeFelice states that, even though he is not a member of B&N's board of directors, "[a]s Corporate Secretary of Barnes & Noble, Inc., I attend board meetings and prepare minutes of board meetings; however[,] I do not participate in board decisions, and to the extent I provide advice of information to the board, such advice or information is limited to legal matters, and does not include advice about business strategy, pricing, marketing strategies, product design and development, or competitive analysis." DeFelice Declaration, ECF No. 78-5 at 3, ¶¶ 10-11. Defendants have failed to provide any evidence suggesting that Mr. DeFelice has ever acted to the contrary. Moreover, noting Defendants' concerns, Mr. DeFelice and Mr. Feuer also have agreed to execute an agreement to be bound by the protective order that is entered and thereby will agree to not to use any confidential information for any purpose other than prosecuting, defending, or attempting to settle this case.

The court observes that it considered Defendants' argument that access to licensing agreements (even among non-competitors) provides in-house attorneys with access to confidential information that they would not ordinarily have, and that this access confers "competitive decisionmaker" status on them. But in the end, considering the balance of risks (and as discussed more fully in the next section), the court is not persuaded that Defendants' categorical rule blocking B&N's in-house attorneys' access to the licensing information makes any sense given those attorneys' need to evaluate damages.

Accordingly, based on the foregoing reasons, the court finds that Mr. DeFelice and Mr. Freuer do not engage in competitive decisionmaking.

**B.  The Potential Prejudice of Non-Disclosure**

"Whether any amount of inadvertent disclosure of confidential information is acceptable is determined by balancing the potential injury to the party disclosing the confidential information against the need for access by the moving party." *Intel*, 198 F.R.D. at 529 (citing *Brown Bag*, 960 F.2d at 1470). In the parties' Joint Letter, B&N contends that its in-house attorneys need access to

"a finite range of confidential information" to (1) "manage" this litigation and (2) "make a realistic assessment of [Defendants'] infringement claims and the scope of potential damages." Joint Letter, ECF No. 78 at 3, 5. At oral argument, it was made clear that what B&N is really after are Defendants' licensing agreements, which B&N contends are relevant for purposes of determining a reasonable royalty for use of Defendants' patents.

As for B&N's first reason, "[t]he party seeking access must demonstrate that its ability to litigate will be prejudiced, not merely its ability to manage outside litigation counsel." *Intel*, 198 F.R.D. at 529 (citing *A. Hirsch, Inc. v. United States*, 657 F.Supp. 1297, 1305 (Ct. Int'l Trade 1987) ("[I]n view of retained counsel's competence, it is not clear how plaintiffs position will be prejudiced by excluding [in-house] counsel from access."). Here, B&N is represented by outside counsel Quinn Emanuel Urquhart & Sullivan, LLP, a law firm that is more than capable of handling this action, and "[r]equiring a party to rely on its competent outside counsel does not create an 'undue and unnecessary burden.'" *Id.*[6]

The court is, however, persuaded by B&N's second reason. B&N argues that "the details of [Defendants'] licensing practices are essential to determining the scope of potential damages." Indeed, several courts have recognized that disclosure of sensitive financial information to an opponent's in-house counsel may be necessary for evaluating settlement. *See*, *e.g.*, *Shared Memory Graphics, LLC v. Apple, Inc.*, No. C-10-2475 VRW (EMC), 2010 WL 4704420, at *2 (N.D. Cal. Nov. 12, 2010) (finding that the protective order should permit in-house counsel access to sensitive sales and profit information so that in-house counsel could fully participate in settlement negotiations); *Vasudevan Software, Inc. v. International Business Machines*, No. C09-05897 RS (HRL), 2010 WL 3629830, at *2 (N.D. Cal. Sept. 14, 2010) ("[T]he Court is sensitive to the fact that in-house counsel to a party, in most circumstances, needs to have some access to the opposing

---

[6] While it is true that courts have found the prejudice to a party seeking disclosure to outweigh the risk of inadvertent disclosure and permit access of in-house counsel to confidential information "[w]here, because of the technical nature of a case, the specialized knowledge of in-house counsel was necessary to supervise the litigation," *Intel*, 198 F.R.D. at 528 (citing *Carpenter Tech. Corp. v. Armco, Inc.*, 132 F.R.D. 24, 28 (E.D. Pa. 1990)), and "where other extenuating circumstances exist which would cause hardship to a party," *id.* (citing *U.S. Steel*, 730 F.2d at 1468), B&N has not shown that such the case here.

