

CHARLENE M. MORROW

EMAIL CMORROW@FENWICK.COM
Direct Dial (650) 335-7155

March 14, 2012

Honorable Laurel Beeler
United States District Court
1301 Clay Street
Oakland, California 94612

    Re:    *Barnes & Noble, Inc., et al. v. LSI Corp., et al.*, Case No. 11-cv-02709-EMC-LB

Your Honor:

    On February 23, 2012, the Court issued an order regarding the parties' dispute over the terms of the protective order to be entered in this case. Dkt. No. 88. The parties have met and conferred but are unable to agree on a provision that implements the Court's order. The parties therefore submit this joint letter regarding their dispute together with their respective proposed protective orders.

**1.**     **LSI's Position**

    The Court's order of February 23, 2012 could not have been clearer. The Court found that plaintiffs Barnes & Noble, Inc. and Barnesandnoble.com LLC's ("B&N") proposed protective order 'inappropriately allow[ed] its in-house counsel access to a broad swath of Defendants' AEO-designated material," and that LSI Corporation and Agere Systems Inc.'s ("LSI") proposed protective order "inappropriately bar[red] B&N's in-house attorneys from license agreements that likely will be necessary for those attorneys to participate in meaningful settlement negotiations." Dkt. No. 88 at 10.. Having made this finding, the Court ordered the parties to meet and confer and submit a proposed stipulated protective order that granted B&N's in-house attorneys access to "relevant license agreements." *Id.* at 9. B&N has ignored this order, and instead takes this opportunity to again seek broad access to LSI's confidential information for its in-house counsel. B&N's efforts to obtain reconsideration of this Court's prior order are not only improper, but have further delayed entry of a protective order in this case, which in turn materially prejudices LSI's ability to obtain discovery from third parties who have generally refused to provide their confidential information to LSI until the question of in-house counsel's access is settled.

    The Court should enter a protective order in the form proposed by LSI. As directed by the Court, and as explained below, LSI's proposed order affords in-house counsel's access to "license agreements," but does not permit disclosure of the broad array of other materials to which B&N previously and unsuccessfully sought access. And, as dictated by recent Federal Circuit authority, LSI's proposed order limits in-house counsel's access to those license agreements that are "relevant" to this dispute.

    LSI's proposed order adds a confidentiality tier for "Highly-Confidential—License Agreements," and defines the license agreements to which in-house counsel would be permitted access as "Discovery Material that constitutes a fully executed agreement (i) reflecting a license to one or more of the patents-in-suit, but excluding non-royalty bearing cross-licenses of multiple patents or (ii) reflecting a license of patents for use by or in any of the accused products in this action." Defendants' Exhibit 1, at para. 2.7. In view of the Court's prior observations and consistent with B&N's own prior proposal, *see* Dkt. No. 88 at 2 n. 3 and 9 n. 7, LSI's proposed provision is mutual; it permits two of its own in-house counsel, Mark Terrano and Marie MacNichol, to have access to "relevant license agreements" produced by B&N. *Id.* at 9. Neither Mr. Terrano nor Ms. MacNichol has a role in competitive decision-making for LSI that would preclude their access to

these license agreements, as reflected in their declarations, attached as Exhibits 2 and 3, respectively.[1]

License agreements are relevant to the damages analysis for patent infringement only where those licenses are comparable to a hypothetical license to the patents-in-suit. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1326 (Fed. Cir. 2009). Typically, comparable licenses are licenses that convey rights to the patent or patents-in-suit, or that are at least directed to the same subject matter and technology disclosed in the patents-in-suit. *See id.* at 1328 (rejecting use of license agreement to a large patent portfolio of "PC-related" patents, when hypothetical license concerned a single patent directed to narrow method of using a graphical user interface tool); *ResQNet, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) ("This court has long required district courts performing reasonable royalty calculations to exercise vigilance when considering past licenses to technologies *other* than the patent in suit.") (emphasis added); *see also Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (second factor in determining the appropriate reasonable royalty is "[t]he rate[] paid by the licensee [i.e. B&N] for the use of other patents comparable to the patent in suit."). To be considered comparable, a license must also have a payment structure that is similar to the structure of the hypothetical license proposed in the litigation. *See Lucent,* 580 F.3d at 1327-30 (distinguishing lump-sum versus running royalty licenses, and rejecting use of a cross-license for a patent portfolio); *Wordtech Sys., Inc. v. Integrated Network Solutions., Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010) (rejecting the use of several past licenses because they were running royalty licenses and the patentee was seeking a lump sum).

