

SILICON VALLEY   801 CALIFORNIA STREET   MOUNTAIN VIEW, CA 94041
TEL: 650.988.8500   FAX: 650.938.5200   WWW.FENWICK.COM

CHARLENE M. MORROW

April 5, 2012

EMAIL CMORROW@FENWICK.COM
Direct Dial (650) 335-7155

Honorable Laurel Beeler
United States District Court
Phillip Burton Federal Building and United States Courthouse,
Courtroom C, 15th Floor
450 Golden Gate Avenue
San Francisco, California 94102

    Re:    <u>Barnes & Noble, Inc., et al. v. LSI Corp., et al.,</u> Case No. 11-cv-02709-EMC-LB

Your Honor:

On March 26, 2012, the Court issued an order regarding the parties' dispute over the terms of the protective order to be entered in this case. Dkt. No. 93. Defendants LSI Corporation and Agere Systems Inc. ("LSI") have conferred with plaintiffs Barnes & Noble, Inc. and Barnesandnoble.com ("B&N") but have been unable to reach agreement on a provision that implements the Court's order. *Compare* Exh. A, ¶ 2.7 *with* Pls.' Exh. 1, ¶ 2.7. The parties therefore submit this joint letter regarding their dispute together with their respective proposed protective orders.

    **1.**    **LSI's Position**

The Court has twice provided guidance regarding the confidential materials to which the parties' in-house counsel should be permitted access under the protective order in this case. *See* Dkt. Nos. 88, 93. B&N continues to ignore this guidance and insists yet again that more expansive access be afforded its own in-house counsel. LSI respectfully requests that the Court put an end to B&N's overreaching and enter a protective order in the form now proposed by LSI, attached hereto as Exhibit A.

By order dated February 23, the Court ordered that B&N's in-house counsel's access to LSI confidential information would be limited to LSI's "relevant license agreements" and directed the parties to confer on the text of a provision implementing this order. Dkt. No. 88 at 9. In response, LSI proposed that in-house counsel be afforded access to the following confidential documents:

> Disclosure or Discovery Material that constitutes a fully executed agreement (i) reflecting a license to one or more of the patents-in-suit, but excluding non-royalty bearing cross-licenses of multiple patents or (ii) reflecting a license of patents for use by or in any of the accused products in this action.

Dkt. No. 90-1 at para. 2.7. In contrast, B&N proposed that its in-house counsel have access to a broad set of "licensing information," including "correspondence and presentations regarding licensing, information regarding licensing policies, . . . licensing plans and projections, . . . royalty projections, assessments of the value of the patents-in-suit, and financial data related to any products made or sold under the patents-in-suit or alleged to infringe the patents-in-suit." *See* Dkt. No. 90-4 at para. 2.5.

After considering both parties' submissions, the Court issued an order on March 26, 2012

providing further guidance on the access to be afforded in-house counsel.  The Court made it very clear that B&N's proposed protective order did not comply with the Court's guidance, finding that B&N's proposed language "violates both the letter and the spirit of the court's prior order."  Dkt. No. 93 at 7.  Conversely, the Court found that LSI's proposed protective order was "a bit too limited," and ordered the parties to submit a proposed order that allowed B&N's in-house counsel access to "executed license agreements, and any drafts of them, that involve the patents-in-suit, regardless of whether they are cross-licenses or not."  Dkt. No. 93 at 7.[1]

LSI promptly provided B&N with a suggested revision to its earlier proposal that LSI believed implemented the Court's March 23 order.  *See* Exh. B.  B&N made no substantive response to LSI's proposal or suggested any language of its own until April 2, when B&N complained for the first time of a supposed "imbalance" in the access afforded the parties' respective counsel.  To address this asserted imbalance, LSI further modified its proposal so that, with respect to the B&N's accused devices, only licenses for technology comparable to the technology of the patents-in-suit – specifically, WiFi, 3G and multimedia technology – would be made available to LSI's own in-house counsel:

> The "license agreements" subject to this provision shall be limited to any Disclosure or Discovery Material that constitutes (i) a license to one or more of the patents-in-suit, (ii) draft terms proposed to or by a prospective licensee for a license to one or more of the patents-in-suit, whether or not the proposed terms were included in a final executed license, (iii) a license of any patent related to WiFi, 3G, and/or multimedia technology for use by or in any of the accused products in this action, or (iv) draft terms proposed to or by a prospective licensee for a license to any patent related to WiFi, 3G, and/or multimedia technology for use by or in any of the accused products in this action, whether or not the proposed terms were included in a final executed license.

