Pages 1 - 36

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

| | |
|---|---|
| BARNES & NOBLE, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| VS. ) NO. C 11-2709 EMC | |
| ) | |
| LSI CORPORATION, et al, ) | |
| ) San Francisco, California | |
| Defendants. ) Friday | |
| ) October 7, 2011 | |
| _____ ) 2:00 p.m. | |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:          QUINN, EMANUEL, URQUHART & OLIVER
                        50 California Street
                        22nd Floor
                        San Francisco, California 94111
                    BY: **JOHN QUINN, ESQ.**
                        **CARL ANDERSON, ESQ.**
                        **SETH SKILES, ESQ.**




For Defendants:         FENWICK & WEST
                        801 California Street
                        Mountain View, California 94041
                    BY: **RAVI RANGANATH, ESQ.**
                        **CHARLENE MORROW, ESQ.**




*Reported By:    Debra L. Pas, CSR 11916, CRR, RMR, RPR*
             *Official Reporter - US District Court*
             *Computerized Transcription By Eclipse*

### P R O C E E D I N G S

**OCTOBER 7, 2011**                                          2:10 p.m.

THE CLERK:  Calling case C 11-2709, Barnes and Noble versus LSI.

Counsel, please come to the podiums and state your appearance for the record.

MS. MORROW:  Good afternoon.  Charlene Morrow from Fenwick & West appearing on behalf of LSI Corporation.  With me in court today is my colleague Ravi Ranganath.

THE COURT:  Great.  Thank you.

MR. QUINN:  Good afternoon, your Honor.  John Quinn appearing on behalf of the plaintiffs, Barnes and Noble and BarnesandNoble.com.

THE COURT:  Welcome.

MR. ANDERSON:  Carl Anderson and Seth Skiles also on behalf of the plaintiffs.

THE COURT:  All right.  Thank you, counsel.

Let me ask defendants whether -- let me ask whether there was an assertion that some tactical advantage was gained by Barnes and Noble by filing a suit that didn't name the proper defendants.

I mean, if part of the question about the first filed rule and whether we defer to that and whether it applies here and which is the first filed turns, in part, upon, it seems to me, the equities of the situation.

I'm not sure I understand why this wasn't a good faith filing, but mistaken in failing to identify the proper patent.

MS. MORROW:  I would respond with two points, your Honor.

First, that we believe there is a subject matter jurisdictional defect here that can't be amended to be cured and cannot be waived.  And so the notion that somehow defendant's conduct in the licensing discussions or the path of the litigation to court should be taken into account in determining whether there is a subject matter jurisdictional defect seems off the point.

With regard to --

THE COURT:  Well, I'll hear that, but I frankly don't see it.  I mean, first of all, there is no dispute that the original complaint at least named one patent that was owned by the proper defendant, right?

MS. MORROW:  It -- that's correct, your Honor.  We would say that nine-tenths of the action there is no subject matter jurisdiction over.

THE COURT:  One-tenth did.  That's a pretty good jurisdictional anchor.  Why can't you amend under Rule 15?

MS. MORROW:  You can't amend under Rule 15 because Rule 15 permits amendments if amendments are appropriate under Rule 12.  Amendments are not appropriate if they are futile.

And we believe under the controlling Federal Circuit principles, the amendment here to add Agere, the owner of the patents, to this lawsuit is futile because the subject matter jurisdictional defect cannot be corrected.

With regard to that, we would direct the Court to the Federal Circuit's opinion in the *Schreiber* case, which is a regular patent infringement dispute.  There the Federal Circuit held that the parties could not amend to cure a jurisdictional defect by amending to bring in the true owner of the patents during the course of the action.

Similarly, the *A123* case had stated that in order to go forward in a declaratory judgment action, you similarly need the patent owner, not a licensee, or another party and dismissed on that basis.

**THE COURT:**  You are saying that if someone were to file suit for good reasons -- let's say there was reason, but it wasn't deliberate, they named the wrong defendant -- they are prohibited from then fixing that problem?  They could never sue again?

**MS. MORROW:**  Under the subject matter jurisdictional decisions of the Federal Circuit with regard to patent infringement claims, yes.

In *Benetech* the Federal Circuit said that a party needs declaratory judgment jurisdiction both at the initiation of the action and throughout the pendency of the action.

And so between *Schreiber* stating that you can't cure a jurisdictional defect in an infringement case and *Benetech* stating that jurisdiction has to be present at all points during the action, we believe the proper conclusion is that the parties here cannot amend under Rule 15 to cure this jurisdictional defect. In other words, the amendment provisions of Rule 15 don't expand subject matter jurisdiction as it's been recognized by the Federal Circuit.

**THE COURT:** Is there a special carve-out to Rule 15 patent cases?

**MS. MORROW:** No, but Rule 15 -- so, obviously, there is Article III subject matter jurisdiction which determines which things are justiciable by the Court.

