Pages 1 – 11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE LAUREL BEELER, MAGISTRATE

```
BARNES & NOBLE, INC., and       )
BARNESANDNOBLE.COM LLC,         )
                                )
            Plaintiffs,         )
                                )
   vs.                          )  No. C 11-02709 EMC (LB)
                                )
LSI CORPORATION and AGERE SYSTEMS )
INC.,                           )
                                )  San Francisco, California
            Defendants.         )  Thursday
_____)  September 6, 2012
                                   10:10 a.m.
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES (via speaker telephone):**

**For Plaintiffs**        Quinn Emanuel Urquhart & Sullivan, LLP
**Barnes & Noble, Inc.;** 50 California Street, 22nd Floor
**Barnesandnoble.com,**   San Francisco, CA  94111
**LLC:**                  (415) 875-6600
                          (415) 875-6700 (fax)
                     BY:  **MELISSA J. BAILY**


**For Defendants**        Fenwick & West, LLP
**LSI Corporation;**      Silicon Valley Center
**Agere Systems, Inc.:**  801 California Street
                          Mountain View, CA  94041
                          (650) 988-8500
                          (650) 938-5200 (fax)
                     BY:  **HECTOR J. RIBERA**

Lydia Zinn, CSR#9223
Official Reporter – U.S. District Court
(415) 531-6587

**THE CLERK:**  Calling Civil Action C. 11-2709, *Barnes & Noble, Inc., versus LSI Corporation, et al.*

Counsel, please state your appearance for the record.

**MS. BAILY:**  Good morning.  This is Melissa Baily, from Quinn Emanuel, for Barnes & Noble.

**MR. RIBERA:**  Good morning, your Honor.  Hector Ribera, from Fenwick & West, for the defendants.

**THE COURT:**  Okay.  Give me a second.  I just finished one case.  All right.  So I'm sorry.  I brought the wrong -- I'm really sorry.  I brought my 10:30 binder, not Barnes & Noble.  I'll be right back.

(Pause in proceedings)

**THE COURT:**  Okay.  Sorry about that.  I'm back, with binder.

Okay.  So here's my view, but you tell me what you think.  Barnes -- so, looking at the first letter first -- you guys have two letters.  You have one that you gave me a day or so ago, which I looked at, too; but looking at the first letter, I mean, I spent time literally charting out your argument, so I could try to understand the source-code arguments.  In the end, Barnes & Noble makes some suggestion that there wasn't an adequate meet-and-confer.

I will say that just, you know, look.  Cut to the meat of what's at issue in your letter.  I didn't see that they were asking for all of the source code; just what's relevant.

I mean, I understand that there were arguments or refinements along the way, because you say first they said they wanted all of the operating system.  Now, they're talking about the code related to accused functionalities.  In the end, they're not asking for all of the source code they're just asking for what's relevant to show the operations of the aspects related to the subject matter of the Accused Patents.  And, as I understand it, LSI is just saying that Barnes & Noble left out source code, and shouldn't be able to unilaterally decide what's relevant, or not.

I mean, I didn't think the case law said it was necessarily particularly helpful, because they were distinguishable.  And what -- the issue here is whether Barnes & Noble has produced the source code that's relevant to the RFP, or whether they haven't.

I thought that -- I mean, look.  For me, looking at the paragraphs describing what defendants want and what Barnes & Noble's holding back is pretty dense.

In the end, they are -- after Barnes & Noble's saying this is not related to the accused functionalities, but you're not really making burden arguments.  And it seems that they're about the stuff that's relevant to infringing the audio; asking for things like source code relating to the music library, and shop apps that relate to the functionality accused of infringing the audio.

And, you know, at the end, there are going to be ripples of information that may or may not be -- ripples of source code that may or may not be relevant to it; but if there's no real burden argument, I don't know why Barnes & Noble should get to decide definitively what's responsive and what's not, when you should just be more expansive, and produce it pursuant to a protective order.

