Pages 1 - 32

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE LAUREL BEELER, MAGISTRATE JUDGE

| | | |
|---|---|---|
| BARNES AND NOBLE, INC. and BARNESANDNOBLE.COM LLC, | ) ) ) | |
| Plaintiffs, | ) ) | |
| VS. | ) ) | No. C 11-2709 EMC (LB) |
| LSI CORPORATION and AGERE SYSTEMS LLC, | ) ) ) | |
| Defendants. | ) ) ) | San Francisco, California Wednesday January 9, 2013 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**      Quinn Emanuel Urquhart & Sullivan
                  50 California Street, 22nd Floor
                  San Francisco, California 94111
            By:  **David Eiseman, Esquire**
                 **Adam Botzenhart,Esquire**

**For Defendants:**      Fenwick & West LLP
                  801 California Street
                  Mountain View, California 94041
            By:  **Virginia K. DeMarchi, Esquire**
                 **Ravi Ragavendra Ranganath, Esquire**

**Reported By:**      *Katherine Powell Sullivan, CSR #5812*
                  *Official Reporter - U.S. District Court*

<u>P R O C E E D I N G S</u>

**JANUARY 9, 2013**                                    **11:46 A.M.**

THE CLERK:  Calling civil action C 11-2709, Barnes & Noble versus LSI.

Counsel, please state your appearances for the record.

MR. EISEMAN:  Good morning, Your Honor.  David Eiseman and Adam Botzenhart from Quinn Emanuel, on behalf of Barnes & Noble.

THE COURT:  Good morning.

MS. DeMARCHI:  Good morning, Your Honor.  Virginia DeMarchi and Ravi Ranganath from Fenwick & West, on behalf of the defendants.

THE COURT:  Okay.  Great.  Thanks for coming in.

So just looking at my notes, I looked at this before the holidays, but I did relook at it last night, briefly.

Okay.  So let me tell you, you know, I sort of get it. Now, I've been very progressive, I guess is the word, about sort of the things that I -- you know, the whole idea of kind of going back to the hypothetical negotiation, I've employed a flexible approach.  And not everybody's necessarily happy with that approach, but it's been applied.

And then, of course, the big takeaway of that is now we're kind of spinning into the next levels, and I've taken that approach.

So I want to tell you, if I can find my notes, a couple of

sort of reactions to everything that's collectively on the plate today.  And that will help you think about what you want to say to me about it, and why you think I'm -- I don't want to do a do-over of what I've already decided.  At the same time, I'm mindful of kind of the arc of, you know, what I've ordered and how that would influence what I order now.

I read the -- Judge Grewal's order just as far as the downloads devices other than the NOOK.  I read the *Elan Microelectronics* decision.  And I get it was different.  The multi-touch functionality and the nonmulti-touch functionality maybe provides more insight into the -- you know, provides a different illumination into damages than Barnes & Noble would think would be provided here by the information that LSI seeks.

All that being said, I -- that order was about a particular context.  And, still, the takeaways for it were something along the lines of, look, the damages theory may or may not -- may not or may, maybe I should say, be good ones.

But if you're going to argue about it, argue about it in a *Daubert* and on the MJ doing discovery, and not the person who's deciding the issue anyway.

So absent, you know, the ordinary arguments like burden, I'm not going to say it's not relevant, I'm going to order it.

And even though I think that the context is different, I still think that for, really, the same reasons that Judge Grewal articulated, that it falls in the damages assessment

purview here.

And so I don't think that the -- I looked at the other cases that Barnes & Noble cited. I read them all. You know, I'm not -- my background is not in patents. So, you know, I read and I think about what other the case seems to apply or not.

You know, I looked at *Samsung* and the -- *SDI Co. vs. Matsushita.* And I -- that case involved the parties' understanding that they were going to limit discovery to the accused products. So it's a different context than here.

And, again, I come back to where I started is, I've articulated an approach in the draft licensing context, sort of to LSI's disadvantage, that was a broad approach to discovery that's relevant to damages and sort of fall on the arc of that decision-making, for good or for bad, decisions that I've already crossed. I think that that militates, too, in favor of letting LSI have it. So that's my preliminary on that.