1 party's confidential financial information to understand the potential damages at issue and thus make
2 an informed decision with respect to any possible settlement of the lawsuit."). Here, given that
3 Defendants seek damages against B&N for patent infringement, the sensitive financial information
4 that will be needed for settlement purposes necessarily includes Defendants' license agreements. As
5 B&N noted at oral argument, it is with these license agreements that a reasonable royalty rate, and
6 hence Defendants' potential damages, will be determined.[7]

7 B&N's proposed protective order is not limited to Defendants' licensing agreements, though. As
8 described above, under its order, its in-house attorneys would have access to a plethora of
9 confidential information. *See* B&N's Revised Proposed Protective Order, ECF No. 85-2 at 3-4, §
10 2.5. In fact, the only information that its in-house attorneys would not have access to would be
11 future business plans, source code, technical documentation related to source code, and technical
12 information related to in-process research and development. *Id*. at 4, § 2.6.[8] Given the court's
13 reasoning, it makes sense to limit B&N's in-house attorneys' access to Defendants' relevant
14 licensing agreements and to not allow access to the remainder of the items listed in B&N's proposed
15 protective order.

16 Neither of the parties' proposed protective orders limit disclosure in this way. Accordingly, the
17 parties shall submit for the court's approval a stipulated protective order that allows B&N's two in-
18 house attorneys access to Defendants' relevant license agreements.

---

20 [7] At oral argument, Defendants pointed out that the cases cited by B&N were instances
21 where the patent holder was seeking an accused infringer's confidential information so that the
22 patent holder could try to access how much it had been damaged, whereas in this case it is the
accused infringer that is seeking the patent holder's confidential information to determine a
reasonable royalty for using the patents. *See Shared Memory Graphics, LLC v. Apple, Inc.*, No.
23 C-10-2475 VRW (EMC), 2010 WL 4704420 (N.D. Cal. Nov. 12, 2010); *Vasudevan Software, Inc. v.
24 International Business Machines*, No. C09-05897 RS (HRL), 2010 WL 3629830 (N.D. Cal. Sept.
14, 2010). But in both situations – without regard to the merits of the infringement allegations –
25 both parties need to have access to the relevant financial data for an accurate and efficient outcome
to be reached.
26

27 [8] In their declarations, Mr. DeFelice and Mr. Freuer suggest B&N's protective order would
limit their exposure to "other computer code and associated comments and revision histories,
28 schematics, netlists, and similar sensitive materials," in addition to the categories listed above. *See*
DeFelice Declaration, ECF No. 78-5 at 3, ¶ 13; Feuer Declaration, ECF No. 78-6 at 2, ¶ 12.

UNITED STATES DISTRICT COURT
For the Northern District of California

## V.  CONCLUSION

Based on the above, the court finds that both B&N's and Defendants' proposed protective orders are insufficient.  B&N's proposed protective order inappropriately allows its in-house counsel access to a broad swath of Defendants' AEO-designated material.  Defendants' proposed protective order inappropriately bars B&N's in-house attorneys from license agreements that likely will be necessary for those attorneys to participate in meaningful settlement negotiations.  Accordingly, the court orders the parties to meet and confer with the instant order in mind and to submit, within 20 days from the date of this order, a joint stipulated protective order that complies with the court's reasoning.

This disposes of ECF No. 78.

**IT IS SO ORDERED.**

Dated: February 23, 2012

_____
LAUREL BEELER
United States Magistrate Judge