For this reason, LSI proposes that in-house counsel be permitted access to executed license agreements that encompass one of more the patents-in-suit, but not to drafts or to cross-licenses of multiple patent portfolios that have no royalty associated with them. As no court or jury could rely on mere drafts, or on licenses that, because of their cross-license/no-royalty structure, cannot inform the hypothetical license negotiation, there is no reason in-house counsel should have need to access this material. LSI further proposes that in-house counsel be permitted access to executed licenses that are used by or in one or more of the accused products in this action, as such licenses are likely to shed light on the rates actually paid by B&N for the use of other patents comparable to one or more of the patents-in-suit.

In seeking yet again to afford its in-house counsel expansive access to LSI's confidential information, B&N attempts to reargue issues that were previously resolved against it by the Court. *See* Dkt. No. 88 at 9. The Court specifically found that "B&N's proposed protective order is not limited to Defendants' licensing agreements . . . [as] under its order, its in-house attorneys would have access to a plethora of confidential information," and rejected B&N's proposed order. The Court directed the parties to propose a protective order that grants B&N in-house attorneys access to "relevant licensing agreements" but "to not allow access to the remainder of the items" originally proposed by B&N. *Id.* B&N has not complied with that direction.

Contrary to the Court's explicit direction, B&N's proposed order is not limited to "relevant license agreements," but would provide its in-house counsel access to a broad swath of LSI confidential information, including "executed and draft license agreements, correspondence and presentations regarding licensing, information regarding licensing policies, and licensing plans and projections" (which B&N euphemistically calls "licensing information"), as well as "financial information related to the value of the patents-in-suit (including, by way of example, royalty reports, royalty projections, assessments of the value of the patents-in-suit, and financial data related to any products made or sold under the patents-in-suit or alleged to infringe the patents-in-suit.)" *See*

---

[1] The Court previously concluded that LSI and B&N "are not competitors in the same market." Dkt. No. 88 at 6. Mr. Terrano and Ms. MacNichol would have no access to any confidential B&N technical information, only license agreements.

Plaintiff's Exhibit 1, para. 2.5.  Such a proposal cannot be reconciled with the Court's clear direction or with Federal Circuit authority regarding what licenses may be considered comparable, and therefore relevant, for purposes of a royalty damages analysis.  In re-asserting its prior, unsuccessful arguments that its in-house counsel should have broad access to LSI's confidential business information, B&N relies heavily on outdated cases that either do not apply or are inconsistent with the more recent Federal Circuit authority discussed above.[2]  In particular, B&N's reliance on discovery orders that apply the broad standard of Rule 26—which governs whether information is discoverable—is misplaced.  The issue before the Court is not whether the confidential LSI information B&N wishes to share with its in-house counsel is *discoverable*, but instead what set of license agreements—which is the subset of material the Court previously ordered should be shared—are actually *relevant* to the royalty damages analysis.  Importantly, none of the cases cited by B&N stand for the proposition that something other than a fully executed license to a patent-in-suit or to comparable technology may be considered by a judge or jury in determining royalty damages.

The Court has explained that, in its view, in-house counsel require access to license agreements relevant to this case in order to evaluate the potential damages at issue and make informed decisions regarding settlement.  Dkt. No. 88 at 8-9.  The Court reasoned that B&N's in-house counsel *did not* require access to any of the other items included in B&N's original, lengthy list.  Nor is there any justification for B&N's in-house counsel to have access to license agreements that would not be relevant to the damages analysis in any event.  LSI's proposed protective order provides in-house counsel access to "relevant license agreements," consistent with the Court's guidance and governing case law.  Accordingly, LSI respectfully requests that the Court enter its proposed protective order.

## 2.    **Barnes & Noble's Position**

Consistent with this Court's February 23, 2012 Order, Barnes & Noble's proposed protective order grants in-house counsel access to only that limited subset of confidential information necessary for *evaluation of damages* and *participation in settlement discussions*.  (Plaintiffs' Exh. 1, at ¶¶ 2.5, 2.6.)

As this Court acknowledged in its Order, "several courts have recognized that disclosure of sensitive financial information to an opponent's in-house counsel may be necessary for evaluating settlement."  (Dkt. No. 88, at 8.)  Indeed, this Court noted that "both parties need to have access to the *relevant financial data* for an accurate and efficient outcome to be reached."  (*Id.* at 9 n.7 (emphasis added).)  And this Court went on to recognize that "the sensitive financial information that will be needed for settlement purposes necessarily *includes Defendants' license agreements*," because "the details of [LSI's] licensing practices are essential to determining the scope of potential damages."  (*Id.* at 8, 9 (emphasis added).)