Exh. A at para. 2.7.  In fact, in making this modification to its proposal, LSI adopted B&N's own description of "comparable" technology.  *See* Exh. C (communication from B&N's counsel observing that "not all patents licensed for use in the accused NOOK products are comparable to the patents-in-suit here, which relate only to WiFi, 3G, and audio," and proposing the phrase "WiFi, 3G, and/or multimedia" to describe this comparable technology).

LSI's proposal tracks the language of this Court's prior orders.  It also tracks the language of the two *Georgia-Pacific* factors which informed the Court's consideration of what constitutes "relevant license agreements":  "(1) [t]he royalties received by the ***patentee*** for the licensing of ***the patent in suit***, proving or tending to prove an established royalty"; and "(2) [t]he rates paid by the ***licensee*** for the use of ***other patents comparable to the patent in suit***."  *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970) (emphasis added); *see* Dkt. No. 93 at 5-6 (citing *Georgia-Pacific*).  LSI's proposal affords access to the patentee's (i.e. LSI's) "licensing of the *patent[s] in suit*," and access to the hypothetical licensee's (i.e. B&N's) licenses for "*other patents comparable to* the patent[s] in suit."  *Georgia-Pacific,* 318 F.Supp. at 1120 (emphasis added).[2]  And, as the Court most recently

---

[1] The Court noted that LSI's proposed protective order allowed its own in-house counsel access to certain license agreements for technology used in the accused devices.  The Court did not criticize this aspect of LSI's proposal.  *See* Dkt. No. 93 at 3 n. 4.  Likewise, B&N also made no objection to this aspect of LSI's proposal.  *See* Dkt. No. 90 at 5 n. 3.

[2] None of the cases on which B&N relies holds that a *patentee's* licenses for patents *other* than those in suit were probative for the reasonable royalty analysis (i.e., factor 1).  Rather, these cases discuss either a *hypothetical licensees'* agreements to license patents for "comparable" technology (i.e., factor 2), or other *Georgia-Pacific* factors not relevant to the scope of what the Court has already ordered nor previously argued by B&N.  As the Court has previously held, arguments not made in

Honorable Laurel Beeler
April 5, 2012
Page 3

instructed, it provides that in-house counsel may have access to drafts, as well as executed license agreements.  Dkt. No. 93 at 7; Exh. A at para. 2.7.

      B&N refuses to stipulate to this provision.  Instead, it insists again on expanding access for its own in-house counsel beyond licenses to the patents-in-suit to include also "license[s] to one or more patents within LSI's *WiFi, 3G, and/or multimedia patent portfolios*," even if those patents are not among those actually asserted in the lawsuit.  *See* Exh. D.  LSI's "patent portfolios" include *thousands* of patents, a significant number of which likely relate to "WiFi, 3G and/or multimedia technology."  B&N's proposal to give its own in-house counsel access to LSI licenses for *all* such patents, if adopted, would vastly expand in-house counsel's access beyond what the Court has previously ordered, but also well beyond the scope of what might be reasonably discoverable in this case.  More importantly, B&N once again presses a proposal that is inconsistent with this Court's prior orders as well as applicable law, both of which make clear that "relevant licenses" are licenses for the *patents-in-suit*.  *See* Dkt. No. 93 at 7 ("the parties' in-house counsel should have access to executed license agreements, and any drafts of them, that involve the patents-in-suit").

      LSI first sought this Court's assistance on the question of in-house counsel's access to confidential information in a joint letter filed in early January 2012.[3]  By repeatedly ignoring this Court's orders, B&N has managed to delay entry of a protective order (and the third party discovery that cannot proceed without it) for months.  LSI asks that the Court resolve this dispute now by entering a protective order in the form proposed by LSI in Exhibit A.

    **2.**    **Barnes & Noble's Position**

      B&N respectfully requests that the Court enter B&N's proposed protective order, which grants two of its in-house counsel, Mr. DeFelice and Mr. Feuer, access to highly relevant license agreements (and drafts).  Specifically, consistent with this Court's February 23 and March 26, 2012 Orders, as well as Federal Circuit and Northern District of California case law, B&N seeks access to licenses (and drafts) related to patents in LSI's WiFi, 3G, and multimedia portfolios—the patent portfolios related to the functionalities at issue in this case.[4]  (Pls.' Exh. 1, ¶ 2.7.)  Such access is not only proper but critical to B&N's ability to assess the litigation risk associated with this case, to evaluate potential settlement positions, and to otherwise make strategic decisions in light of LSI's allegations.

      B&N acknowledges that one sentence in the Court's March 26 Order is susceptible to a reading that limits the licenses that should be accessible by B&N's in-house counsel to only license agreements (and drafts) that involve the patents-in-suit.  But the Court has also held that B&N's in-house counsel

---

B&N's original submission should not be considered now.  Dkt. No. 93 at 7 ("The place and time for making [new] argument[s] . . . was in the parties' January 10, 2012 joint letter or at oral argument on February 10, 2012.").  None of the cases on which B&N now purports to rely was argued in its prior briefing.  Dkt. Nos. 78, 90.