**THE COURT:** Sure.

**MS. MORROW:** Rule 15 amendment rules cannot override that and the Federal Circuit has held that as a jurisdictional matter, you need to have the patent owner in the case, whether in an infringement suit or in a declaratory judgment suit, the entire time.

Now, there are two other cases in this district --

**THE COURT:** Well, if they were to dismiss the suit and refile it all over again -- forget first filed rule. If they were to do that, you would agree there is not a problem? There is subject matter jurisdiction.

**MS. MORROW:** Correct. They just can't go forward in

this suit.  And then at that point --

**THE COURT:**  You cannot amend.  You have to dismiss in a patent case.

**MS. MORROW:**  And file a new action.

**THE COURT:**  And file a new action.

**MS. MORROW:**  Yes.

**THE COURT:**  Even though that may not be the rule in any other context where you name the wrong defendant.

Arguably, there is no proper case or controversy. You simply identified the wrong boat owner in an admiralty case, or you identified the wrong employer not knowing who the true employer is in a Title 7 case, or you name the wrong copyright holder.  In all those cases, that's okay to fix a jurisdictional problem under Rule 15, but patent cases are special.

**MS. MORROW:**  Well, I'm not familiar with the other areas of the law that your Honor is obviously familiar with. What we have looked at are the decisions of the Federal Circuit and the other decisions of this Court applying it.

There are two District Court decisions from within this district within the last year where exactly this issue was addressed.  Those are the *Pneumatic versus Magnacoustic* case and *Top versus Hitachi* case.  In those two cases Judge White and Judge Breyer reached the conclusion that we're urging here, which is that the Court has no choice but to dismiss if the

patent owner is not present in the declaratory judgment action and they both concluded that you cannot amend to cure this jurisdictional defect, citing the *Schreiber* case that I referred the Court to that said that you cannot amend to cure jurisdictional defects in infringement suits.

THE COURT:  What about the fact that there was jurisdiction over at least one of the claims here?  This is not a case where there is no jurisdiction whatsoever.

MS. MORROW:  Correct.  In that instance we would say one-tenth of the claim is properly before the Court and the Court can rule on it.

THE COURT:  Has the Federal Circuit ever said use the one-tenth rule if you have -- even where you have one jurisdictional anchor for a conceded subject matter jurisdiction, you cannot amend to expand and add additional claims, additional defendants?

MS. MORROW:  We have not been able to find a case addressing that issue in either direction from the Federal Circuit.  And the question is -- we know that the Court looks at each patent claim, each is a separate intellectual property right and each has separate Article III jurisdiction under the relevant patent statute which permits suits by patent owners or against patent owners relating to infringement.

We believe that each is a separate cause of action and that like, as usually the case when the Court is looking at

a motion to dismiss, it needs to look at each cause of action individually.

While the Court may have jurisdiction to adjudicate the question of whether the LSI patent is infringed, we don't believe that somehow confers jurisdiction on the Court to adjudicate other disputes where the Court has indicated that there are -- where the Federal Circuit has indicated there would be jurisdictional defects with those if they were filed separately.

So there is -- there's no -- it's like coming to court and saying, "I want to go forward on multiple claims and only one of them are ripe."  You can go forward on the ripe claim, but that doesn't mean you get to go forward on the claims that aren't ripe.

THE COURT:  Right.  And then when they do become ripe, normally you can amend in most normal circumstances.

MS. MORROW:  And we have the Federal Circuit precedent.  The Federal Circuit precedent is clear, and we do --

THE COURT:  It makes no difference whether one timely amends as a matter of right under Rule 15?  What if somebody filed the case the very next day?  Before it was even served, they find out we've got the wrong -- we have got the "LLC" instead of the "Inc."

MS. MORROW:  As a practical matter, we wouldn't be in

here arguing about it because we wouldn't have the intervening pending patent case in Pennsylvania.

**THE COURT:**  That's what it boils down to, whether we give credit to the first filed rule.  I'm not sure I understand the substantive jurisdictional claim.

Let me ask the response about the *Schreiber* case.  Is that right?  Is there --

**MR. QUINN:**  Your Honor, I take it there is common ground now that the Court did and does have jurisdiction over the action.

**THE COURT:**  One claim of the action.

**MR. QUINN:**  Over the action.  And that sets this case apart from other cases on which defendants rely.  In each of those cases there was no jurisdiction over the action.

Now, we have not been able -- like counsel for the defendants, we have not been able to find the case on all fours with this, which squarely says where the Court has subject matter jurisdiction over one patent claim, that, therefore, you can amend to cure issues with respect to other patent claims as to which if they were the sole subject of the action, there wouldn't be jurisdiction.  But what sets this case apart from all the cases on which defendants rely is the Court does have jurisdiction over this action.