So that's my view of things.  I don't think they're asking for the sun, the moon, and the stars.  I think they're just asking for what's relevant to show the operation of the aspects related to the subject matter of the Accused Patents, but --

And so then the only other issue is really:  has there been a meet-and-confer?  And, really, can't you guys work this out?

But if you can't, I think there should be a more expansive production, pursuant to the terms of the Protective Order. And -- because generally, I can't really see any burden argument.

Okay.  So let's hear from Barnes & Noble first.

**MS. BAILY:**  Sure, your Honor.  And what I would say on the burden argument is, A, there is a burden, because -- there is a burden in two ways.

The first reason why there is a burden -- and maybe that's not quite the right word -- is because Barnes & Noble's source code is so extremely confidential and competitively sensitive. And so there is a sense that, you know, LSI should not have

more than it's entitled to, especially with respect to source code, because it's not a matter of producing some, you know, extra documents that may or may not have some tangential relevance, and that aren't super competitively sensitive.

With the source code, this is basically Barnes & Noble's crown jewels.

**THE COURT:**  No.  I understand that, but here's the thing:  you didn't describe the methodology used to select the source code; at least, LSI says that.  It said that you -- LSI requested specific code; for example, code related to the recognition of the ID3 audio headers.  And -- but it didn't give the code related to the music app responsible for displaying the ID3 header info in the next screen.  And LSI says those are irrelevant to the indirect infringement allegations.

So I just -- I just -- it's -- you aren't telling me.  I mean, you're just saying, "We're not giving" -- you didn't describe what the methodology used to select it was.

And I'm just -- I'm a little reluctant to just direct a meet-and-confer, because, you know, you guys take very -- what's the word I'm looking for? -- very specific approaches to discovery in these kinds of cases.  And it doesn't feel fair, necessarily, to make people engage in endless meet-and-confers with people who take extreme positions.

At some point, if you're not revealing the methodology by

way -- by why you're not producing source code, when they're asking for source code relevant to the functionality accused of infringing the audio -- it seems to me with the specific examples that LSI gave, you aren't doing that.

**MS. BAILY:**  Well, your Honor, if I could address that, I'd really appreciate it, because that example really crystallizes why we are where we are, and why Barnes & Noble does think that additional -- with additional meet and confer, the parties can come to a resolution.

So, first of all, on page 4 of the Order -- I mean, I'm sorry -- page 4 of the letter brief, the joint letter brief --

**THE COURT:**  Right.

**MS. BAILY:**  Barnes & Noble did set forth, under -- in the second paragraph, under the first heading on that page, the categories of source code that it produced to LSI.

**THE COURT:**  The seven categories?

**MS. BAILY:**  That's right.  And so there is sort of an objective description of what was produced.

Now, LSI says, like you said, your Honor, that, you know -- so we said, "Look.  With respect to the ID3 tag, we've produced code regarding the recognition, processing, scanning, parsing of the ID3 audio headers."

Now LSI is saying, "Well, we also want the information and the code regarding the displaying of the ID3 headers."  And that is something that's, in our view, more than what's

relevant to the case, but it's something less than all of the code related to music.

**THE COURT:** Right, but they're -- right.  I understand.  I do understand that argument, but the problem is, is that -- and again, maybe this is an overly simplistic way of approaching what you're saying -- is this is why a meet-and-confer might ordinarily be helpful; but you're cutting it off at one place.  And they're not asking for the whole operating system.  They are not asking for that.

And it seems to me that when there's code related to a job app layer that determines whether sound effect is necessary when a user -- I think that's the example that you used -- when a user touches a key, that it seems like the source code for the user interface that recognizes when the user touches the key, and then is relevant.

And I just -- it's -- I can see why they're not asking for the whole source code.  I don't think they should get it, but the -- there's a -- there's a code.  There's code related to the processes related to the functionality accused of infringing the audio that's a couple of layers out that may raise confidentiality concerns, but at the same time can be protected by the Protective Order.  And I think that's the stuff they ought to get.  And it doesn't sound like LSI has gotten it.