As far as NOOK Media, I didn't see it at all. Sorry, I mean, I just didn't see it at all.

I mean, I understand the arguments. I read the letters. I read the cases. It happened three years after the hypothetical negotiations. That's just getting too far away from it for me.

Then as to the burden issues that I previously said okay, just work it out without having me do it, I think that LSI's

approach is probably -- maybe you have more information to report to me.

I glanced at the letter that LSI provided me last night, but not -- really only the first part, the burden part, not so much the second part, because, A, you didn't weigh in on it; B, I kind of was already there; C, I got it last night; D, there's only probably so many hours in the day, as you might get by the fact that I sometimes submit my own orders at alt times.

**MR. EISEMAN:** Including December 23rd, Your Honor.

**THE COURT:** And you can tell it's me because it says Beeler, comma, Laurel.

So all that being said, I -- look, I think in the end let's -- I always -- my whole approach generally, in my own cases, is start, and if there's really more you rally need, get there.

I think that that would seem like a fine approach that you're proposing. Let's start with attorneys who are actually involved in the potentially relevant licensing. The burdens of the privilege log seem too much under the circumstances, at least now.

If what you get -- and then I have that -- you know, and at some point what I'm trying to do is re-create -- A, give you an ability to assess your damages; B, re-create the hypothetical negotiation standpoint.

But, of course, everybody -- what I do understand now --

I'm learning so much more about patent cases because now, you know, I'm trying to do all my own discovery and read through it because it's an education, and so this is the kind of stuff people kill to get access to.

So I don't -- you know, at some point it goes -- I will just say, parenthetically, that business aspects of patent litigation are something I never appreciated as a lawyer in my old job.

All that being said, at some point it strikes me as going a little far afield, so let's try to get to the meat of it.

You guys have a mediation coming up.  And I personally think that you don't -- and, you know, private mediation is hard to -- I can't remember who your mediator is.  It was someone good, I thought.

**MS. DeMARCHI:**  Judge Michel.

**THE COURT:**  Yeah.  And, you know, there's a certain amount of illumination that's really provided, as opposed to the scorched earth damages assessment.

It seems to be that we're problem solving in that universe already.  And I let everybody get pretty far into damages theories.  And I thought that LSI's proposals seemed fine on the burden.

So those are my preliminaries.  And so you tell me why -- I mean, that goes with you on two of the main things.

**MS. DeMARCHI:**  Sure.

**THE COURT:** Doesn't go with you on NOOK Media.  I really didn't see NOOK Media.  And I'm just saying -- I mean, I understand the argument, but I really didn't see it.

Maybe we should start with you because it's -- you know, and then we'll come to you.

**MS. DeMARCHI:**  Okay.  Very well.

**MR. EISEMAN:**  That's fine, Your Honor.  And maybe we can start with the burden issue, actually, because -- and Ms. DeMarchi's letter didn't say this, but when we met and conferred on Monday, we actually were amenable to a proposal, I was, but we needed to talk to our client.

**THE COURT:**  I see.

**MR. EISEMAN:**  And so with a couple of clarifications and one request, I think that their proposal is fine.

The one clarification is that -- and I think we reached this understanding during the meet-and-confer.  Their letter last night said -- referenced the fact that they were going to limit their search to in-house attorneys who were involved in negotiating licenses that have been identified as potentially relevant.

And we just are hoping that LSI will commit -- like they said they did on Monday in our meet-and-confer -- that what that means is they're going to produce communications and draft licenses that are related to actual or contemplated licenses covering any Wi-Fi, 3G or multimedia patent in their portfolio.

**MS. DeMARCHI:**  If this is a good opportunity, I will tell the Court exactly what our position is on this.

**THE COURT:**  Okay.

**MS. DeMARCHI:**  So, as I explained to Mr. Eiseman, LSI does not agree that the -- the expansive terms used, for example, "multimedia," has definitional weight.  I mean, that's -- he can't even tell me what he means by "multimedia."

So recognizing that the functionality at issue --

**THE COURT:**  Does that mean different modes of connecting, like USB or whatever?  Those were the three identified in the complaint.