---

[2] B&N cites only one Federal Circuit case in support of its position that "licensing information" is relevant to the reasonable royalty analysis.  That opinion, *Unisplay S.A. v. Am. Elec. Sign Co., Inc.*, was issued in 1995, over a decade before the prevailing Federal Circuit opinions of *Lucent, ResQNet,* and *WordTech* regarding the use of licenses for damages purposes.  69 F.3d 512 (Fed. Cir. 1995).  B&N otherwise relies on pre-*Lucent* district court *discovery* orders that resolve the issue of "relevance" of licensing-related documents under Rule 26(b)(1)'s broad standard (*i.e.*, whether the information is reasonably calculated to lead to the discovery of admissible evidence.).  *See, e.g., Sorensen v. Lexar Media Inc.*, 2008 WL 538513, at *2 (N.D. Cal. Dec. 22, 2008); *Phoenix Solutions Inc. v. Wells Fargo Bank, N.A.* 254 F.R.D. 568, 582 (N.D. Cal. 2008); *West v. Jewelry Innovations, Inc..* 2009 WL 668695, at *1 (N.D. Cal. Mar.13, 2009).

March 14, 2012
Page 4

Consistent with these findings, Mr. DeFelice and Mr. Feuer seek access to two narrow categories of information relevant to the evaluation of damages and settlement negotiations: (i) licensing information (including, for example, draft license agreements, correspondence and presentations regarding licensing, information regarding licensing policies, and licensing plans and projections) and (ii) a small subset of financial information—specifically, financial information that relates to royalties paid under relevant licenses and to LSI's understanding of the value of the patents-in-suit (including, for example, royalty reports, royalty projections, assessments of the value of the patents-in-suit, and financial data related to any products made or sold under the patents-in-suit or alleged to infringe the patents-in-suit). (Plaintiffs' Exh. 1, at ¶ 2.5.)  Contrary to LSI's assertions above, Barnes & Noble is not seeking to "afford its in-house counsel expansive access to LSI's confidential information"—as required by this Court's Order, Barnes & Noble's proposed protective order no longer permits in-house counsel to access confidential information related to business plans, business development, research and development, product designs, engineering or technical information, product specifications, software, vendor information, operations information, production information, distributor agreements, development agreements, and sales agreements. (*See* Dkt. No. 88, at 3-4.)

LSI's request to limit the confidential information accessible by in-house counsel to a *subset* of *executed* license agreements is not grounded in any legal principle.  As an initial matter, there is no reason why in-house counsel should not have access to all executed license agreements (including cross-license agreements) involving the patents-in-suit.  Moreover, both the Federal Circuit and various district courts have repeatedly recognized that license *proposals* and *offers* (even if never accepted) are relevant to determining a reasonable royalty.  *E.g.*, *Unidisplay S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995) (prior license proposals and license agreements "should carry considerable weight in calculating a reasonable royalty rate); *Sorenson v. Lexar Media, Inc.,* No. C-08-00095, 2008 WL 5383513, at *2 (N.D. Cal. Dec. 22, 2008) (draft agreements relevant to "the issue of what value should be placed on the patents-in-suit"); *Curtis Mfg. Co. v. Plasti-Clip Corp.*, 933 F. Supp. 94, 100 (D.N.H. 1995) (information relevant to calculating reasonable royalty includes "evidence of prior offers to license by the patentee") (citing 5 Chisum on Patents § 20.03[3] (1994)).

In addition, correspondence and communications regarding executed and unexecuted license agreements are necessary to understand the degree to which license agreements are comparable for purposes of determining any recoverable reasonable royalty in this case.  *E.g.*, *Phoenix Solutions Inc. v. Wells Fargo Bank, N.A.*, 254 F.R.D. 568, 582, 585 (N.D. Cal. 2008) (finding that "all documents related to the negotiation of licenses . . . with any third party" are relevant to "ascertain the extent of [a party's] liability"); *West v. Jewelry Innovations, Inc.*, C-07-01812, 2009 WL 668695, at *2 (N.D. Cal. Mar. 13, 2009) (finding that "all documents and things referring or relating to the negotiations . . . of all licenses" are relevant to "damages, what constitutes a reasonable royalty, and the value to be placed on the patents-in-suit").  And courts have long held that information regarding a party's licensing policies is relevant to any determination of damages.  *E.g.*, *Monsanto Co. v. Strickland*, 604 F. Supp. 2d 805, 814 n.2 (D.S.C. 2009) (factors for determining reasonable royalty include "licensor's established policy and marketing program regarding licensing others"); *see generally Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