[3]  As the Court is aware, LSI filed a motion for entry of a protective before Judge Chen as far back as November 30, 2011 (*see* Dkt. No. 67), but this motion was denied without prejudice after Judge Chen referred the matter to this Court, which then ordered compliance with the joint letter procedure.  Dkt. No. 69.

[4]  B&N's proposed protective order would permit in-house counsel access to:
    (i) a license to one or more patents within LSI's WiFi, 3G, and/or multimedia patent portfolios, (ii) draft terms proposed to or by a prospective licensee for a license to one or more patents within LSI's WiFi, 3G, and/or multimedia patent portfolios, whether or not the proposed terms were included in a final executed license, (iii) a license of any patent for use by or in any of the accused products in this action, or (iv) draft terms proposed to or by a prospective licensee for a license to any patent for use by or in any of the accused products in this action, whether or not the proposed terms were included in a final executed license.  (Pls.' Exh. 1, ¶ 2.7.)

Honorable Laurel Beeler
April 5, 2012
Page 4

should have access to "relevant licensing agreements." (Dkt. No. 88, at 9; Dkt. No. 93, at 5.) And Federal Circuit case law clearly holds that license agreements relevant to the reasonable royalty calculation may include not only licenses involving the patents-in-suit but also licenses involving patents *comparable to* the patents-in-suit. For that reason, B&N has consistently maintained that access by its in-house counsel to licenses involving patents comparable to the patents-in-suit is important to B&N's ability to evaluate risk, alleged damages, and potential settlement.

As this Court has acknowledged (Dkt. No. 93, at 5), LSI's alleged damages in this case will be based on a reasonable royalty calculation. *Wordtech Sys., Inc. v. Integrated Network Solutions, Inc.*, 609 F.3d 1308, 1391 (Fed. Cir. 2010). As this Court has also acknowledged (Dkt. No. 88, at 8-9), (i) B&N's in-house counsel must have access to license agreements in order to evaluate the issue of a reasonable royalty and (ii) B&N would suffer prejudice should its in-house counsel be barred from reviewing such information. Accordingly, the Court stated in its February 26 Order, and reemphasized in its March 23 Order, the overriding principle that any protective order entered in this case must grant B&N's in-house counsel access to "relevant licensing agreements." (Dkt. No. 88, at 9; Dkt. No. 93, at 5.)

Consistent with this principle, B&N's in-house counsel should have access to any license agreements (and drafts) produced by Defendants, as such licenses (and drafts) are likely to have at least some relevance to purported damages and settlement. Nonetheless, B&N's proposed protective order seeks access *only* to those license agreements (and drafts) involving patents in LSI's WiFi, 3G, and multimedia portfolios. Pursuant to Federal Circuit case law, such agreements (and drafts) may be relevant to any reasonable royalty determination. And such agreements (and drafts) are the documents most likely to play a role in any evaluation of litigation risk, alleged damages, and settlement.

The Federal Circuit and other courts have repeatedly held that—under *Georgia-Pacific* factors 1, 2, 4, and 12—license agreements relevant to the reasonable royalty calculation may include not only licenses to patents-in-suit but also licenses to *comparable patents* associated with related technologies. *E.g.*, 7 Chisum on Patents § 20.07[2][b] ("Courts give weight to the licensing customs in the industry and actual licenses on comparable patents in determining both the royalty rate and the base for the reasonable royalty."); *Lucent Techs., Inc. v. Microsoft Corp.*, Case No. 07-CV-2000, 2011 WL 5513225, at *14-15 (S.D. Cal. Nov. 10, 2011) (holding under *Georgia-Pacific* factors 4 and 12 that two licenses for comparable technologies between the patent holder and third parties were relevant to a reasonable royalty calculation and stating that a license agreement may support a reasonable royalty rate where the agreement involves *similar technology*) (citing *Lucent Techs. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009); *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1345 (Fed. Cir. 2011) (noting that royalties which the accused infringers "or *others* pa[id] for licenses to patents *comparable* to the '277 Patent" were relevant to a reasonable royalty calculation) (emphasis added); *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1239 n.3 (Fed. Cir. 2011) (noting under *Georgia-Pacific* factor 12 that information relevant to a reasonable royalty includes the "selling price that may be customary in particular business[es] to allow for use of . . . *analogous inventions*") (emphasis added); *Lucent*, 580 F.3d at 1325-32 (finding third party licenses not probative of reasonable royalty rate only where those licenses were for patents not sufficiently comparable to the patents-in-suit); *Metso Minerals, Inc. v. Powerscreen Int'l. Dist. Ltd.*, No. 06-cv-1446, 2011 WL 6223047, at *25 (E.D.N.Y. Dec. 08, 2011) ("[L]icense agreements from the same or comparable industry are probative for purposes of establishing a reasonable royalty rate."); *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317-18 (Fed. Cir. 2011) (finding that *GeorgiaPacific* "factors 1 and 2—looking at royalties paid or received in licenses for

Honorable Laurel Beeler
April 5, 2012
Page 5

the patent in suit or in *comparable licenses*— . . . remain valid and important factors in the determination of a reasonable royalty rate").