And if I could address the question that the Court initially posed, and that is to whether there's any -- some

type of tactical advantage --

THE COURT:  Well, before we get there, I want to make sure I understand.

So you would concede that under *Schreiber* if there were no jurisdiction, if that one claim had not been made here just the -- just an assertion of -- with respect to the patents that are held by *Agere*, that *Schreiber* would control.

MR. QUINN:  You know, we don't take a position on that, your Honor.  That seems to me what that decision indicates.  Our only point would be that's not our case.

THE COURT:  So the fact that there was jurisdiction over the action, in your view, distinguishes *Schreiber*.

MR. QUINN:  Right.

THE COURT:  And allows an amendment to bring in other claims of the parties.

MR. QUINN:  It makes a difference.  What it means is this Court then has the power to entertain an amendment.

And I take it take the defendant's argument, based on the *Schreiber* case, would be that if the Court doesn't have jurisdiction, it doesn't have power, so it has no reason or basis for entertaining an amendment to the complaint.

THE COURT:  Well, let me ask you a question.  If this had been a single count against LSI properly named -- there is no question there was subject matter jurisdiction.  They had the proper patent owner -- and then they decided ten days

later, you know, we're going to expand this and add eight or nine more patents held by this other patent holder, there is nothing in *Schreiber* that would prevent an amendment under Rule 15 for that, would it?

**MS. MORROW:** If there was no jurisdictional defect as to the original claim, and we're positing there is no jurisdictional defect as to the amendments, then I believe that would be appropriate.

Now, there are two points, though, with regard to whether there was some kind of improper procedural advantage obtained here.

**THE COURT:** Okay.

**MS. MORROW:** And the two points that I would make is that this is, one, a clear instance of forum shopping. And, two, under the Court's declaratory judgment discretion it has the discretion to move this case to a more appropriate venue.

And we believe that we have shown quite clearly that the majority of the identified named witnesses are located either in the Eastern District of Pennsylvania or within 100 miles of that court.

First, with regard to forum shopping, it's a term tossed around, but I think that one of the cases that Barnes and Noble cited gives us good insight into what forum shopping actually is. And that's the *BBC International* case, which is out of the Eastern District of New York. And there it said

that a defendant shouldn't be able to use a declaratory judgment action as a tool to pick a district in which a patent suit will proceed that is not its home forum.

Now, obviously, the Northern District of California is not the home forum to either Barnes and Noble or BarnesandNoble.com, both of whom have their primary places of business within the Southern District of New York.

In fact, we looked to see where Barnes and Noble usually bring declaratory judgment actions, and in Pacer we found two instances where they brought a declaratory judgment action in the last year. One is *Barnes and Noble versus Alcatel Lucent* and the other is *Barnes and Noble versus Xerox*. Both of those were filed in the Southern District of New York in 2010.

So, it's clear that Barnes and Noble was forum shipping here. The reason that Barnes and Noble was forum shopping here is shown by its notice of related cases where it filed a notice to relate this case to a previously dismissed case involving *Agere* and *Sandisk*. There had been two prior cases, one in Texas and one here. The case in Texas had been by Agere against Sony. It had gone to trial and Agere had obtained a substantial trial verdict. We believe Barnes and Noble was trying to avoid that possible forum and sought relief in the Northern District of California, hoping that it would find a more friendly home here than in the Eastern District of

Texas.

THE COURT:  The predicate case to which relation was sought was not necessarily one that that was --

MS. MORROW:  Well, Judge Alsup found it wasn't substantially related and refused to relate the case.  So, the matter before Judge Alsup had gone through some preliminary proceedings, but there was no claim construction order, summary judgment order or any other major substantive dispositions.

THE COURT:  I would understand the forum shopping argument better if the anticipation was that, Oh, we might get related to a case which we already won or which there were already adverse findings that we maybe able to employ --

MS. MORROW:  They clearly didn't want to be in Texas where Sony had lost.

In addition, the *National Phone Case* that we cited to the Court is actually from the proposed transferee Court in Pennsylvania.  It's the *National Phone* case and it said that there's forum shopping where the plaintiff engaged in a race to the Court so fast that it didn't get the patent owner right.

And we have that here as well.  We have a scenario where Agere Systems is a wholly-owned subsidiary of LSI.  When LSI got into discussions with Barnes and Noble about the case, they provided proposed licensing terms -- and these are quoted in Barnes and Noble's papers and ours -- that indicated that the licensing proposal was from LSI and Agere Systems,

Inc., it's wholly-owned subsidiary with Barnes and Noble. Those were the proposed parties to the licensing transaction.

When LSI lawyers, who do work both for LSI and for the wholly-owned subsidiary Agere and the licensing counsel, met with Barnes and Noble, they went through claims charts about why there was infringement and they showed the cover sheet of the patents. And the cover sheet the patents showed that every single one of these patents was either assigned to Agere or was assigned to an Agere predecessor, either Lucent or AT&T.