And so I'm not telling you to give the whole operating

system source code, at all; but a couple of layers out gives LSI, pursuant to the terms of the Protective Order, the kind of levels of source code related to the infringing the audio functionality that seems like it's completely relevant discovery, unless I'm just missing something super basic.

**MS. BAILY:**  Well, your Honor, if you wouldn't mind me just -- and I don't want to beat a dead horse.  I would like to have permission to make one more point --

**THE COURT:**  Okay.

**MS. BAILY:**  -- which I think is really key here, because I feel that the shorthands that the parties have been using to identify the Accused Patents and the Accused Functionalities have been a little misleading here.

So the parties have been talking about audio functionality and, quote, unquote, audio patents; but the two, quote, unquote, audio patents -- they don't cover all audio or all music.  The one patent that we were discussing earlier is specifically related to ID3 tags.

And so I understand that some layers out from the ID3 tag issue --

**THE COURT:**  Yep.

**MS. BAILY:**  -- would be an appropriate production, but the shorthand of audio and the shorthand of music and --

**THE COURT:**  No.  I understand.

**MS. BAILY:**  -- related to music is --

**THE COURT:**  Let me be more specific, because again, you guys are the people who are dialed into your case, not me; but let me be more specific.

They -- I mean, tell me if I'm getting these wrong, but they want to examine the code for the apps and the operating system that play a role in 3G and Wi-Fi and MP3 playback and sound effects for system events and keyboard, you know, striking, and coding and decoding of audio data.  And that's what they want.  And then ought to get the code some layers out from that, pursuant to a protective order, to examine, you know, the accused -- what's relevant to show the operation of the aspects related to the subject matter of the Accused Patents.  I mean, that's what they ought to get.

It seems that what you've given them is less than that.

The -- I think that that's what they ought to get generally.  That's a very kind of a meta-level concept, but it's related to the specific stuff that you say in your letter about -- LSI says in the letter about what it's seeking.

And the issue, to me, really seems like not that they should get the whole operating system, but they out to get a few levels out, pursuant to the Protective Order.  So that's my inclination.

LSI, what do you think about meeting and conferring, now that I've given that guidance, to kind of hammer out getting more; and then if that doesn't work, coming back?

**MR. RIBERA:**  Your Honor, our with that -- and, first of all, I think you have it absolutely right.  Our problem with continuing the meet-and-confer process is that we asked for this in January, and we're in September.  They've just given us a few files.

**THE COURT:**  I understand.  So let me -- let me be more specific.  Let me be more specific, just because I've got to sort of move it along.  I mean, it's very -- what -- the paragraphs that you describe of what you want and what they've given you are dense; but I've kind of encapsulated it in the way I just described.  And they ought to give that to you.  And so I'm perfectly happy to order that, and I order it now.

And -- but you know, I use devices.  I know how it works. I have some sense of what the source code related to those events -- you know, that it exists.  And I've defined kind of a bubble around the -- you know, Barnes & Noble has defined it narrowly.  I've defined it a bit more broadly.  You guys ought to -- so Barnes & Noble ought to produce it.  And if it's not sufficient, then you'll tell me it's not sufficient in the context of getting more, based on the guidance I've just issued.

And as to your second letter, you guys haven't done the meet-and-confer.  I wanted to point out that my joint letter process and the discovery briefs is -- is designed that any person can set a meet-and confer with ten days' notice.  I'm

just going from memory.  And then after that, the joint letter can be filed within five days.

    That process, from a time-line perspective, is meant to avoid a situation where one person can keep discovery out the of court.  And so you guys need to meet and confer on the second letter.  Okay?

            **MS. BAILY:**  Thank you, your Honor.

            **THE COURT:**  All right.  Thank you.

            **MR. RIBERA:**  Thank you, your Honor.

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


_____          September 11, 2012
Signature of Court Reporter/Transcriber    Date
Lydia Zinn

Lydia Zinn, CSR#9223
Official Reporter - U.S. District Court
(415) 531-6587