**MS. DeMARCHI:**  The patents relate to the Wi-Fi connectivity and certain --

**THE COURT:**  Wi-Fi standard, right.

**MS. DeMARCHI:**  I mean, the Wi-Fi 3G is -- and "multimedia" is the other term, but the actual patents that are neither Wi-Fi nor 3G relate to MP3 audio technology, so -- and even within that context, Your Honor, the standards, for example, that govern in the 802.11 sense is a vast document that has many parts to it.

However -- so I -- unless I --

**THE COURT:**  But you can identify with the licenses that you produce, what technology is implicated.  And then if you don't think it's good enough, you can tell her.

**MS. DeMARCHI:**  Yes.

**THE COURT:** The words "audio technology," I think, were used in the complaint, right?

**MS. DeMARCHI:** Yeah.

Your Honor, if I can just kind of clarify what our communications were.

**THE COURT:** Sure.

**MS. DeMARCHI:** I think this is an academic dispute for the following reason:

So even though LSI doesn't agree that the broad scope of relevant licenses is, in fact, the correct scope of license production, the way that our client does its licensing -- and we have found no exceptions to this so far -- is that when one of the patents-in-suit is licensed, the entire intellectual property that the client has that relates to that same field is included in the same license.

They license by target product, and in some cases by portfolio, which may include lots of patents, for example.

So as a practical matter -- and I shared this with Mr. Eiseman -- we have found no examples where we would say, ah, this one doesn't have a patent-in-suit, or the technology that the patent covers, or something related, and exclude it for that reason. So I don't think there's a dispute here about that.

So my proposal in the burden context was that we will identify licenses, as we have been, that fit that criteria, and

then we have that as the universe.  We will look for the drafts in the licensing attorney files, communications with the licensee target about those drafts.

And the licensing attorneys would be the custodial universe that we would search for, collect and review for purposes of satisfying the Court's direction.

THE COURT:  Okay.

MR. EISEMAN:  And the only -- I guess the only clarification I'd ask that the Court ask Ms. DeMarchi to make is that there may be licenses that don't involve the patents-in-suit, but that still implicate wireless, 3G or technology.  And I'm happy, Your Honor, to limit it from multimedia down to audio technology.

We needed assurances that we would be obtaining actual and draft license agreements covering those technologies if they are patents other than the patents-in-suit involved because they would still be absolutely relevant to the reasonable royalty inquiry.  And Your Honor's already made that ruling, I think, now three different times.

THE COURT:  Well, the other rulings that I have made stand, so this is just a question of burden and identifying the custodians.  So, yes, that's correct.

MR. EISEMAN:  All right.

THE COURT:  Okay.

MR. EISEMAN:  And then the only other thing we would

ask, Your Honor, with respect to the privilege log -- and we suggested this during a meet-and-confer on Monday, is that we would like LSI to provide us with one -- with a privilege log with respect to one licensing file.  At their choice, they pick a license between LSI and whoever, and just --

THE COURT:  Just so you can have an idea of the kind of information that's being ...

What do you think about that as an approach?

MS. DeMARCHI:  My reaction to that is there shouldn't actually be any privilege documents because the Court has ordered that draft licenses exchanged with the other side --

THE COURT:  And communications.

MS. DeMARCHI:  -- and communications, they're not going to be responsive as the internal communications with the licensing attorney and --

THE COURT:  Then it should be easy.

MS. DeMARCHI:  So I don't think we have anything to log --

THE COURT:  Okay.

MS. DeMARCHI:  -- but I didn't want to be under some obligation that somehow the boundaries of what we were supposed to review and, you know, encompass the licensing attorney files that were clearly internal communication.  I just asked that be clarified.

And then I think the question of a privilege log is mute

because we shouldn't be logging any of that stuff anyway, if it's not responsive.

MR. EISEMAN:  We don't believe that's the case, Your Honor.  If it's --

THE COURT:  Well, the issue is whether it's responsive.  And then if it's responsive, whether there's information that's being withheld.  And what -- what you're saying is that you were -- that you don't believe there's anything that would go in a privilege log for what's responsive.  But if there is, then you'll provide a privilege log for one licensing packet.