LSI's refusal to permit in-house counsel to review financial information related to (i) royalties paid under license agreements and (ii) LSI's understanding of the value of the patents-in-suit is similarly untenable.  Such information is directly relevant to alleged damages and to the evaluation of any settlement proposal.  *Shared Memory Graphics, LLC v. Apple, Inc.*, No. C-10-24-75-VRW-EMC, 20120 WL 4704420, at *2 (N.D. Cal. Nov. 12, 2010) (granting in-house counsel access to financial information); *Gerawan Farming, Inc. v. Prima Bella Produce, Inc.*, No. 10-cv-00148-LJO-JLT, 2011 WL 2516224, at *2 (E.D. Cal. June 22, 2011) (same); *Vasudevan Software, Inc. v. Int'l Business Machines*, No. c-09-05897-RS-HRL, 2012 WL 3629830, at *2 (N.D. Cal. Sept.

14, 2010) (noting need for in-house counsel to access confidential financial information); *see generally Georgia-Pacific*, 318 F. Supp. at 1120.

LSI's proposed protective order is thus entirely contrary to both the Court's reasoning in its February 23 Order and the relevant case law. Indeed, the flaws in LSI's position are highlighted by two hypothetical examples involving license negotiations or agreements between LSI and companies that offer products that compete with Barnes & Noble's NOOK products. Under LSI's protective order, Barnes & Noble's in-house counsel would not have access to any documents—correspondence, draft license agreements, etc.—related to the negotiation of a potential license for Apple to use the LSI patents-in-suit in connection with the iPad if LSI and Apple ultimately chose not to enter into a license agreement or ultimately chose to execute a cross-license. This, despite the fact that Apple's assessment of a reasonable royalty for the patents-in-suit is directly relevant to determining a reasonable royalty here. Similarly, under LSI's protective order, Barnes & Noble's in-house counsel would not have access to an executed LSI-Amazon license to use other allegedly standards-essential LSI patents, even if that executed license relates to the WiFi, 3G, or audio functionality of the Kindle. Again, such a license would be directly relevant to determining a reasonable royalty in this case.

Finally, it is important to note that the instant dispute does not concern which licensing information and other financial information is relevant to this case or the weight that such information should be given in the context of a particular method for calculating damages. This dispute concerns <u>only</u> whether certain categories of documents can be accessed by in-house counsel. LSI should not be permitted to parse out which licenses and damages-related financial information can be accessed by Barnes & Noble's in-house counsel based on <u>LSI's</u> view of the weight that information should be afforded in any damages calculation (or vice versa)—parties routinely have different views on such issues. Indeed, unlike the cases cited by Barnes & Noble (which confirm that the categories of information cited in Barnes & Noble's proposed protective order are routinely deemed relevant to damages issues and/or provided to in-house counsel), the cases cited by LSI relate to whether specific license agreements were properly analyzed in the context of particular damages calculations—that is, the license agreements were relevant to damages and produced during discovery, but the parties disputed the proper weight to be afforded to those agreements in the context of calculating a reasonable royalty. Barnes & Noble's in-house counsel should not be restricted to reviewing only licenses that <u>LSI</u> deems comparable or only financial information related to <u>LSI's</u> purported calculation of damages. In order to arrive at an independent assessment of damages and an informed settlement position, Barnes & Noble's in-house counsel must have access to all of the information that falls within the narrow categories described in Barnes & Noble's proposed protective order—namely, licensing information, financial information that relates to royalties, and financial information that otherwise relates to the value of the patents-in-suit.

LSI is unable to point to any prejudice it would suffer should Barnes & Noble's in-house counsel have access to such information in accordance with the Court's February 23 Order. Indeed, this Court has already found that Mr. DeFelice and Mr. Feuer do not engage in competitive decision-making and that there is therefore no legitimate risk of competitive harm arising from their access to these categories of information.[3] (Dkt. No. 88, at 6.) And, to the extent settlement is a possibility in this case, such information is required by in-house counsel in order for "an accurate and efficient outcome to be reached." (*Id.* at 9 n.7.)

For all of these reasons, and consistent with the Court's February 23 Order, Barnes & Noble respectfully requests that the Court enter Barnes & Noble's proposed protective order.

---

[3] Barnes & Noble reserves its right to challenge the inclusion of Ms. MacNichol and/or Mr. Terrano as LSI in-house counsel permitted to review the categories of confidential information discussed herein pending review of any declarations submitted to the Court.

02706.23503/4654762.1

March 14, 2012
Page 6

Respectfully submitted,

FENWICK & WEST LLP

*Charlene Morrow* by PRR

Charlene M. Morrow


QUINN EMANUEL URQUHART & SULLIVAN, LLP

*John B. Quinn* by AJB

John B. Quinn