Thus, there is no doubt that any licenses to patents in Defendants' WiFi, 3G, and multimedia patent portfolios will be the subject of discovery. *Fresenius Medical Care Holding Inc. v. Baxter Int'l, Inc.*, 224 F.R.D. 644, 652-53 (N.D. Cal. 2004) (rejecting patent-holder's argument that "only licenses under the patents-in-suit are relevant to the calculation of a reasonable royalty" and ordering patent-holder to produce licenses involving its *other* patents related to the technology at issue). Because such licenses are also likely to play a role in the evaluation of any reasonable royalty,[5] B&N's in-house counsel should have access to those licenses so that they can make informed decisions regarding litigation risks and strategy.

It should be noted that, contrary to Defendants' assertion in footnote 2 above, two of the cases cited herein *do* hold that a *patentee's* licenses for patents *other* than those in suit are probative of the reasonable royalty analysis. *Lucent*, 2011 WL 5513225, at *14-15; *Fresenius*, 224 F.R.D. at 652-53. The remaining cases cited herein make no distinction between a patentee's licenses for comparable patents and other's licenses for comparable patents, but make clear that comparable licenses—whatever the source—may be relevant.

For all of these reasons, B&N has consistently sought access to such license agreements (and other information) for its in-house counsel. B&N noted at several points during the February 10 hearing that relevant license agreements would include both licenses to the patents-in-suit and licenses to comparable and related patents. For example, B&N stated that "there are plenty of cases . . . that say that the key issue to look at is comparable license agreements." (Pls.' Exh. 2, at 5 (noting that B&N could not cite to such cases in its letter brief because of space limitations).)[6] B&N further argued that "LSI's licensing practices with respect to [the patents-in-suit] *and related patents* is going to be a central issue in the case, and therefore our in-house counsel has the right to get access to that information in order to evaluate both the damages possibilities and also settlement possibilities." (*Id.*) Likewise, in its March 14 letter brief, B&N noted that LSI's proposed protective order, limited to licenses to the patents-in-suit, was improperly narrow as "B&N's in-house counsel would not have access to an executed LSI-Amazon license to use *other* allegedly standards-essential LSI patents, even if that executed license relates to the WiFi, 3G, or audio functionality of the Kindle." (Dkt. No. 90, at 5 (emphasis added).)

As this Court has already acknowledged, no risk of harm to Defendants would result from entry of B&N's proposed protective order.[7] (Dkt. No. 88, at 6.) In contrast, the prejudice to B&N should its in-house counsel be denied access to the very limited licensing information at issue is real and concrete—B&N would be forced to litigate this case absent a full understanding of the litigation risks involved. Accordingly, for the above reasons, and consistent with the Court's finding that B&N's in-house counsel should be afforded access to relevant license agreements, B&N respectfully requests that this Court enter B&N's proposed protective order.

---

[5] Indeed, Defendants have contended that they often offer and execute licenses to the entirety of each patent portfolio.
[6] Contrary to Defendants' assertion above, B&N did advance this argument during the February 10 hearing.
[7] Moreover, Defendants' contention that their receipt of third-party discovery has been delayed as a result of the parties' dispute regarding the protective order is without merit. Under Northern District of California Patent Local Rule 2-2, third parties may produce documents (and have produced documents in response to Defendants' subpoenas) in reliance on the Interim Model Protective Order.

Honorable Laurel Beeler
April 5, 2012
Page 6

        Sincerely,

        FENWICK & WEST LLP


/s/*Charlene M. Morrow*
Charlene M. Morrow


QUINN EMANUEL URQUHART & SULLIVAN, LLP


/s/ *John B. Quinn*
John B. Quinn


CMM:lmk

Honorable Laurel Beeler
April 5, 2012
Page 7

## ATTESTATION PURSUANT TO GENERAL ORDER 45

Pursuant to General Order No. 45, § X(B), regarding signatures, I attest under penalty of perjury that the concurrence in the filing of this document has been obtained from its signatories.

Dated: April 5, 2012                                FENWICK & WEST LLP


                                                    By: */s/ Ravi Ranganath*
                                                        Ravi Ranganath
                                                        Attorneys for Defendants
                                                        LSI Corporation and Agere Systems Inc.