And then we know that under 37 C.F.R. 1.17 the information about -- the current recorded assignment information about issued patents is available on the Patent Office's retrieval system, the Public Available Information Retrieval system called PARE.

And we attached to Mr. Tyson's supplemental declaration in this case copies of what Barnes and Noble would have found if they had gone to the Patent Office website, public website, and pulled down the assignment data. There they would have found no indication that any of these patents were assigned to LSI. And they could have requested the actual underlying documents and reviewed the relevant licenses and corporate documents themselves. The website shows they are publicly available. Those documents would have confirmed that LSI has no ownership interest in these patents.

So we think that like *National Foam*, this was an instance where the plaintiff was in such a rush not to get sued in Texas, that they filed here without adequate investigation. Clear forum shopping.

**THE COURT:**  What evidence is there this they feared imminent suit in Texas?  Is there some communication that threatened imminent suit if they didn't sign the licensing agreement within X number of days?

**MS. MORROW:**  The parties were clearly exchanging information in licensing discussions.  LSI had gone through infringement of the LSI and Agere patents.  Barnes and Noble had provided responses.

I believe there was a meeting that both parties would totally describe as unproductive, after which Barnes and Noble filed this suit.  But there was no express threat at this point to bring suit in Texas.

**THE COURT:**  So normally that's what's required in terms of anticipatory filing to thwart the first filed rule, and I don't see that fact here.

**MS. MORROW:**  It's forum shopping that's required, your Honor.  And the two cases that I just delineated found forum shopping where there was suit filed outside the home forum, and in a different way than the company usually acts and, suit filed in such a rush that the parties were wrong. And those are exactly the factors that we have here.  So we

think there was clear forum shopping.

There is also the question under the Declaratory Judgment Act of whether the Court is looking at all of the action or one-tenth of the action; that we believe the appropriate venue is in the Eastern District of Pennsylvania.

And so should I address that now or shall I --

THE COURT:  Let me hear on this forum shopping argument.

MR. QUINN:  Our understanding is, as the Court indicated, that forum shopping, the essence of that is evidence of an anticipatory filing.

The case that we cited for that proposition is the *Intersearch* case, where the Court said that forum shopping, you have an anticipatory filing when the plaintiff has received a specific concrete indication of suit by the defendant.

THE COURT:  Counsel says there's a distinction. That's one prong of the analysis, but a separate prong is -- even if it's not an anticipatory filing, it's still forum shopping.

MR. QUINN:  What I heard was you look to where the party usually brings its declaratory relief actions.  And I have to say that's kind of a novel proposition to me in the first instance, that you would look to past behavior in different suits involving different parties and different fact situations and different evidence to make a decision about

whether the selection of a forum was inappropriate forum shopping.

It's common ground here between the parties from the papers that these are discussions from the first notice to the filing of suit was over a year. So there was no rush to a courthouse here. There is no indication by anybody that LSI was about to file, or Agere, or any party was about to file a suit. There wasn't a rush to the courthouse.

In terms of getting the name of the party wrong, I think the Court has to assess the -- I would submit, the plaintiff's conduct in light of what it was told and what it knew. And I would refer the Court to the declaration and attachments of Mr. Snow where -- attaches the communications that Barnes and Noble received from LSI beginning with the first letter from June 29, 2010, where Barnes and Noble is told by counsel for the licensing manager of LSI on LSI letterhead:

"I'm writing this letter on behalf of
lsi's intellectual property group. LSI has
an extensive patent portfolio relating to
e-book readers. My responsibilities include
the licensing of LSI's intellectual property
within LSI's portable digital media player
area."

And then he identifies these -- what he describes as LSI patents; that that information is then repeated in a second

letter, which is attached as Exhibit 2, the August 19th, 2010 letter.  There are then three PowerPoint presentations, one of which is not before the Court because it's subject to a nondisclosure agreement.  The Court does have the one that's 129 pages in length.  Again and again and again it's -- these are LSI's patents, is what we're told.

The gentlemen who appear have business cards that say they are from LSI.  There is never anyone who makes a phone call, sends an email, appears at a meeting that says he's from Agere.

Finally, when they get down to the point of signing a nondisclosure agreement, that's explicitly -- the Court has that in the attachment also, the only agreement the parties enter into is between Barnes and Noble and LSI.  Again, no reference to Agere.

Now the defendants point to three things which they say buried in these documents should have put Barnes and Noble on notice that they are really dealing with Agere here.  One -- one of the preparations had an image of the patent, which identified Agere as the patent owner, but that is -- that fact, your Honor, is not at all inconsistent with the notion that that had been assigned to LSI.  And that what LSI was telling Barnes and Noble at the time they were talking and at the time the complaint was filed, that this is an LSI patent.  There is nothing unusual or surprising or shocking that would come from

the fact that, you know, a subsidiary would have assigned to its parent the patent.  That image of the patent didn't put Barnes and Noble on notice that, you know, frankly, LSI was being less than candid.