MS. DeMARCHI:  And, frankly, Your Honor, we haven't begun the review and collection.  But my understanding is that if a licensing attorney is sending a draft license over to the licensee target, that's not going to be a privileged communication.  We wouldn't be logging it anyway.

THE COURT:  So, then, just say that.

MS. DeMARCHI:  So, I mean, I can -- once we begin the process of review, I can make that representation to Mr. Eiseman.

THE COURT:  Okay.

MR. EISEMAN:  Just so the record's clear, Your Honor, I think it's true that your orders have not expressly addressed and ordered production of internal licensing communications at LSI, but we absolutely have requested them.

**THE COURT:**  Well, no, I'm not going to authorize internal communications.  That's the stuff you're dying to know, but you don't get to know that stuff.

**MR. EISEMAN:**  Well, maybe we don't if -- maybe we --

**THE COURT:**  I'm not saying it's not relevant, but that sort of gets into -- it's the drafts that you're after.  To give a course of conduct that seems -- you know, the point that LSI made before is that at some point you start kind of like creeping into areas that you don't get to know about.  But this seems that we've carved out what you do get to know about.

**MR. EISEMAN:**  Well, let me -- I understand Your Honor's position, but let me just give you one example.  If there are internal nonprivileged e-mails --

**THE COURT:**  That are responsive, okay.

**MR. EISEMAN:**  -- then we are entitled to those.  And I'll give you an example.  If one engineer says, hey, we're reaching out to so and so company to license our two 3G patents, and the lawyers tell me we're going to demand 10 percent but I think it's worth a quarter percent because both patents are no good, that's something directly relevant to the damages issue in this case, and we should --

**THE COURT:**  So say that again.

**MR. EISEMAN:**  So if there are internal communications within LSI that go to the valuation of their patents, those would be absolutely relevant.  Now, they may claim they're

privileged, but that's where the privilege log comes in and that's why we want the example of a privilege log.

But we've absolutely asked for those internal communications, and they are very relevant.

**MS. DeMARCHI:**  So, Your Honor, this is something that Mr. Eiseman and I also discussed on Monday, and my response at the time -- and I'll share with you as well -- is that this particular endeavor that the Court has ordered has to do with the draft license agreements.  And those occur in a particular context, as I've tried to explain.  There's a procedure in LSI for doing those.

So separate and apart from whatever discovery may be on the table and out there, this particular issue of how do we go about satisfying the Court's directive to produce draft licenses, those -- those aren't part of this discussion.

Mr. Eiseman has discovery requests, as do both parties, for respective valuations of the patents-in-suit, the patents that are licensed into the NOOK devices, which is actually a subject I'd like to get to in the context of NOOK Media.

So I view that as a separate matter, and one where we certainly would lodge privilege communications if those were responsive to those requests.

But as to the licenses and drafts exchanged --

**THE COURT:**  So what you're saying is, like, literally the way they keep track of their licenses, you're not going to

have that kind of information in the licensing communications that you're going to be reviewing to respond to my prior order, ordering the draft.

**MS. DeMARCHI:**  Yeah.

**THE COURT:**  Okay.

**MS. DeMARCHI:**  Addressing the Court's order on this particular topic, there's a methodology that the client has for dealing with licenses.  And I described that in our papers.

And so I think, you know, the scenario that both parties have documents from other people that might relate to evaluation, those are things that would be separately searched for and appropriately logged in a privilege log if they were internal communications.

So I'm just -- it's really just, you know, trying to keep focused on what we're actually talking about for purposes of the discussion today, was my reaction.

**THE COURT:**  So if there are responses to other discovery requests and there's privileged information they're required, then my discovery dispute procedure is to provide you with a privilege log.

And what you're saying is, with this particular production here, as to the draft licensing agreements, the information review only produces the drafts and the communications around them because that's how the client stores the information.

**MR. EISEMAN:**  But as they go through a licensing

attorney's files and they're looking for communications with the potential licensee and draft licenses, they're going to come across internal communications.

And let me just read for Your Honor our request for production No. 113.  It's:

"All documents and communications regarding licensing of the patents-in-suit, including but not limited to negotiations, discussions and/or correspondence, regardless of whether or not a license was executed."