Secondly, they point to the prior case in this Court, the *Sandisk* case, where LSI owned one of these patents, and the record in that case indicates that at that time the patent was owned by Agere.  As to that, again, I would say that's not inconsistent with the notion that had been subsequently assigned to LSI, as LSI seemed to be representing.

**THE COURT:**  Let me ask you.  I'm actually less interested in the -- you know, what degree of diligence was employed.

What about this avoiding Texas argument?  The whole reason to rush to file here was to avoid the adverse, potentially adverse environment in Texas?

**MR. QUINN:**  That sort of folds over with the 1404 discussion about the location of witnesses and whether this is a --

**THE COURT:**  It also goes with the forum shopping argument, which is an exception to the first filed rule.  The allegation here is that your client wanted to do whatever it took to get out of Texas.

**MR. QUINN:**  Your Honor, neither party has any connection with Texas.  The Court has in the record before it

information about where all the inventors are.  They are roughly split, half and half between the east coast, New York, Philadelphia area, and northern California.

We think, most importantly, that the fact that the suppliers, the chip set suppliers, Samsung, Qualcomm, Sierra Wireless, Texas Instruments, CyberTone, are all located here is very important.  They say you don't have to get into that because it's purely a matter of standards.  I submit that assumes that they're going to get past the Markman with a favorable construction that says if it reads on the standard, we don't have to look into infringement.

Just a footnote, your Honor.  We have some reason to think that maybe they think that's relevant, too, since the end of the briefing they served subpoenas on most of those parties for documents.  So they seem to think that they are going to have to get into the functionality of the chips and it isn't just a question about whether these patents read on the standard.

So to get back to the Court's question, we're going to have to look at infringement.  A couple of the patents, anyway, they don't claim are essential to the standards in the case they filed back in Pennsylvania.  We're going to have to look into infringement issues.  They know that.  It's reflected in the document requests that they served on us and the subpoenas that they served on these third parties.

It's my understanding that the ease of discovery and the convenience of third-party witnesses is probably entitled to more weight than that of parties.  And if we look at that, you've got inventors that are split roughly five-four, four-five on the two coasts.  You've got these third parties here.  And we also have, in addition to the chip set, the suppliers, we have the outside design manufacturers, who are actually involved in the design -- manufacturing design.  They all have locations here in northern California.

Sure, Barnes and Noble and LSI -- or LSI is actually headquartered here, as I understand it.  Barnes and Noble and, I think, Agere have offices back in New York, but those -- what we would look to those offices for, you know, the types of corporate records, recordkeeping, you know, I don't think that that's a significant burden when you compare it to the kind of detailed technical design records that are going to be located here where Barnes and Noble designed this product.

In terms of the forum shopping and the low number, with respect to the *Sandisk* case, your Honor, it's our understanding under the local rule if there has been a prior case that involves the same patent, it's actually obligatory that you give notice of a prior action, related action involving the same piece of intellectual property.

I think what we can't lose sight of is the result, the particular mischief.  And I'm not saying that there was --

folks were up to mischief in this particular case.  But if --
if on this record, which the Court has before it, if Barnes and
Noble had sued Agere, would we be seeing a motion to dismiss
for lack of justiciable controversy because there had never
been any assertion of infringement whatsoever by Agere.  We've
got dozens and dozens of references from LSI that there's
infringement.  That would really put Barnes and Noble in a
bind, if we could not -- at least for assessing the first filed
in the bon fides and the forum shopping issue, if we couldn't
consider what they told us consistently about who owned the
patents.

And in terms of what's public information, although
the face of the patent names the original assignee of the
patent at the time of issuance, grants of exclusive licenses
are not typically matters of public record.  Assignments are
not required to be recorded.  And even the recording of an
assignment with the PTO is not conclusive evidence of
ownership.

So Barnes and Noble would have had no way to
independently verify whether Agere had assigned the
patents-in-suit to its corporate parent, LSI.  What it did was
accept at face value and rely on what LSI consistently told it
about who owned these patents.

**THE COURT:**  All right.  Let me hear on the
convenience factors.

Your opponent says that there are a number of third parties that may be relevant, depending how the claim construction plays out.  But there are a lot of third parties that may be relevant or located in this district.  LSI, I -- is in this district and the inventors are split between the east coast and west coast and employees that are -- may be involved in Agere back in Pennsylvania, their interests are not quite as heavily weighed as third-party interests -- third-party witnesses.

**MS. MORROW:**  First of all, the bulk of the Agere witnesses are third-party witnesses, and I'll get to that in just a moment.  So, they, obviously, weigh heavily in the balance because they are subject to the subpoena power of the court.