So that would include internal communications.  And for them to not log those seems --

THE COURT:  Okay.  He said one file.  You pick the file.  Pick a file, any file.  Let's just do that.  And then if there's a problem, I can at least understand it in the context.

I'm a very contextual thinker.  I don't understand things in abstract.

I'm kidding.

MR. EISEMAN:  And then, Your Honor, one related issue is, to the extent that LSI withholds any documents that were exchanged with persons outside of LSI, but they claim somehow are still privileged, will those appear on a privilege log?

THE COURT:  Well, it's the same review.  You're saying it's not there, there's nothing that's going to be there, you'll just look at what's filed.

MS. DeMARCHI:  I can't imagine we'd be claiming

privilege for something we shared externally, but I --

THE COURT:  Exactly.

MS. DeMARCHI:  You know, it just doesn't seem like that's a plausible concern.

THE COURT:  Yeah, it seems that there would be no privilege because it was disclosed.  Okay.

MR. EISEMAN:  And then, Your Honor, I know you've had a long morning, so let me be brief about the download issue.

Your Honor referenced the arc, the path you've set us on with respect to licensing.  But I think that the order you've made with respect to licenses is very different than this download data.

Licenses, obviously, are at the heart of a reasonable royalty case.  And these are LSI's licenses, and that's why you've given, you know, us a broad range of discovery --

THE COURT:  Right.

MR. EISEMAN:  -- in that sense.

THE COURT:  But let me just say this, though.  But they've articulated a damages theory.  They say it's relevant to damages.  They've articulated something.  It's -- without some kind of a robust illumination of a damages theory, which is not my job or my delegated -- my delegated job, I just have concerns.

You know, I don't see anything that -- I mean, I read your decisions about device specific.  I understand it.  I

understand the context of the *Elan* decision.  I mean, look, we all -- I shouldn't say that to people.

What I've actually found out is that my own use of technology means that I do so much better in these cases than I ever thought I would.  That's all I'll say.

**MR. EISEMAN:**  Well, let me just say this.  They've articulated two reasons.

The first one was in their letter last night, which was not in the original joint letter, and that was that they somehow accused equipment used in downloading data when a customer is in a Barnes & Noble store.

And so on that issue, A, they didn't raise it in the joint letter brief; and, B, their 3.1 infringement contention claim charts do not set forth a claim of infringement with respect to in-store equipment.  And so, Your Honor, that's not at issue in this case.

Now, they're going to disagree with me, but the fact of the matter is, they need a claim chart under 3.1(c).  They don't have one that relates to the equipment that's used in Barnes & Noble stores.

So to the extent they say it's directly relevant to damages, as they did in their letter last night, we disagree, because when a customer is in a Barnes & Noble store, say with a Samsung Tablet -- so that's not an accused device, but they have a NOOK application on their Samsung Tablet -- that's a

nonaccused device being used to download nonaccused content.

That is not *Elan* or any other case they've cited.

THE COURT:  Right.  And I hear you, because you say the absence of the multi-touch functionality makes *Elan*, you know, an easier conceptualization of how you might approach the damages assessment.

And you're saying it's not so -- it's not so obvious.

MR. EISEMAN:  And, in fact, if we're ordered to produce this data, they're going to get data that's going to show downloads onto nonaccused NOOK devices.

They'll have no way to say that that shows demands for downloads using the 3G or wireless functionality on NOOK devices.

THE COURT:  Their argument is something like it's the mix of technology that influences how the damages ought to be assessed for the accused functionalities here.

MR. EISEMAN:  But all these devices do it the same way.  They either do it wirelessly or through a cellular network.  And so they're not going to be able to draw that distinction.

THE COURT:  Well, I suppose they could.  Well, I mean, I guess the theory is something along the lines of, depending what you use, it might influence how you value damages.  And it's that mix of use that enables us to make our experts, they say, to make some sort of damages assessment.

**MS. DeMARCHI:**  If the Court would like, I can elaborate on that issue.

**THE COURT:**  Okay.  Why don't we have her tell me, and then you can respond.

**MS. DeMARCHI:**  Yeah, so taking a little bit higher step back in terms of what's relevant for damages discovery, as the Court knows, the Federal Circuit has become a lot more rigorous in its demands on the parties, and particularly the patent holder, in proving the damages about having some rigor around the analysis.