So, we think the case law says that the Court ought to look at the identifying and willing and unwilling witnesses and look to see where the balance tips in terms of venue.  So, if you look at the witnesses that Agere has identified as being either within the Eastern District of Pennsylvania or within the subpoena power of that Court, they include the Barnes and Noble CEO, who was involved in product development meetings and in the conception of the Nook, Mr. Lynch; the Barnes and Noble CFO, who we believe will give damages evidence; the former vice-president and general manager of the E-Commerce group, Anthony Asterita, who indicates on his LinkedIn resume that he

launched the Nook in a project that involved people in New York, California and China.

The identified individuals who were involved in the licensing discussions with LSI will be testifying about the Agere licensing practices.

THE COURT:  They are located where?

MS. MORROW:  They are located in the LSI office in Allentown, Pennsylvania.

So that, in addition, LSI and Agere have identified the following unwilling witnesses who are within 100 miles of the courthouse in Pennsylvania.

The patents at issue were developed either at AT&T or at Lucent or at Agere, almost all of the inventors on the wifi and 3G patents are on the east coast, but no longer within the control of Agere.  So that would include six of the inventors on the patent-in-suit; the 14 prosecuting attorneys; and then the other former Agere personnel that we would need to show the commercial success of the patents-in-suit with the former -- the Agere sales of those products prior to the spinoff.

Now, in addition --

THE COURT:  They are salespeople?

MS. MORROW:  They were -- I think we would need an Agere person to describe the commercial success of the practicing product.

THE COURT:  Who is no longer with Agere?

**MS. MORROW:**  Who is no longer with Agere.

**THE COURT:**  There is nobody at Agere that can describe that?

**MS. MORROW:**  That business division was sold to another company and the records went, as far as we can tell, with the sale.  And so we will need someone who is a former Agere witness on the commercial success prior to the sale of that business unit.

Now, we know that in Mr. Asterita's resume, he states that the business unit that he led that launched the Nook had personnel in New York, Palo Alto and China.  So it's likely there are additional Nook New York personnel who would be called but we tonight know their identities at this point and we wouldn't ask that they be counted, because we don't know who they are.  But that totals at least 24 specifically identified people who are within the scope of the court in Pennsylvania, most of whom are uniquely available for trial in Pennsylvania because they are within the -- they are former employees within the subpoena power of the Court in the Eastern District of Pennsylvania, but, obviously, not within this Court's subpoena power.

So that's the weight.  We think there are more than 20 witnesses that are within the Court's jurisdiction in the Eastern District of Pennsylvania.

Now, let's look at Barnes and Noble's response.

Barnes and Noble doesn't identify anyone specifically, other than the four inventors who are located here in California who are identified in our papers. Those were three on the LSI patent and one additional inventor on an Agere patent who has moved out here.

Instead, LSI has submitted a broad brush declaration from Mr. Gilbert referring generally to the number of Barnes and Noble in this district and stating that he believes that substantially all of them, people who are involved in development of the Nook work in Palo Alto, but he doesn't identify who those people are. He doesn't identify how many there are. He doesn't identify how many of those Barnes and Noble would either propose to call in this trial or believe they would be producing as 30(b)6 witnesses to testify on the accused infringing functionalities.

It's likely that there are some witnesses from Palo Alto that we would need discovery from, but at this point we don't know who they are and Barnes and Noble has not identified to the Court a single witness in Palo Alto that it knows it will be calling from its Nook division.

With regard to the third-party witnesses, we have the same problem. Mr. Gilbert identifies four suppliers with what look like sales or field engineering functions supporting this area and Asia. Those were Samsung, Marvel, CR, TI and Inventech. However, he doesn't identify any of these

individuals at these entities as people that they are likely to call as witnesses in this case.  And at this point we're not far enough along in discovery to know that we would even call any of them.  In fact, we think it's much more likely that the chip designers who are outside the scope of this Court's jurisdiction would be the likely witnesses on the infringing instrumentality from, for example, ATI or Sierra Wireless.

So, we've been assuming we would be going to TI facilities either in Texas or in Asia, and that similarly we would be going to CR facilities in Canada, Samsung facilities potentially in Korea, if the design work was not done here. Then that would leave just Marvel here, but we don't know who would be called from Marvel.

So, we have a situation which we think is akin to the *Carolina Casualty* decision from Judge Walker but was quoted in Barnes and Noble's papers, where the plaintiff -- defendant identified specific witnesses in its opening papers that were outside the district for the venue motion.  The plaintiff came back and did not identify a single witness likely to testify who resided in the Northern District of California.  Judge Walker found that on that record, the record supported the transfer and we believe the same is true here.