And so, you know, contrary to what Mr. Eiseman suggests, it's not just the licenses, which, as he will discover, typically include technology other than the patents-in-suit, which is what we're trying to value here.

So the *Georgia Pacific* factors include a lot of different considerations, not just the licensor.  It's the patent holder's licensing.

And that includes some of the factors we cited where you consider whether the sale of an accused device, for example, in this case the NOOK, drives sale of content.

You consider whether the relative functionality that's involved comparing one device to another influences the sale of content.

In this case, what we're talking about, downloads of content from the Barnes & Noble store to nonNook devices, if,

as Mr. Eiseman is correct -- and we don't think he is because these devices are not identical, they all have a different mix of functions.

But if he were correct that the third-party devices shared functionality with the Nooks, which themselves have different functionality across different iterations, then that would be useful information, too, because we would expect to see no difference in terms of the content that's -- that's driven by those devices.  You would say the device -- the content was independent of the devices.

We don't have that information.  We're in a position now where we're trying to develop a damages theory without having access to the information that Barnes & Noble has.

And it's not burdensome information to provide because they've already provided all of their download data for MP3 files, for example --

THE COURT:  For the accused devices.

MS. DeMARCHI:  No, no, for all of them.

THE COURT:  Okay.  For all of them, that's right.

MS. DeMARCHI:  For the MP3 patent, the '730 patent, where MP3 file technology is the issue, we asked for and received all of the information -- at least we were told it was all of the information about the downloads of MP3 files, regardless of device.

And they said that they have it for the, you know,

third-party devices as well.  They can give us all of that download information.  They can also tell us to what device it was downloaded, which would be very relevant for our purposes.

So I think that if the Court is taking the approach that, you know, the damages theories are in development, as they are, we are still producing licenses, we are still trying to collect information --

THE COURT:  And that the attacks on them are the ones that are going to have to be made in District Court at a *Daubert* hearing, not before me when I'm kind of trying to devise discovery that's not burdensome, which I always care --

I mean, look, I do care about the proprietary aspect of information, but it's also the burden that ends up being the rub, which is why I came out that way --

MS. DeMARCHI:  Yes.

And I don't think that Mr. Eiseman is saying that it's burdensome to produce this information.  I don't think that's his issue.

THE COURT:  Okay.  Well, I understand the argument. Thank you.  It's helpful to have it said out loud --

MS. DeMARCHI:  Okay.

THE COURT:  -- because the context of it makes me understand it better.  Okay.  Thank you.

MR. EISEMAN:  And I think, Your Honor, we've made our --

**THE COURT:** Okay. Good. Thank you. Thank you very much. So --

**MS. DeMARCHI:** Oh, could I be heard on the NOOK Media issue?

**THE COURT:** Yes, yes, yes.

**MS. DeMARCHI:** There are really two categories of information there.

So there's the question of getting access to information that was part of the valuation that the parties certainly did when they did this transaction.

The transaction was, in part, a resolution of a dispute between Barnes & Noble and Microsoft. And it was the transaction that led to the formation of the company that now owns one of the patents-in-suit. This NOOK Media is not just some third party.

**THE COURT:** Right. But tell me this. I'll tell you what my issues were just super specifically.

Three years later --

**MS. DeMARCHI:** Okay.

**THE COURT:** -- those cases -- those cases, one of them they were concerned about it being a shell company, and the second one, it was roughly contemporaneous.

And this is just so much later, I just didn't -- I mean, I see why you'd want to know it. Of course, you want to know it, but I just didn't see how it was relevant.

**MS. DeMARCHI:**  So two responses there.

First is the *Lucent* case, which we cited in our brief, which actually makes clear that information like this is not only discoverable but can also be actually relevant and admissible in trial.  That's a Judge Michel decision, in fact.

And I think that that is a critical point here because here -- it's only -- it's only three years as to the first NOOK, but they are -- they are releasing Nooks constantly.