**THE COURT:**  All right.  Let me ask Mr. Quinn.

Who can you identify that is likely, a very likely witness here within this district and not otherwise within the

control of the plaintiffs?

**MR. QUINN:** Other than the inventors who are identified?

**THE COURT:** And I understand that there's four inventors.

**MR. QUINN:** Yes.

**THE COURT:** Okay.

**MR. QUINN:** We don't have in the record, your Honor, names of specific people at the chip set suppliers; but, I mean, it's undisputed that -- who they are, who those suppliers are:  Samsung, Marvel, Sierra Wireless, Qualcomm and Texas Instruments all either are headquartered in this district or have offices in this district or in California, Newark, California.  Actually, I don't know where Newark, California is.

**THE COURT:** It's within this district.

**MR. QUINN:** I don't have names of people there.  I mean, the Court has a declaration before it that this is where the technical work is done.  That's where -- if we get to infringement and I don't -- obviously, I don't see how we avoid that, that functionality is going to be found in those chip sets and the technical work done by the 240 people in Barnes and Noble's office.

**THE COURT:** What's the likelihood that the chip designers, the people who most likely will have information

relevant to this case, would be located in this district as opposed to Texas, China, Korea, Canada, et cetera?

MR. QUINN:  You know, what they -- where the particular individuals are, I don't know, your Honor.  I know they work with the people at these offices in this district.  I can't make a representation.

Mr. Gilbert says in his declaration -- he doesn't identify.  He does not identify individuals.  He said the work is done by these third parties, all of whom are in this district.

THE COURT:  They are in this district, but they are in other districts, too.

MR. QUINN:  They have offices here, but, you know, your Honor, I think we've heard statements by counsel about -- first off, I don't think Reading, Pennsylvania by our geography is within 100 miles of New York City, and we have --

THE COURT:  It would be interesting to know.  Is there some dispute about that?

MR. QUINN:  We can look that up.  I'm told it's not within 100 miles of New York City.

We have speculation about where former employees are located.  You know, we don't have anything in the record with respect to that, with respect to that specifically.

You know, in terms of the CEO of -- and the CFO and the former executive vice-president of Barnes and Noble, we

have the declaration from Mr. Gilbert saying that the financial records, the sales records, all that information is equally available here, located at Barnes and Noble's offices here.

THE COURT:  Yeah, the records I'm less concerned about.  The issue that drives a lot of the forum issues or the transfer issues is access to non-controlled witnesses.

MR. QUINN:  Here we have entities.  We can -- we know these third parties are present here.  Subpoenas, 30(b)6 deposition notices can be served on all these suppliers here in this district.  They can be compelled to produce documents here and to designate and produce a knowledgeable witness here.

You know, in patent cases the bulk of the relevant evidence is going to be where the infringer is and where it does its work.  The Ninth Circuit said that in the *Genentech* case.  And in the *Decker* case the Court said that a Court must make a strong showing of inconvenience in order to transfer a case.

What we've got stacked up against the other side are senior executives on the east coast, lawyers, prosecuting attorneys, people involved in licensing discussions.  On the other hand, we have, really, the technical focus of this product that's alleged to be infringing these patents, where the evidence is located and third parties who are most knowledgeable about that.  And, you know, the authors of the functionality where -- that infringement is going to be found

are all subject to subpoena here.

THE COURT:  Are there Barnes and Noble's employees current or past that seem to be weighted or concentrated here in this district as opposed to Eastern District of Pennsylvania?

MR. QUINN:  I mean, I don't think there is anything in the record about Barnes and Noble employees, past or present, in the Eastern District in Pennsylvania.

THE COURT:  Or here, versus here.

MR. QUINN:  Yeah.  No, there are lots of them here.

THE COURT:  That would be relevant to this case.

MR. QUINN:  Absolutely.  Absolutely.

THE COURT:  What are some other examples that?

MR. QUINN:  Well, Mr. Gilbert's declaration.  He says that 240 full-time employees work at the offices here in California.  These employees are primarily responsible for designing the Nook products, developing the Nook specifications, selecting and sourcing components and develop software for the Nook products.  In a patent infringement case I would think those things are pretty important.

THE COURT:  So your assertion is that this is the focus of where that activity occurred in terms of designing and marketing, et cetera, et cetera of the Nook?

MR. QUINN:  Yes.  It's certainly not at the corporate headquarters of New York.

**THE COURT:**  Let me get a response from that.

The fact that the chief executive officer, CFO are there, but if the people who were really on the ground and most likely to give percipient witness testimony are concentrated here in this district, doesn't that change the center of gravity or at least spread it out?

**MS. MORROW:**  First, with regard to the personnel in New York.  We know from the V.P. for development of the Nook, that the Nook project was New York, Palo Alto and China.  So we assume that there are additional Nook employees in New York.  We assume there are additional Nook employees here.  We don't know how many, because Barnes and Noble did not have Mr. Gilbert address how many Nook technical employees are in New York and did not have Mr. Gilbert explain who the people are in the Palo Alto office who worked on the relevant aspects of the Nook, which would be the wireless functionality, the 3G functionality, and some specific multi-media functionality associated with data formatting.