**THE COURT:**  *Lucent* was about the accused products.

**MS. DeMARCHI:**  That's right.

**THE COURT:**  And they've already disclosed all the information about the accused products.

**MR. EISEMAN:**  Absolutely, Your Honor.

**MS. DeMARCHI:**  But it's actually information about the valuation of the technology.  So that part of it was a damages case, Your Honor.

**THE COURT:**  No, I understand, but it was discovery about the use of the products.  The --

**MS. DeMARCHI:**  Yes, but that's what we want.

**THE COURT:**  They gave it to you already.

**MS. DeMARCHI:**  We're not talking about downloads. We're talking about the, you know, plans, the projections, the discussions between the parties about the value of the accused products.

I mean, their business is selling the accused devices and

selling the content that can be downloaded to the accused -- so we're not talking that the download third-party device now. We're talking about Microsoft and Barnes & Noble exchanging documents in connection with this transaction, where there are discussions about the value of the business that this NewCo NOOK Media company is going to be running.

Barnes & Noble -- sorry, Microsoft is making a significant investment in this partnership to form this company.  And we are confident that there are significant documents that don't just say we're valuing the business at X, but underlying reasons explaining, for example, this very issue about whether content sales are really driving the value or whether it's, you know, something in the device itself.

All of that is information that, you know, frankly, we're surprised we're not getting access to.  The agreement -- there are two -- as I understand it, two agreements possibly at issue.

There's the agreement that formed the -- you know, between Microsoft and Barnes & Noble that forms the company.  But then very particularly -- and this was the second piece of information that is critical -- is the license agreement whereby Barnes & Noble licenses intellectual property, including patents from Microsoft.

And as the Court will recall, when we had the discovery -- the discussion about the protective order, the discussion went

around licensing and licenses from LSI relating to the technology areas.

And on Barnes & Noble's side, as the Court will recall, it was patents used in the Barnes & Noble accused devices.

This is -- this Microsoft Barnes & Noble license, we believe, although we don't have access to it, is for technology used in the accused devices.

Now, that license will be relevant for two reasons.  If, as Barnes & Noble has contended, the license concerns functionality, that's like way more critical, you know, different, whatever, from what's at issue in this case, that will be a benchmark.

If it's a license to the operating system, then we'll be able to say, okay, well, that's a significant chunk of the device.  That gives us some metric.

If it's for something small, like the date picker feature in Outlook, which was at issue in the *Lucent* case, that will also be useful information.

So this license is absolutely critical to our damages case because this is a -- I don't know how many examples of licenses we're going to get from Barnes & Noble.  We've asked for them and, as far as I know, we haven't received any licenses from them.

We know they license in technology to the accused product. And if we're trying to figure out what value our intellectual

property has in their product, we need to be able to make that apportionment.

THE COURT:  But it's not just the value that -- I mean, you could have damages theory.  It's supposed to be a damages theory back at the time of the hypothetical negotiation.

And so you don't get the benefit of hindsight, even though you sort of do by the way discovery goes.

MS. DeMARCHI:  But you do, Your Honor, because of the Book of Wisdom analysis, which *Lucent* references, that goes back.

This is something that the courts have actually become over time much more willing to accept because there's this recognition that economic reality has to inform how you're valuing this technology.

THE COURT:  And it's just plain easier.

MS. DeMARCHI:  I mean, it's like -- and, besides, as I reminded the Court, we've already kind of been down this road.

The contemplation was that if we're giving this broad discovery of our licenses, broadly defined, then Barnes & Noble signed up for the same thing, which was all licenses by Barnes & Noble of technology into the accused devices.

THE COURT:  Okay.

MS. DeMARCHI:  So, anyway, I'll leave it there.

THE COURT:  Thank you.

**MR. EISEMAN:**  Your Honor, three brief points.

**THE COURT:**  Yes.

**MR. EISEMAN:**  I mean, Your Honor is right on about *Lucent*, which is -- the issue in *Lucent* was actual usage of the accused functionality, and whether that could be admitted down the road after the hypothetical negotiation.  It was not about projections.

And, in fact, for the reasons Your Honor articulated, projections three years later are simply not relevant to what would have happened back in 2009.

As to counsel's point about the fact that we're introducing new Nooks all the time, there would have been only one hypothetical negotiation.  It would have started at the time of the alleged first infringement, which is when the original NOOK was introduced to the market.