And so we don't have -- we assume, yes, some documents will come from the Nook facilities here.  We assume documents will come from the Nook facilities in New York.  Documents will come from Pennsylvania.  Documents will come from LSI here, not very many from LSI here.

But in terms of the witnesses, we simply don't have a record that suggests that the number of party or third-party

witnesses who are located in the Northern District of California is equal to or more than the number of party and third-party witnesses and, particularly, third-party witnesses that are within the subpoena power of the Court in Pennsylvania.

And just FYI, Mr. Ranganath did use Google Maps and figure out what the 100-mile subpoena power is for the Court and we believe the Barnes and Noble New York facility is within the subpoena power of the Court in Philadelphia.

THE COURT:  Can you tell how many miles, 98?

MS. MORROW:  I didn't ask him to bring his Google Map him, but...

THE COURT:  This could be a pivotal point.

MS. MORROW:  Well, we can make a supplemental submission on that point, your Honor.

MR. QUINN:  The case is pending in Reading, and not Philadelphia.

THE COURT:  Reading?

MR. QUINN:  R-e-a-d-i-n-g, Pennsylvania.

THE COURT:  Where is that?

MR. QUINN:  I'm told it's more than 100 miles.

MS. MORROW:  It's north of Philadelphia.

THE COURT:  North of Philadelphia.

Okay.  There is a District Court in Reading?

MS. MORROW:  Yes, it's near Allentown.  It's north of

Philadelphia.  It's not that far north of Philadelphia.  I just can't recall how many driving --

THE COURT:  Google Maps shows New York City is within 100 miles of Reading as opposed to Philadelphia?

MS. MORROW:  I don't believe we checked that.  I believe we checked within the subpoena power of the district, which is that you can have witnesses travel who are within 100 miles of the District and --

THE COURT:  The border of the district is where you draw the radius?

MS. MORROW:  Exactly.  We used Philadelphia as the point in our Google Maps and checked New York and it was, indeed, within 100 miles.  The Barnes and Noble location in New York was within 100 miles of Philadelphia, which is within the Eastern District of Pennsylvania.  So we think we have our geography right on this, your Honor.

THE COURT:  I haven't looked at it in awhile.

Do you disagree with that, Mr. Quinn?  That the rule is 100 miles within the district and not necessarily which courthouse?

MR. QUINN:  I have to confess, your Honor, it's not a question I have ever looked at.  If somebody has a copy of the FRCP available or the Judicial Code, we ought to be able to get an answer to that.

THE COURT:  And Rule 30 --

**MS. MORROW:**  Your Honor, I may be able to circumvent this inquiry.  I understand that we used Allentown in the Google Maps -- I apologize, I was mistaken -- which is where the action is actually pending, and that our investigation showed that the Barnes and Noble New York location was within 100 miles of Allentown.

**THE COURT:**  Allentown, not just the district?

**MS. MORROW:**  Not just the district.  So I apologize for taking us off on an unnecessary tangent.

**THE COURT:**  Now I'm interested.  This is the most interesting issue yet.

Well, I'll have to -- oh, "modern deposition practice adequately covers..."  Oh, distance, "100-mile from the place of trial."  Place of trial seems to be, but we'll have to look at that more closely.

But you're saying irrespective of that, it doesn't matter because they are within 100 miles --

**MS. MORROW:**  Yes, your Honor.

**THE COURT:**  (Continuing) -- of the place of trial.

All right.  I will take this under submission.  I think that the close issue is the venue transfer question and convenience of the witness questions.

I don't believe that jurisdiction is a problem here.  I believe there is jurisdiction.  I believe that -- although it's a close call and I don't know how much weight to give to

the first filed rule, but if we were only looking at the technical application of the first filed rule, there is a pretty good argument that this, indeed, is a first filed case.

I'm not thoroughly convinced that the kind of forum shopping that creates the exception to the first filed rule applies here, although the first filed rule has some give-and-take to it.

But I do think the witnesses, the transfer issue is one that is a close one, and I will look at that.  I will re-look at the affidavits that you all submitted and the case law, but I want to take another look at that because it's obviously a very important decision.  So I will take that under submission.

I guess, I think I need to decide that before we go and start setting dates and those type of things.  So if we do keep the case here, we will set this shortly for a case management conference and start setting dates.  And if not, I guess you'll see each other in Pennsylvania and get some new dates there.

I appreciate it.  Thank you.  Your arguments have been very helpful.

(Proceedings adjourned.)

**CERTIFICATE OF REPORTER**


    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Tuesday, July 17, 2012