Now, they haven't cited a case that says that somehow you have serial hypothetical negotiations.  Maybe if new patents issue, that sometimes happens.  But in the context of damages in patent cases, there's one when the infringement begins and -- or alleged infringement begins, and that would have been in 2009.

**THE COURT:**  Could I just ask a question, because this is -- this is why I'm always having you show up, so I can ask questions.

The "Book of Wisdom" kind of argument, is that just

something that you get to do if the book of wisdom, the current economic realities, don't make the hypothetical negotiation -- doesn't give it -- doesn't make any sense anymore because of declining economic realities?  And what's the context of those cases?

MR. EISEMAN:  I think that's a fair summary of how it goes.

THE COURT:  Yeah.

MR. EISEMAN:  And the third point I'd like to make with respect to the Microsoft license, it's been publicly reported -- and I think LSI knows this -- that the deal between Microsoft and Barnes & Noble did involve a patent license, but it also involved an investment of $600 million by Microsoft in Barnes & Noble.

And so unless and until LSI wants to invest $600 million in Barnes & Noble, that license agreement which covers technologies that are not incorporated in the NOOK -- no Microsoft-supplied technologies are incorporated in the NOOK -- then that -- it's just a completely irrelevant license and shouldn't have to be produced.

MS. DeMARCHI:  But that argument could apply equally to LSI's licenses --

THE COURT:  I know.

MS. DeMARCHI:  -- which include maybe hundreds of patents besides the patents-in-suit, and for the same reason

that that's been deemed relevant.

So with -- I mean, the parties can make those discriminations.  And, ultimately, our licenses, that license may not be admissible, but we should have the opportunity to make that evaluation.

THE COURT:  I understand the argument, but the time context is different.  It is different.  I know you're saying it doesn't make a difference because it's still relevant, and it's relevant and it informs.

MS. DeMARCHI:  Your Honor, it's actually relatively close in time, quite honestly.

I mean, sometimes we have cases where you're talking about a license that's ten years old.  We are producing licenses right now that date back to the mid '90s.

I mean, it's very far -- because that's the scope of the Court's order.  It's very far removed from the date of the hypothetical negotiation Mr. Eiseman is advocating.  This is actually relatively close in time.  It's about the accused device.  And, as I said, it provides those benchmarks.  And it's exactly aligned with the discussion on *Lucent*, which advocates the consideration of -- you don't turn a blind eye to evidence.

And on the new product issue, the new products are not identical to the original NOOK device, which is the one that Mr. Eiseman is referring to with the date of the hypothetical

negotiation.

They have different features.  They have less technology, in some ways, that's at issue.  And we should --

THE COURT:  Right, I understand what you're saying. You're saying, for all the same reasons that mix is relevant to your damages assessment.  I understand the argument.

MS. DeMARCHI:  And one other small point.  Again, I don't hear Mr. Eiseman arguing about burden.

We're asking for a specific license, a specific agreement and a, you know, specific exchange of material relating to one transaction.

And here we are, you know, turning out the files for -- you know, reviewing 1200 license agreements.  And, you know, it's just -- I find it -- I find it hard to believe that this position would be taken, given what LSI has been asked to do in this case.

MR. EISEMAN:  And, as I think we've made clear, it's not a burden issue.  It's a discoverability issue.  And for all the reasons we've articulated, we don't think the Microsoft documents are discoverable.

THE COURT:  Okay.  All right.  Good.  Thank you.

You know, and I'm mindful that three years isn't a long time.  I mean, it can be a lifetime in technology too, but I know what you're also saying is the bundle of how stuff gets done is relevant to your damages assess.  I understand the

argument.  Okay.

          **MR. EISEMAN:**  Thank you very much, Your Honor.

          **MS. DeMARCHI:**  Thank you, Your Honor.

     (At 12:22 p.m. the proceedings were adjourned.)

                         - - - - -



                    **CERTIFICATE OF REPORTER**

          I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


DATE:    Tuesday, January 15, 2013





_____

          Katherine Powell Sullivan, CSR #5812, RPR, CRR
                    U.S. Court Reporter