Pages 1 - 188

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

| | |
|---|---|
| BARNES & NOBLE, INC. and BARNESANDNOBLE.COM LLC,  ) ) ) | |
| Plaintiffs,  ) ) | |
| VS.  ) | No. C 11-2709 EMC |
| LSI CORPORATION and AGERE SYSTEMS LLC,  ) ) ) ) | ) San Francisco, California |
| Defendants.  ) | Tuesday |
| _____)  | March 25, 2014 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**      Quinn Emanuel Urquhart & Sullivan
                         50 California Street, 22nd Floor
                         San Francisco, California 94111
                    By:  **David Eiseman, Esquire**
                         **Carl G. Anderson, Esquire**
                         **Seth Skiles, Esquire**

                         QUINN EMANUEL URQUHART & SULLIVAN
                         777 6th Street NW, 11th Floor
                         Washington, D.C. 20001
                    By:  **Jeffrey Gerchick, Esquire**
                         **Carl G. Anderson, Ph.D., Esquire**

**For Defendants:**      Fenwick & West
                         275 Battery Street - Suite 1500
                         San Francisco, California  94111
                    By:  **David D. Schumann, Esquire**

(Appearances continued on next page)

**Reported By:**     *Katherine Powell Sullivan, CSR #5812*
                     *Official Reporter - U.S. District Court*

**APPEARANCES (CONTINUED):**

**For Defendants:**          Fenwick & West
                             801 California Street
                             Mountain View, California  94041
                        **By:  Charlene M. Morrow, Esquire
                             Hector Ribera, Esquire
                             Yixin Zhang, Esquire
                             Armen Nercessian, Esquire
                             Adam Lewin, Esquire**

                             Sidley Austin LLP
                             1001 Page Mill Road, Building 1
                             Palo Alto, California  94304
                        **By:  Diane Gabl, Esquire**

**P R O C E E D I N G S**

**MARCH 25, 2014**                                        **10:09 A.M.**

**THE CLERK:**  Calling case C 11-2709, Barnes & Noble versus LSI.

Counsel, please state your name for the record.

**MR. EISEMAN:**  Good morning, Your Honor.  David Eiseman from Quinn Emanuel, on behalf of Barnes & Noble Inc. and BarnesandNoble.com LLC.

With me are Carl Anderson, Jeff Gerchick, Seth Skiles, and Brett Watkins of Quinn Emanuel.  Also present is Lisa Brannen, the director of IP at Barnes & Noble.

**THE COURT:**  All right.  Thank you, Mr. Eiseman.

**MS. MORROW:**  Good morning, Your Honor.  Charlene Morrow from the firm of Fenwick & West.

And with me today are my colleagues David Schumann, Hector Ribera, and Yixin Zhang at counsel time, and in the well, Diane Gabl from the Sidley Austin firm, who is our co-counsel, along with Arman Nercessian and Adam Lewin.

**THE COURT:**  All right.  Good morning, everyone.

What I'd like to do is just go through patent by patent the terms that come up within each respective patent and, at least in my own mind, organize our discussion and first talk about the '730, since the subject matter of that is the digital music, and then to the video technology, which is the '087 and the '006, and then saving for last the wireless technology,

which is the other six, I guess.

MR. EISEMAN: Your Honor, one question about the video patents. Also, the '663 is one of those three video patents. And we notice Your Honor's order yesterday that term 13, "setting said index value to a threshold" from the '663 was a term that the parties didn't actually fully brief. It was briefed in Fenwick's or in LSI's opening brief but then, because of space limitations, we did not address it.

So we just wanted to make sure the Court wanted to hear from the parties on that term, even though it hasn't been fully briefed.

THE COURT: Well, if you have any additional comments, this is your chance to say something about that.

MR. EISEMAN: Your Honor wouldn't entertain a brief on the issue, would you?

THE COURT: Well, depends if I feel like we need to have more.

MR. EISEMAN: Okay.

THE COURT: All right.

MS. MORROW: Thank you, Your Honor.

THE COURT: So let's start with the '730.

THE CLERK: Two of the same thing?

MR. EISEMAN: One is for Your Honor's law clerk.

THE CLERK: Thank you.

THE COURT: Well, is it your intent to give a brief

presentation then on each of these, or --

MS. MORROW:  We are prepared to give a brief presentation if the Court would find that helpful.  If the Court would prefer to ask specific questions, we can obviously proceed in whatever fashion would be most useful.  But we have prepared a short presentation.

THE COURT:  The ones where I have questions I'm ready to kind of jump into it.

And this one seems a little bit less conceptually difficult than the others.

So first question I have is when you just look at the language, and this is very somewhat simplistic, but just look at the plain language, isn't there a difference between -- that has a different connotation between "global header" and "first header" in terms of whether there's a differentiation?

I know you've treated these as similar, but it seems to me that "global" would imply a narrower concept than "first header."

MS. MORROW:  In the specification, if you look at the teaching, it talks about a global or a first header alternatively.  So based on the teaching in the specification we think that they should be treated consistently.

THE COURT:  Where are they treated interchangeably in the specification?

I'm not sure "first header" comes up until you get to the

claims.

MS. MORROW:  I apologize, Your Honor.  That's correct.

So in the specification it talks about a global header. The claims refer to either a global or a first header.  The claims that talk about what the first header contains contain information that is very similar to what the claims describe the global header as containing.

So, for example, in Claim 1 the first header has information used in decoding.  And then, similarly, in Claim 18 the global header also has parameters used in an encoding technique.

And so it is our view that both the global header and the first header are directed to the same teachings in the specification about what the global header can contain.

And in --

THE COURT:  Let me ask you, Claim 18, that refers to "global header" in contrast to Claim 1, that talks about the "first header."  Says "global header having parameters stored therein corresponding to an encoding technique" in the singular.

MS. MORROW:  Yes.

THE COURT:  Which seems to me more specifically teaches that -- you know, this single data structure.  Whereas, Claim 1 just talks about "first header having parameters stored therein for use," et cetera, et cetera.

It seems --

**MS. MORROW:**  So the first header does just require parameters for use in decoding in Claim 1.

When we get to Claim 18, the global header has parameters corresponding to an encoding technique.  And so, basically, it's some kind of a designation of an encoding technique.  That encoding technique is used for storing audio in memory.

But if you look at the claim, it doesn't say that, you know, there's all the information needed for this encoding technique.  In fact, other claims call out, the dependent claims call out the other information needed.

In addition, it doesn't refer to the encoding technique for all of the tracks or all of the audio in memory.  It just refers to an encoding technique used for storing audio in memory.

And so we think that it would be incorrect to construe the global header, based on this language, as requiring all of the information for encoding or as requiring all of the information for encoding for all of the audio in memory because neither of those things are recited in the claim.

And if you look at, for example, Claim 19, it has additional information to be used, like the bit rate.  And other claims have -- if you go down to Claim 20, it then has information indicative of a music category.  And so it's not until you get to dependent Claim 20 that you get any mention of

the specific tracks on the chip.

And so we think that Claim 18 has to be construed as being broader than Claim 20, and as encompassing more than just data for a specific track of audio.

**THE COURT:**  Let me hear the response to that.

**MR. WATKINS:**  Good morning, Your Honor.  My name is Brett Watkins.

**THE COURT:**  Good morning.

**MR. WATKINS:**  So in response to that last comment, I would like to point out that Claim 18 does refer to individual tracks.  In the limitation relating to at least one individual header it says that it includes information about individual tracks of audio.

And that's part of the sort of overall structure of the claims which match between Claim 1 and Claim 18.  They refer to, in the case of Claim 18, a single global header -- it doesn't use the word "single," but it refers to global header in the singular -- and then at least one individual header.

So the inventors knew what they were -- how to claim something that could be multiple, and they used the term "at least one" in that case.

Similarly, with Claim 1, they said "first header and at least one second header."  And "at least one second header" relates to individual tracks of audio similar to Claim 18.

So if you go through the structure of the claims it's

clear that they have recited a singular first or global header and multiple or one or more individual or second headers.

**THE COURT:**  Thereby implying that it must provide a data structure that decodes all --

**MR. WATKINS:**  That's correct, Your Honor.

**THE COURT:**  -- tracks?

**MR. WATKINS:**  And that's -- basically, the entire patent describes a hierarchal arrangement of headers for a music chip.  And that's repeated in the specification.

And the Federal Circuit has actually told us that when statements like that are used of the present invention -- this is the *Verizon Services* case and *Honeywell* cases that we've cited in our brief -- the -- when statements of the present invention are used, and here it's a hierarchal arrangement of headers, that language limits the claims, and the claims should be interpreted to be limited to that statement of the present invention.

So the hierarchal arrangement described in the patent is -- in the specification is described as a global header.  Global means something.  Global means the entirety and not just a part.

**THE COURT:**  Is it your view that global is equivalent to first header?  Do you --

**MR. WATKINS:**  Well, I agree that they use different terminology, Your Honor.

**THE COURT:** But do they mean something different, Claim 18 and Claim 1?

**MR. WATKINS:** They use different language but they're referring to the same thing.

And the reason for that is that the claims are set up in a similar manner to refer to this hierarchal arrangement.

And, also, the Federal Circuit has told us that on claim differentiation it's a guide and not a rule; and, specifically, claim differentiation cannot be used to expand a claim beyond its appropriate scope.

So if the appropriate scope of Claim 1, reciting the first header, is a header that relates to all of the music, as consistent with our proposed construction, you can't look at Claim 18 and say, well, because they're different I'm going to construe them differently.

**THE COURT:** So you construe them as same in scope?

**MR. WATKINS:** Yes, we do.

And, actually, I'd like to point out, also, that during prosecution the inventors referred to a global header in distinguishing the prior art.

And I have a slide, if you'd like to see this visually.

But they referred to a global header and cited Claim 1. At the time, Claim 1 did say "a first header." So they -- they treated the first header and global header claims in the same way during prosecution.

**THE COURT:**  Is this the 1996 letter to the patent examiner --

**MR. WATKINS:**  Yes.

**THE COURT:**  -- in October?

**MR. WATKINS:**  I'm referring to page 8, specifically.

**THE COURT:**  So why use a different term?  I'm curious, why say "first header" in Claim 1, and "global header"?  If they perform the same function, as you say, why the difference in terminology?

**MR. WATKINS:**  Well, we can't ask them, I guess, but I would submit that -- I would submit that inventors use different language to claim the same things pretty often.

And if you check out the *Nystrom* case that we've cited in our brief, this is actually the case the Federal Circuit addressed where the inventor used the term "board."  And it was claims directed to wood decking.

And they used the term "board" in the claim.  And the Federal Circuit noted that different claims of similar -- otherwise similar said "wooden decking boards."  But they looked at, also, the specification and determined that wood decking boards would -- boards made from wood cut from a log were the only thing that was disclosed.

And they said, okay, well, I recognize that there are differences in the language used between these two claims, but "board" has to be construed consistently with what the

invention was.

THE COURT:  So you disagree with the construction in Agere, as well as in the *Sandisk* case, in which both Judge Alsup and the Eastern District of Texas saw a difference between "global" and "first header"?

MR. WATKINS:  I would disagree with them to that extent.

And I would like to point out that Judge Alsup, in the *Sandisk* case, recognized that the hierarchal arrangement was the key feature of the '730 invention.  And he said, well, okay, I'm going to limit it to a single data structure.  But he said, okay, well, one of ordinary skill in the art at the time would have known that memory could be subdivided.

THE COURT:  Right.

MR. WATKINS:  And you have a global header -- I'm sorry, a first header relating to each memory subdivision.  That may be true.  But that's not described in the patent.  And what the patent does describe is a global header throughout the specification.

So I think we should consider what the inventors actually did describe, rather than try to come up with things that they could have claimed and described.

THE COURT:  Well, because he points out that you could have multiple first headers on a single chip if you had different algorithms or bit rates or different formats, right,

on the same chip?

**MR. WATKINS:**  Theoretically, maybe.  But the '730 Patent itself only describes the case where you have a single header, first header, containing encoding information that specifies a particular encoding algorithm for that chip.

**THE COURT:**  Ms. Morrow, what about that?

If you look at the plain language of Claim 1, it says "first header" singular, and then describes and goes on to say "at least one second header."

**MS. MORROW:**  So the claim uses -- first of all, the claim uses the term "comprising."  So we know from the Federal Circuit case law that we cited in our brief that the process can have additional steps in it and you still infringe.

Second, we cited -- and we also cited a case, and I think it was a drug discovery case where the patent claim was directed to three shots, and the Court held that it could encompass additional shots as well.

So the fact that the patent holder elected to spell out one global header or one first header and then multiple second headers should not be treated as determinative.

In addition, I think the notion of a global header should be given a little more meaning here, which is if you think about it in the context of computer programming, a global variable is something you can use in the program as a whole, and various routines in the program can access it.  A local

variable is something that's only used for a specific subroutine; it isn't available to the rest of the program.

And when I read this and they talk about a global header, they're really using it in that same sense, that the global header provides some information that can be used in decoding whatever's on the chip, regardless of how many tracks are on the chip, and that the local individual headers contain individual subroutines for the different tracks which are obviously going to differ.

And, so, I don't think it's appropriate to treat "global" as a description or a word, a single word that, standing alone, somehow means all of the decoding data used for the chip.

In addition, opposing counsel referenced the summary of the invention. And if we look at the summary of the invention there's a lot of stuff packed in the piece that they quote.

They say that there's global header, it includes the bit rate, it includes information pertaining to specific algorithm encoding in recording audio on the chip.

Basically, the summary of the invention that they're pointing to is something that -- it isn't claimed in each of the individual claims.

I mean, if we look at Claim 18, the parameters for encoding are in Claim 18, and then the bit rate is in Claim 19, and other information is in other dependent claims.

And so the inventors didn't set this -- set the claim

structure up such that that entire invention was in either Claim 1 or Claim 18.  They set it up so they claimed just specific pieces of the data that you would need to do this entire decoding process.

Obviously, in Claim 1, with the first header you need more information than just parameters.  You need to know what the decoding routine is, you need to know what the bit rate is, other information so that you could possibly decode all the music on the chip.  So it doesn't make sense to say that this global header somehow contains all of the information for decoding.

And, similarly, the global header in Claim 18 just has information about the encoding technique.  It doesn't have the parameters.  It doesn't have the bit rate.  It doesn't have the other information referred to in the summary of invention that counsel is pointing to.

In addition, the --

**THE COURT:**  What's the function of the global header if it doesn't contain those things?

**MS. MORROW:**  Well, it can contain those things.

Obviously, the inventor is trying to claim something that can be flexible.  And he's indicating that in some instances, for example, in Claim 18, all you need is the information about the encoding technique.

Claim 19, you know, you would add to that a bit rate

because in that particular embodiment for some reason you would need both in the same header.

But the claim structure doesn't require that all of the information needed in order to perform the decoding function be in the broadest independent claims.

**THE COURT:**  So what suggests that whether you call it a first header or global header can contain more than a single data structure that's devoted to processing of all the tracks? Where would you lead me to --

**MS. MORROW:**  I would start with the preamble to both claims.

And if we look at the preamble to Claim 1, the first header refers back to "said digitally encoded music stored in said memory."  And if we look at what that is, it's just "said music digitally encoded in memory on the integrated circuit music chip."

So it doesn't say anything about all of the music encoded on the memory chip or all of the tracks of music encoded on the memory chip.  It's just "said digitally encoded music."

And so since it's not drafted in that kind of closed-in form of all of the information or substantially all of the information, we ought to treat this as the statement that it is, that it refers back to decoding some of the music on the player.

And that makes sense, if you think about it, because

you're not decoding everything at once.

THE COURT:  Well, not at once, but it's capable of decoding all tracks unless -- I mean, can you have a single header and multiple tracks that have different bit rates?

MS. MORROW:  The patent specification says that you could have information for different bit rates.

So it says, at line 55, in Column 2, "The parameter information is included because as compression techniques evolve it may be possible to encode more on a single chip using different algorithms and almost certainly different bit rates."

So that was the information that I believe Judge Alsup cited earlier.

THE COURT:  That doesn't necessarily say on one chip. It says any one chip can have a different algorithm and a different bit rate.

MS. MORROW:  Right.  So if one chip could have a different algorithm and a different bit rate, then different tracks would have been encoded according to a different algorithm.

THE COURT:  On the same chip?

MS. MORROW:  Yes, that's what it says.

THE COURT:  I'm not sure it says that.

MS. MORROW:  It says, "The parameter information is advantageously included because as compression technology evolves it may be possible to encode more on a single chip,"

single chip, "using different algorithms and almost certainly at different bit rates."

So the idea would be if I had -- this is not contemporaneous, but if I had different versions of a music file, that the system could recognize those different versions if I had different information in the headers for each one. So, for example, it could tell that I have an MP3 file versus some other kind of file stored in memory.

If you think about modern music players, they can do that. I can play things from the iTunes Store. I can play things from other formats on the same player these days.

And this is directed to the same kind of thing, that you could have different files with different encoding techniques or different bit rates that they're accessed at on the same chip.

**THE COURT:** So wouldn't you need more than one first header if you had different formats?

**MS. MORROW:** You would need at least -- I think -- sorry, just lost the mic. I got too excited there.

I think you would need at least two headers, global headers that contain the encoding information if the file formats are different because you would have two different encoding schemes.

And then as to whether you needed additional second headers, you'd need at least one for each track. I don't know

that you'd need more than that if the second header contained all the kind of management information you needed for each of those files.

**THE COURT:**  But you would need a global or first header for each different format if you had different algorithms?

**MS. MORROW:**  Yes.

So that's why we think the claim is drafted in either including or comprising, open ended with this notion that, you know, down the road it could be possible to have multiple bit rates on the same or decoding schemes on the same chip.

**THE COURT:**  What's your response to that?

**MR. WATKINS:**  So to first address the issue of "comprising" I think this is going to come up a couple of times today, but one way that that term is used is to indicate additional steps.

For example, if you have a claim that says a method comprising steps A, B, and C, then a device that performs steps A, B, C, and D would perhaps be encompassed within the scope of that claim.

But *Dippin' Dots*, the case we cited in our briefs, specifically says you can't use the term comprising in the preamble to reach into each individual limitation and render that open ended.

So what the claims here do require is global header or

first header and individual header and second header.  At least one of those.

So as applied to this case, the use of the word "comprising" doesn't remove the requirement that there be a global header in the sense of it's global.  It applies to everything stored on the chip.

And global is -- you know, it's not a -- it's not an ambiguous term.  It applies -- it's something that I think we all can understand pretty easily.

So if we go back to the issue about what the disclosure is of the '730 Patent, and I think Your Honor touched on something that is correct in that the description in Column 2, starting at Line 55, going through Line 67, it doesn't describe multiple global headers per chip.

It says as technology evolves, different encoding algorithms can be used from chip to chip to encode more on a chip, perhaps if you have a more efficient algorithm, or perhaps encode the same amount of information but using a higher quality.

And they say specifically that, referring to the bit rate Your Honor asked about, in the last sentence it says this would allow an algorithm from a specific -- an album, sorry, from a specific artist introduced today to use 128 kilobits per second, while an album released at some future date from the same artist could use a different algorithm that would play at,

perhaps, 32 kilobits per second with the same quality that the 128 kilobits-per-second piece has at present.

So they're describing that this chip, by using a global header, you can associate each chip with a specific algorithm, and then later chips that you produce on down the road would have different algorithms.

**THE COURT:** So the different algorithm or different bit rate from chip to chip, not within chips?

**MR. WATKINS:** Exactly, Your Honor.

And just to address one thing about what they actually described, the music chip that the inventors described in this patent was -- is a small thing. It was a couple of inches wide and tall. Or it's like a credit card almost, maybe a little thicker. But at the time it could only hold about 15 tracks. And they describe it as a replacement for CDs, almost.

So this isn't a case of I have an iPhone or an iPod and it has 1500 tracks on it, where you have different formats and things.

Certainly, we're not arguing that the music chip has to be limited to that size, but it makes sense that they would describe something like that by using a global header and where they were concerned about the amount of space that they had available so they used one global header to describe everything, the encoding algorithm for everything.

**THE COURT:** So your view is that what is claimed here

is a single header with a single data structure that applies to all the tracks, not something that has multiple first headers that could apply to some but not all of varying tracks with different algorithms or bit rates?

**MR. WATKINS:**  That's correct, Your Honor.

And to the extent Your Honor sees Judge Alsup's analysis and concludes that, you know, there could be different memory subdivisions like that, the key point of this invention is the hierarchal arrangement.  That's described as the present invention.

So what we have to remember is that the hierarchal arrangement includes one header that applies to multiple tracks that have associated second headers.  And so we have to maintain that hierarchal arrangement in order to stay true to what the inventors described as their present invention.

**THE COURT:**  All right.  I'll give you the last word.

**MS. MORROW:**  Thank you, Your Honor.

I would just direct the Court to Column 2, Line 57, which says, "It may be possible to encode more on a single chip using different algorithms."

So this does talk not about moving from -- just moving from different versions of chip to versions of chip, but different algorithms on the same chip.

And that was the language that Judge Alsup quoted in reaching his conclusion with regard to the scope of the global

header.

And, in addition, with regard to the hierarchy point, there's no claim language in here that creates a hierarchy between the first header and the second header.  There's no second header associated with the first header or second header depending on first header or incorporating information from the first header.

The claims are drafted with these two headers that serve two different functions.  And they don't link them together in the manner that counsel seems to be trying to suggest with this hierarchy argument.

**THE COURT:**  I still come back to the question why the claim, Claim 1, refers in the singular to first header, even though it acknowledges there may be more than one second header.

And, similarly, with Claim 18, just talks about global header singular and at least one individual -- at least one individual header having multiple data fields, et cetera, et cetera.

**MS. MORROW:**  Well, we think the answer is it was drafted by a patent attorney who knows the case law on "comprising" being an open-ended claim.

Obviously, you need to have one global header or you can't access data at all.  And you need to have some information about the tracks to have the invention.

But, beyond that, he's not restricting the claim so that it has to have all of the information needed to do this entire process.

THE COURT:  But the drafter could have easily said "at least one first header" as he or she did when they referred to at least one second header, but didn't do so.

MS. MORROW:  I'm not sure that distinction is really meaningful in the sense that the claim is drafted in an open-ended form not a close-ended form.

THE COURT:  Okay.  That's helpful.

Let's go on to the '087.

So one issue is whether the unified memory can be -- needs to be confined to one chip, or can it be, for instance, as I think Fig. 3 indicates, a single unified memory that occupies four chips that are coupled.

I don't know if there's much dispute on that issue.  Is there?

MS. MORROW:  We do dispute -- maybe I didn't understand the Court's question.

We are in dispute that the '087 Patent doesn't -- isn't limited to a single piece of silicon.

We think that the first unified memory can be --

THE COURT:  Right.

MS. MORROW:  -- any chip structure that contains --

THE COURT:  That seems to be fairly evident.  I'm

asking whether that's really contested here.

**MR. EISEMAN:**  Well, Your Honor, we believe that the proper construction is a single memory chip based upon, in particular, Fig. 3.

And let me get a slide out, hopefully.

Actually, Your Honor, if you just go to slide 11 in your binder.  So slide 11 depicts -- we have Figs. 3 and 4 on this.

Fig. 3 is where the invention is described.  And as we quoted from the specification, in particular the summary of invention, where they describe the memory 212, which is the single memory or the first unified memory that we're talking about here, it says and the patentee said, "The memory includes a plurality of memory portions, including," and goes on.

So 212, which is the claimed first memory in this invention is a single memory device with four portions.  So we actually believe that the proper construction is a single memory chip.

**THE COURT:**  All right.  What's your response to that?

**MS. MORROW:**  Well, the claim doesn't say a single memory chip.  It says a unified memory.

And the specification talks about a 16-bit SDRAM embodiment, where in Fig. 3 it shows it as possibly having four banks of memory.  And in Fig. 4 it shows it as possibly having two banks of memory.

And we had provided examples to the Court of memory

packages from the time where you could get this 16-bit capacity with a memory package that had either two pieces of silicon totaling up to 16 megabits or four pieces of silicon totaling up to 16 megabits.

And so we think that one of ordinary skill in the art, when reading this claim and the specification, would understand it to require a memory package, a package containing one or more memory chips with the desired capacity, rather than reading a claim that doesn't say a memory chip as limited to a single piece of silicon on a single substrate.

And we did cite to the Court a case from Magistrate Judge Seeborg, now Judge Seeborg, where he reached a similar conclusion in a semiconductor case where the claim said "a controller."

And he said there was nothing in the claim that required that the controller be on a single substrate or a single piece of silicon.  And so for that reason he concluded that it could be spread over multiple pieces of silicon.

And so what we think is depicted here is a device that plugs in, that provides the memory capabilities, but is not limited to a single piece of silicon.

**THE COURT:**  All right.  I'll give you one more comment on that.

Why doesn't Fig. 3 suggest that there are four chips or pieces of silicon?

**MR. EISEMAN:**  Because it's described in the specification as -- I'll just get to slide 11 and read it.

It says, "The memory includes a plurality of memory portions."  And one of ordinary skill in the art would understand that's a single memory device containing four portions.

But if Your Honor is having problem with our use of the word "chip" in our proposed construction, I think we could propose a compromise, which would be "a single memory device which stores code and data for the transport logic, system controller, and MPEG decoder functions," because the patent uses device -- talking about memory devices in describing the prior art.  And that would be more true to what the scope of the claimed invention is.

It's definitely not what LSI has proposed, where although Ms. Morrow is talking about separate chips packaged together, that's not what LSI's proposed construction would allow for here because memory functioning as a unit is completely undefined, really.  And it could be a memory in a controller that was somehow communicating with external DRAM memory.

Under LSI's proposed construction, those are two separate memories, but one could argue that they would be functioning as a unit.

And that's just not possible or not a proper construction on this record when the patentee told the Patent Office, in

getting his patent granted, that what he was doing was he was combining multiple memories that were used for these functions into a single unified memory.

And so we could live with a comprised construction based on ours, that changes "chip" to "device."  But LSI's construction is going to rewrite on the prior art.

**THE COURT:**  What's your response to that, broaden "chip" to "device"?

**MS. MORROW:**  I'm concerned that I'm not sure that I know exactly what counsel is referring to with "device."

But setting aside -- and if we have the idea that multiple memory chips in a package is a device, then that seems appropriate.

Where we get concerned with Barnes & Noble's construction, though, is that they are reading this single memory device as providing all of the memory functionality for the transport logic, system controller, and MPEG decoder functions.

And we think that's far too narrow a reading of what is described in the Chau patent because it doesn't have this notion of reading exclusively from the unified memory that Barnes & Noble has tried to read into the claims.

And so, for example, it talks about the different subsystems accessing the unified memory, and several steps, access or use unified memory.  But there is never a statement that this is to the exclusion of external memory or that there

could not be other, obviously, memories in the system.

And there is, you know, external memory in almost every decoding system, so we're concerned that they're trying to come up with a construction that just doesn't make sense.

The claims are both directed to things that have a comprising requirement. And then the discussion of the present invention says it provides for a video decoding system -- and this is in the abstract -- with reduced memory requirements.

So the idea that somehow the first unified memory has to provide all of the memory requirements for this system is inconsistent with the specification. What the specification just requires is that this improved decoder reduce memory requirements.

THE COURT: Let me ask the parties to look at Column 12, Lines 48 through 56, where it says, "The motion compensation block 310 analyzes each motion vector from the incoming temporally compressed data and retrieves a reference block from the frame store memory 212. In response to each motion vector the motion compensation block 310 includes a local memory or on-chip memory 116 which stores the retrieved reference block. The motion compensation block 110 then uses this retrieved reference block to decompress the temporally compressed data."

Doesn't that suggest that there are other -- I don't know if you call them local memory or something equivalent to cache

or something that there's some memory function that's being employed in the decoding process other than the main unified memory unit?

**MR. EISEMAN:** But the motion compensation block 310, Your Honor, I believe includes the external memory 212. So, again, it's within the same block of the invention or claimed invention or device. And so we think that still it's the memory 212 --

**THE COURT:** So when it says "local memory," what does that mean? Includes local memory or on-chip memory, what is that?

**MR. EISEMAN:** Your Honor, our view of this is that people of ordinary skill in the art reading the patent would understand that local registers and -- those are just talking about local registers and the like. And it's not a separate memory. And so we're still talking about a single memory in 212.

**THE COURT:** Ms. Morrow, do you have any reaction to --

**MS. MORROW:** Well, we think the system does include additional memory because the device has to take the data that's being operated on by the decoder out of memory, operate on it, and put it back in memory.

And so the functions that the claim talks about are the interim processing steps and using a single unified memory for those steps.

But, obviously, the data has to start somewhere and end up somewhere.  And the patent doesn't exclude using the usual configuration of external memory for those purposes.

So we think that when they're talking about using local memory for some of the processing steps, they're talking about unified memory these various items can address.

But you have to pull the data from external memory and return the data out of external memory or you haven't done anything other than decode it, which isn't a very useful function.

So the claim doesn't exclude bringing data in from external memory or storing it in external memory, it just tries to improve the use of memory during the decoding function.

**MR. EISEMAN:**  Your Honor, briefly.

Slide 5 sets forth excerpts from the summary of invention.

And, again, under *Verizon* and *Honeywell* and lots of Federal Circuit authority, when a patentee tells the public in the summary of the invention what his or her invention or claimed invention is, that limits the claims.

And here we have three separate occasions where it says, "The present invention comprises an MPEG decoder system and method for performing video decoding or decompression which includes a unified memory for multiple functions."

And we've cited two other portions.  And we've actually -- if you go through the summary of invention, nine different

times the patentee told the public that the claimed -- the invention was based upon the use of a single memory.

And they should be bound to that under *Verizon* and *Honeywell* and the other cases that have been cited by the Federal Circuit.

**MS. MORROW:**  Your Honor, if you continue reading in the summary of the invention, at the end it says, "The present invention" --

**THE COURT:**  Which line?

**MS. MORROW:**  This is Column 5, Line 40 to 41, which is the end of the summary of invention section that counsel was just reading from.

It says, "The present invention thus provides a video decoding system with reduced memory requirements."

And so it doesn't eliminate the use of other memory in the system, it just provides for reduced memory requirements during the specific decoding steps that are described in the claim.

And the abstract has the similar language as well.  It says, "The present invention" -- this is, you know, the summary of the invention on the cover sheet of the patent says, "The present invention thus provides for a video decoding system with reduced memory requirements."

That, obviously, contemplates that there is other memory since you've only had reduced memory requirements, not satisfied all memory requirements for the --

**THE COURT:** Well, let me ask. This says "includes." It doesn't say "exclusively employs." It just says "includes a unified memory for multiple functions."

**MR. EISEMAN:** But, Your Honor -- and we can go to another slide. Why don't we take a look at Slide 7.

This is what the patentee told the Patent Office and the public: "Prior art MPEG video decoder systems have generally used a frame store memory," and then he goes on to describe that the frame store memory was used for MPEG decoder motion compensation logic.

And then he goes on to say there's a separate memory for the transport and system controller functions. So two separate memories.

Then he goes on and says, "Therefore, a new video decoder system and method is desired which efficiently uses memory and combines the memory subsystem."

And so that's what was done for reduced memory requirements.

Yes, Ms. Morrow is right that the patent does talk about reduced memory requirements. But the way that the patentee accomplished that in the claimed invention was by combining multiple memories into a single --

**THE COURT:** Right, but you can accomplish that goal without making that be the exclusive and sole source of memory for any one of those functions.

If you combined and used it for 99 percent of the memory requirements, you've accomplished the purpose of the invention.

**MR. EISEMAN:**  You may have accomplished the purpose of the invention, but they describe the invention as a single unified memory.

**THE COURT:**  Includes a single unified memory.

It's the inclusion and the combining, not the exclusive use that seems to be the teaching of this patent.

Show me something that says exclusive in the specification language.

**MR. EISEMAN:**  Your Honor, I can't point to anything.

**THE COURT:**  Exactly.

**MR. EISEMAN:**  But let me just make one last point, which is that Claim 10, the language of Claim 10 specifically doesn't say "including a first unified memory."  In every claim step it says "using a first unified memory," "using said first unified memory," et cetera.

And so the claim itself says that a single unified memory is going to be used to carry out the claim steps.

**THE COURT:**  Well, you can use it.  It doesn't say "exclusively" use it.  I'm not sure that the claim language itself has such a clear limitation.

Let's go to the other question about whether -- I guess there's a dispute about whether the MPEG encoded stream can consist of only a single multimedia stream, or does it have to

have a plurality.

Is that the issue here?

**MR. EISEMAN:**  That is, Your Honor.

**MS. MORROW:**  Yes, Your Honor.  If we could address that.

And if we look at the claim that's asserted and we look at Claim 10 itself, I think that provides the answer to this.

It talks about, in the limitation, receiving an MPEG encoded stream.  And then if you go on to the next limitation it says "demultiplexing one or more multimedia data streams from the encoded stream."

And so the MPEG encoded stream has to include one or more multimedia data streams because that is what is then demultiplexed from the MPEG encoded stream in the next step.

And so we, frankly, don't understand this argument because given the claim language the claim seems to have resolved this issue.

In addition, there are multiple embodiments in the specification that -- some of which have multiple data streams multiplexed together, like the broadcast example that Barnes & Noble cites to, but other examples that don't.

So, for example, there's a description in the specification of how the system can get the information, and this is at Column 7, the system can get the information from a DVD or other local source of data, in addition to getting it

through some kind of a broadcast path.

THE COURT:  What line?

MS. MORROW:  So, for example, it says -- at Column 7, Line 19, it says, "The computer system may also include one or more internal RAID arrays, CD-ROM drives, and/or may couple to one or more separate digital video disk DVD storage units."

So that's a discussion of how the data that's being processed in this claim can come from either a local or external device that provides a single stream of data like a DVD or a CD-ROM.

And then if you go down, you start seeing the discussion that Barnes & Noble has referred to.

At line 25 it starts by saying, "Alternatively, the compressed digital video file may be received from an external source," and then it goes on to talk about the example that they use.

So we think that the patent clearly teaches kind of two ways that you can get the data stream: one, a single data stream from something like a CD-ROM; and, two, a more complex data stream that you can get from an external source like is described in the broadcast example that they go on to discuss in Column 8.

And so we think, given the plain language in the claims and the fact that it maps to this specific example, that the reading of the patent that would require multiple multimedia

streams as against that claim language would not be a correct one.

**THE COURT:**  So a DVD produces a single media stream?

**MS. MORROW:**  Yes.

So the examples are a DVD player which was going to pull a single stream of data off at once, versus a broadcast example, which is in Column 8, where they talk about a broadcast signal from a broadcast network which is obviously going to provide multiple streams of data, and then you just tune into the piece of the broadcast that you want.

And, so, the example that Barnes & Noble is citing is one of these broadcast examples where you do have multiple streams of data and you pick one.

But that's not the only example in the patent.  The other example is the DVD example, where you have a single stream of data coming off your local DVD.

**THE COURT:**  All right.  Your response to that?

**MR. EISEMAN:**  Well, Your Honor, the claim step we're talking about is the first and second elements of Claim 10.

Let me just get them up there.

So we are talking about an MPEG encoded stream, but then we're then going on to talking about demultiplexing one or more multimedia data streams.

And the demultiplexing step in the claimed invention or the discussion of that is in Column 8.  And we cited it in our

brief.  It's Lines 10 through 21, where the patentee said, "The transport and system controller block 204 includes transport logic which operates to demultiplex the received MPEG encoded stream into a plurality of multimedia data streams."  And then it goes on.

And so what we're talking about is an MPEG encoded stream that has multiple programs on it.  And the demultiplexing that takes place then eventually splits up into audio and video signals.

So the description in Column 7 is not relating to the functionality that we're talking about in Claim 10.

**THE COURT:**  Say that again.

**MR. EISEMAN:**  It's our position that the description in Column 7, that LSI is now relying on, does not relate to the demultiplexing step that we're talking about in Claim 10.

**THE COURT:**  All right.  Well, let me ask, how do you have demultiplexing of a singular DVD stream, data stream?

**MS. MORROW:**  If I could answer kind of with two points, Your Honor.

First, the text that opposing counsel just referred to is at the bottom of Column 7 and at the top of Column 8, described as one embodiment of the present invention.

And in the text that they talked about demultiplexing it says, "In other words" -- this is the piece we didn't read.  "In other words the encoded stream preferably includes a

plurality of multiplexed encoded channels or multimedia data streams which are combined into a single stream."

So this is just a preferred embodiment.

And with regard to how you would demultiplex the single stream of data from the DVD, you've got more information coming off the DVD than just the data.  You've got the headers, you've got the other information, control information, other information not associated with this decoding function that is of interest here.

And so, basically, what the multiplexing would be doing is pulling off the pieces that are appropriate for decoding; i.e. the pieces that have been encoded using the MPEG functionality.

**THE COURT:**  All right.  So even a single data stream is subject to demultiplexing?

**MS. MORROW:**  Yes, because it's been interleaved and altered from its original format on encoding.

**THE COURT:**  Okay.  Let's go on to the next one, which is the '006.

And it appears to me that the critical issue here is the question about the further parsing, and whether that includes translation or not.

Is that the --

**MR. RIBERA:**  Yes, Your Honor.

**MR. EISEMAN:**  Definitely seems to be the crux of the dispute, Your Honor.

**THE COURT:**  Let me ask, if you look at Claim 16 and its dependent Claim 23, 23 expressly makes reference to translating the parsing video bitstream which, of course, implies that the parsing in -- further parsing in Claim 16 does not include translation.

And so -- I know we're talking about Claim 27 but, I mean, doesn't that suggest that if we're talking about the concept of further parsing, certainly as used in Claim 16, that translation is a separate element?

**MR. EISEMAN:**  Your Honor, our response to that would be that Claim 13 is a means-plus-function claim.  So I don't think you can necessarily analogize a means-plus-function claim to Claim 27.  And so that would be one part of it.

And the second part of it would be that the patent consistently teaches that further parsing includes translation.  And we've cited the various portions of the spec where it talks about a two-part step within the post-parser.  And there's no dispute that the post-parser that's claimed in the patented invention does the further parsing.

**MR. RIBERA:**  Your Honor, if I may address that.

**THE COURT:**  What's your comment on that?

**MR. RIBERA:**  So on slide 164, which we have on the screen, we show, kind of, the same issue that Your Honor pointed to.

And we're comparing Claim 1 with Claim 13, Claim 1 being

the independent claim.  And the fact that it's a means-plus-function is irrelevant.  The point here is that it's talking about a means for parsing, where parsing is a function.  So it's a means-plus-function term.

Claim 13 depends from Claim 1, and it includes an additional function, which is the function of translating.  So it clearly points out that there's two separate functions: Parsing and translating.

And so on the claim differentiation, as Your Honor points out, the scope of Claim 1 has to be different and broader than that of Claim 13.  So those functions must be different based on claim differentiation.

In addition, the specification is very clear that these are separate functions.  Just because they're performed by the same block doesn't mean that they're the same function.

**THE COURT:**  Show me in the specifications where that's made clear.

**MR. RIBERA:**  I think it's at Column 10, Line 48 through 51, which I am displaying on slide 163.

**THE COURT:**  Column 10, Lines --

**MR. RIBERA:**  -- 48 to 51.

**THE COURT:**  Makes reference to subsequent translation.

**MR. RIBERA:**  Exactly.

It says, "The variable length codes comprising the video bitstream are parsed by the parallel post-parser."

So "parsed" is one function.  And the way that's done, the specification explains, is by extracting out the various layers comprising the video bitstream for subsequent translation.  So the translation is another step that happens subsequent to the extracting, which is the parsing.

The same is true when -- when you look at the claim language itself, on Claim 27, you have two different parsing steps.  There's a first parsing step and a further parsing.  So the same word in the claim needs to be construed consistently.

When we look at the abstract in the specification, it talks about the first parsing step as something that's done by the pre-parser block.  And the pre-parser extracts information from the multiplexed bitstream.  So, again, the notion of extracting appears with respect to parsing.

The pre-parser does not do any translation.  So the pre-parser does parsing but not translation, so parsing cannot include translation.

The post-parser also parses by extracting, which is what we looked at at Column 10.

So by construing "parsing" as extracting, you can have a consistent definition of parsing within the same claim.

THE COURT:  Okay.

MR. RIBERA:  I think that sort of shows that parsing cannot include translation.

MR. EISEMAN:  Your Honor, if I could respond.

**THE COURT:**  Yeah.

**MR. EISEMAN:**  With respect to the citation to Column 10, Lines 48 and following 52, it does say for subsequent translation, but it's done by the post-parser.

And that is made clear in the rest of this Column 10.  And so it's done it as one single step.

And let me point Your Honor -- if we could switch the monitor over -- to our slide 8, which -- which is from the '006 Patent, at lines -- Column 14, Line 67, through Column 15, Line 5, where the discussion is as follows:

"The parallel post-parser 76 parses the five layers of video information comprising the video bitstream by comparing the bitstream to the five variable length code (VLC) tables comprising the VLC dictionary/decoder 82."

That's done by the post-parser.

And then it says:

"The translated VLC symbols 198, also referred to as events, may then be transferred to the video decoder 58 for subsequent frame reconstruction."

So there's no dispute in this patent that translation is done as a single unitary step by the post-parser.  And so, therefore, we need to give meaning to the translation step when we're construing the term "further parsing."

And then, just briefly, with respect to --

**THE COURT:**  Talks about the function of the

post-parser.  Doesn't necessarily define what parsing means.

**MR. EISEMAN:**  It does, I think, Your Honor.

It says it parses the five layers of video by comparing the bitstream to the five variable length VLC code tables. That's parsing and then translating.

And two weeks ago, when Dr. Schonfeld was here, he talked to you about how in the prior art it had been done where parsing was done and then the value was returned to the parser, and then there was a separate later step where translation had to take place.

But in the claimed invention of the '006 Patent, it's all done as part of a single unitary step.

**THE COURT:**  Give me a quick primer again about what parsing is in translation, what the relationship is.

**MR. EISEMAN:**  Well, with respect to post-parsing, the post-parser does two things:  It extracts out the layers, and then it compares those layers to a video lookup table to get a value, a number.  And it then takes that number, that's the translation, and provides it to the decoder for further action.

And so it's the post-parser that's both extracting the layers and then comparing the numbers to -- or comparing those layers to the numbers in the table.  And that's where the translation takes place.

**THE COURT:**  All right.  So that suggests it is inherent in the parsing process, the post-parsing process?

**MR. EISEMAN:** And described specifically not only at Columns 14 through -- and 15, but in a number of other places.

And if we go back to slide 6, we have, again, three different parts of the specification where the patentee told the public that the post-parser performs a translation operation and so forth.

And as we cited in our papers, Your Honor, when the patentee consistently tells the public in his or her specification along the lines of what the patentee has done here, that that limits the claims.

And you have to look to what the patentee has told the public in construing the claims.

**THE COURT:** What's your response?

**MR. RIBERA:** Your Honor, I don't think there's a dispute that the post-parser performs additional steps. But that's not the point.

This is a method claim we're construing, and the step is the step of parsing, not the step of doing everything the post-parser does.

So while the specification does describe that the post-parsing extracts the layer information and then also translates it, it doesn't require that the parsing step include both of those steps.

And it's clear from the claim language and the description in the specification that those are separate steps. The fact

that they're performed by the same block doesn't mean that the claim is limited to everything that --

THE COURT:  We're construing "further parsing," after "parsing the video bitstream from the synchronized multiplexed bitstream."

MR. RIBERA:  Right, Your Honor.

So there's two parsings that take place here.  The first parsing is done by the pre-parser, which extracts, sort of, the sync codes for the entire multiplexed bitstream.

So you may recall from the tutorial that in MPEG you have in one pack multiple streams that could relate to video, could relate to audio, could relate to data.

So the first step is to take out those different streams and identify the one that's relevant to video here.  And that's what the pre-parser does.  So it extracts the data and synchronizes it, then it puts it in a buffer.

And the next step is done by the post-parser.  And the post-parser extracts out of that video data the layers.  So it's a further parsing by extracting the layers.

Now, as you may --

THE COURT:  Doesn't further parsing correspond to what the post-parser does in this Claim 27?

MR. RIBERA:  No, it does not.

The further parsing is done by the post-parser.  It doesn't mean that everything the post-parser does is further

parsing.

The post-parser further parses by taking out the layers of the video data, and then it translates to convert the information in those layers into --

**THE COURT:**  So post-parser, in your view, performs both the further parsing which removes/extracts the layers as well as the translation?

**MR. RIBERA:**  Correct, Your Honor.

**THE COURT:**  But the term "further parsing" is only part of what the post-parser does?

**MR. RIBERA:**  Exactly.

And that's evident from Claim 1 and Claim 3.  It talks about a second means for synchronizing, which could be the post-parser.  And it includes means for parsing and means for translating.  So those are separate steps.

And you may recall from the tutorial that -- I forgot if Barnes & Noble's expert explained how in the prior art the translation was done by the MPEG decoder.

And one benefit of this invention is that that could be also done by the post-parser to offload some of the information that was initially done by an encoder.  But that's not a requirement in this claim.

**MR. EISEMAN:**  Your Honor, just very briefly, with respect to the claim differentiation issue.

Those claims are drafted a certain way.  That doesn't mean

that because they have a specific translating step claim that Claim 27, when it talks about post-parsing and you read post-parsing in the context of the specification doesn't mean that Claim 27 can't mean that post-parsing includes both translation and post-parsing.

And we know that because of, again, Column 14, Line 67, through Column 15, Line 5, which describes the activity of the parallel post-parser, which LSI admits does the further parsing. And it describes it specifically as a single unitary step.

So that's our position on translation.

**THE COURT:** Well, Claim 27, does it contain the term "post-parsing"? It says "further parsing."

**MR. EISEMAN:** Right. But I think there's no dispute between the parties that further parsing is carried out by the post-parser.

**THE COURT:** Right. I think that's admitted.

I think you're arguing that, well, but that's only one function of the post-parser, that the post-parser does admittedly perform translating.

The question is: Does further parsing encompass everything that the post-parser does, or just a portion of it?

**MR. EISEMAN:** And our position would be if you look at the specification, in particular what I just read to Your Honor, that it does, in fact, include translation.

**THE COURT:** Okay. All right. Thank you.

Now we get into the fun stuff.

Well, let's tackle one before we break, the one that, frankly, is one of the most difficult to understand, I think. And that's the '958 question.

**MR. RIBERA:** Your Honor, just a suggestion. If you would like to finish the multimedia patents, '663 --

**THE COURT:** Why don't we do that. Let's do that.

This is a system of binarization?

**MR. EISEMAN:** Yes.

**MR. SCHUMANN:** That's correct, Your Honor.

**MR. EISEMAN:** The exponential-Golomb codes.

**THE COURT:** Got it.

So there's no disagreement, is there, that the index value changes as you go through from step A, B, and C?

**MR. SCHUMANN:** I'm sorry.

**MR. EISEMAN:** Go ahead.

**MR. SCHUMANN:** That's correct, Your Honor. The index value does change from step A, B, and C.

You can see here the claim language "setting said index value to a threshold." And then the other ones, "adding offset to index value," and "adding that value to said index value."

So there's two other operations that are being done to that index value that change it throughout the claim.

And this is a method claim, so our concern is that if you

have a construction that you've set an index value to constant, it will never change again.

We also have a second concern within step A completely, but I don't know if you want to get to that just yet.

**THE COURT:** Let me ask, because the construction Barnes & Noble seeks is the setting the index value to a predetermined constant. I don't understand how that occurs. Maybe I'm misunderstanding.

**MR. EISEMAN:** Your Honor, it's not our position that it never -- that it never changes. But we do say that it has to be set to a predetermined constant. And by that we mean a predetermined number. It's not just setting an initial number, as is proposed in LSI's construction.

So there isn't a fight here about that it's -- that the index value changes over time. But what the fight is about is that the initial number part of LSI's construction suggests that somehow it will change.

And we don't think that when you're talking about "setting said index value to a threshold" that you need to tackle that issue right now, essentially.

**THE COURT:** Well, LSI is prepared to say that this means that "setting said index value to a threshold" means setting the index value to an initial number.

That would be a constant, right?

**MR. SCHUMANN:** That's correct.

**MR. EISEMAN:** Well, if then they're talking about a predetermined constant as the initial number, then I don't think we have a dispute at this point.

**MR. SCHUMANN:** Your Honor, predetermined constant means a whole lot more than initial value or initial constant.

What we're trying to point out here is that the value changes throughout the claim.

And this is a method claim, so to the extent we're going to say we set the index value to a predetermined constant, it's now fixed throughout the claim.

**THE COURT:** Maybe I'm confused. It's the threshold that's sort of fixed, isn't it?

**MR. SCHUMANN:** It's fixed for a particular operation. I think in the patent you'll see that it can be set to 16 for one time, to 64 for another particular time.

**THE COURT:** When you say "for a particular operation," do you mean depending on what the --

**MR. SCHUMANN:** A particular decoding operation.

**THE COURT:** Right. All data that comes in is going to be subject to that same threshold for that operation?

**MR. SCHUMANN:** Sure.

I guess the other problem that we have with this is that if you take a look at the way this is actually done in the patent, I think maybe if you recall Dr. Schonfeld, Barnes & Noble's expert, explained that this initial unary

prefix of the codeword that comes in is this array of 1s.

And if you look at the Table, you'll see that the symbol at index 1 has a single-bit 1.  The symbol at index 2 has 2-bit 1s.  The symbol index 3 has 3 and, so on.

The way that this gets calculated when you receive a codeword is the first portion is codeword, and they count up these 1s.

And that's actually expressed in the patent in Column 4, Lines 38 to 41, where they say the binary arithmetic code, or the thing that accepts this code, sets a binary representation of a codeword and then recursively examines it.  It basically counts up the number of 1s that you have.

So in that first step the process of setting it to a predetermined constant excludes this kind of, well, we're just going to count up how many we get and then we're going to hit something that's the threshold, and now we have it set to a threshold.

**THE COURT:**  Say that again.

**MR. SCHUMANN:**  Yeah, sure.

So in receiving the codeword, the way that the system will operate is it will get this first unary prefix, and it will recursively count through the numbers, 1, 2, 3, okay, I have symbol index 3.

Or if it's beyond the threshold it will, you know, count all the way up to threshold 16.  It will come up with a number

16 by counting --

**THE COURT:**  "Threshold" being the point where you change --

**MR. SCHUMANN:**  Yeah.

**THE COURT:**  -- and go to the next --

**MR. SCHUMANN:**  Exactly.

**THE COURT:**  -- suffix or prefix or whatever --

**MR. SCHUMANN:**  Yes.  The exp-Golomb suffix.

**THE COURT:**  At least on this table there are -- are there three?

**MR. SCHUMANN:**  That's correct.

**THE COURT:**  Two thresholds with three different --

**MR. SCHUMANN:**  That's correct.

Well, there's a unary prefix.  That goes up to a threshold -- I think in this diagram the threshold is 64.  Once it hits 64, then it uses a modified unary prefix.  And then the part that's in the exp-Golomb column is just pure binary numbers.

**THE COURT:**  All right.

**MR. SCHUMANN:**  And the step we're talking about right here just relates to that first unary prefix.

**THE COURT:**  It does?

**MR. SCHUMANN:**  Yes.

The setting a value to an index -- setting the index value to a threshold.  Excuse me.

**THE COURT:** And that refers to -- in this case, that would be 63 or 64?

**MR. SCHUMANN:** Ultimately, the threshold in this one example would be 64.

**THE COURT:** So you would set the index value to a threshold, i.e., 64 in this example?

**MR. SCHUMANN:** In this example.

**THE COURT:** Right.

**MR. SCHUMANN:** Could be --

**THE COURT:** And that number has to be, you predetermined for this operation, 64. It's not like in Fig. 6, it was 16, or the other one. You could set that depending on the length and however what the unary prefix, how many --

**MR. SCHUMANN:** That's right. The system will know that it's 64.

**THE COURT:** So what's the dispute? I guess I'm not sure --

**MR. EISEMAN:** Your Honor, there may not be a dispute, but I think the problem we have with LSI's proposed construction is setting the index value to an initial number doesn't really give meaning to the word "threshold."

And I'm actually sitting here thinking that perhaps plain and ordinary meaning is fine because the idea is the patent describes having a predetermined number as a threshold. And so either our predetermined constant or simply a predetermined

threshold would work.

But the concept of setting the index value to an initial number pretty much rights the --

**THE COURT:**  What if it were determined to mean "setting said index to an initial predetermined number"?  The point is it's predetermined, but is an initial number.

**MR. EISEMAN:**  That would be fine with Barnes & Noble. Your Honor.

**THE COURT:**  It sounds like --

**MR. SCHUMANN:**  I don't see a problem with that.

**THE COURT:**  Okay.  We've come to an agreement. Excellent.

All right.  Well, those are the main questions I have with the '663.

So I would like to be educated on the '958, perhaps, again.  And maybe if you want to do a presentation on this one, if it's not too long, I'll entertain it.  I don't know what you had in mind.

And maybe I have a preliminary question that will help me frame this.

Is the dispute with respect to real versus complex values, which includes imaginary and -- an imaginary component, are we talking about the chips within the code, or are we talking about whether the code can represent a complex value?  I'm a little confused.

The code itself -- I mean, the tables that are provided are 1s and -1s.  And I didn't know whether -- and I've looked at the other Courts that have looked at this, and I got, frankly, a bit more confused as to what we're talking about.

Are we talking about the actual codes themselves containing complex values, or are we talking about whether or not the -- the codes essentially represent or encode imaginary or complex values?

**MR. SCHUMANN:**  I guess the way I would phrase it, Your Honor, is that we're looking at whether these codes can represent something other than just simply real values.

**THE COURT:**  "Represent" meaning something that is encoded or something that -- the input into the coding process can be complex or real numbers?

**MR. SCHUMANN:**  Correct.

**THE COURT:**  Is that the issue?

**MR. SCHUMANN:**  Correct.

**THE COURT:**  Not the actual chips within this code --

**MR. SCHUMANN:**  Right.

**THE COURT:**  -- themselves?

**MR. SCHUMANN:**  I think both experts, in their declarations, you know, said that these coefficients that are actually used in these tables are real numbers.  They're binary.  They are 0s and 1s.

**THE COURT:**  Right.

**MR. SCHUMANN:** And if you actually look at the Frank paper on polyphase codes, or if you look at the '182 Patent which Barnes & Noble's expert has said this contains complex numbers, you'll see that there's no Is or Js, or anything like that, in those tables.

It's a general practice that those coefficients are always represented by actual digits. However, the system is transmitting codes that represent complex values because it's using -- doing it in an environment that's a QPSK transmitter, which people of ordinary skill in the art will always consider to be a system that's modeled using complex numbers and that uses complex codes.

**MR. GERCHICK:** Your Honor, do you mind if I respond to that real quickly?

**THE COURT:** Sure.

**MR. GERCHICK:** I think the fundamental misunderstanding here has a lot to do with nomenclature and identifying where in the system we're talking about.

**THE COURT:** Yeah.

**MR. GERCHICK:** So can we switch over and pull up Fig. 3.

Because there is a distinction between a carrier signal. So if you see down here on the right-hand side, you see the co-sign Omega T and sign Omega T and 24 and 26?

**THE COURT:** Yes.

**MR. GERCHICK:** Okay. That's the end of the digital modulation system that is described in the patent.

And, oh, by the way, my name is Jeff Gerchick.

**THE COURT:** Welcome.

**MR. GERCHICK:** So --

**THE COURT:** You must be the brains of the operation if you understand this.

**MR. GERCHICK:** I picked the shortest straw, actually.

So down on the right-hand side of the system you see this is where the signal is being transmitted. This is the carrier signal, okay. And this is what we were talking about with respect to QPSK. That is a QPSK-modulated signal, carrier signal.

Now, what the patent is talking about with respect to codes are something different. And that is what you see output by boxes 32 and 34, which is the modulators here.

Okay. So what the patent is talking about as codes are the codes from the extended code set. And if you look at the title of the patent, it's "Digital Modulated System Using Extended Code Set."

So what you have is you have the code set. And those are Table 1 and Table 2 and Table 3. And each of those is output on a single I branch or Q branch by the modulator. Okay. So those are your codes. And those are the codes from the extended code set.

Now, those are real codes.

THE COURT: Right.

MR. GERCHICK: They don't have an imaginary portion. There is no nomenclature for imaginary portion with respect to them.

But because the system as a whole uses an I branch and a Q branch, and the I and Q are combined onto the carrier signal for ultimate transmission, there is no dispute that you can use complex nomenclature to refer to the carrier signal that is output at the right-hand side of Fig. 3.

But when you look at the claim --

Brett, can you pop over to slide 4.

So the claim has grouping a number of information bits based on the grouping selecting a code having N chips from a code set that includes M codes, wherein M is greater than N.

And this is selecting the code from this extended code set that's in Table 1, Table 2, and Table 3, and then modulating the phase of at least one carrier signal in accordance with the selected code.

So this modulating the phase of a carrier signal is where you have this complex notation. But when you look in what the patent is talking about as codes, those are the things -- that's the 11 chip sequence that's being output by the I modulation branch, and the separate 11 chip sequence that's being output by the Q modulation branch. Each of those --

**THE COURT:** Meaning the blue?

**MR. GERCHICK:** Yes.

Each of those are real codes. They are binary codes, 1s and 0s.

**THE COURT:** Right.

**MR. GERCHICK:** So when the patent is talking about codes -- and this is consistent throughout the patent. I can bring -- you know, here, this is from Column 7, talking about four of the bits of the data modulation system are provided to the first modulator, which produces the corresponding 1 of 16 length 11 codes from the extended code set according to the principles of the present invention.

And we've already talked about the present invention language as it shows up in a lot of the cases.

But that's what we're looking at here. You have 4 bits that are coming into this modulator 32. And one of the rows from Table 1 corresponds uniquely to that 4 bits.

Okay. And there's a reason why there's 16 rows. So you have -- we talked about this, Dr. Bambos talked about this -- 2 to the 4th gives you 16 different combinations.

**THE COURT:** Right.

**MR. GERCHICK:** Well, you have 16 rows here, okay, and that's because these are binary, 1s or 0s.

**THE COURT:** Right.

**MR. GERCHICK:** If the individual codes were complex

you would have changes in phase, and there would be a real component and a complex component, and you wouldn't necessarily have it line up with 16 lines like this.

This is a binary system, 1s and 0s the whole way down. And that's because these codes are real codes.

And if you look at Column 7, which is right here, right before that, the sentence before that, which is Column 7, Line 9 or 10, depending on how you read it --

**THE COURT:** Column 7.

**MR. GERCHICK:** Column 7, Line 9 or 10, kind of right in between.

It says, "The ten data bit symbol is encoded into a I/Q code pair of 11 chip codes or codewords."

So then it goes to explain what that -- what they mean by an "I/Q code pair," which is four of the data bits of the data symbol are provided to the first modulator, which produces a corresponding 1 of 16 length 11 codes from the extended code set, according to the present invention.  That's right underneath.  So that's one code of this code pair is output by modulator 32.

And then if you go down to Line 24 of Column 7, a second set of 4 bits --

**THE COURT:** Line --

**MR. GERCHICK:** Line 24.

A second set of 4 bits of the data symbol from the

converter is provided to the second modulator, which produces a corresponding 1 of 16 length 11 codes from the extended code set, according to the principles of the present invention.

So each of the I and the Q has its own code.  And those are output by modulator 32 and output by modulator 34.

Now, if you go up -- and I'm sorry for jumping around on you, but if you go up to Column 7, Line 16, it says, "In the above example each symbol contains 10 data bits."  So that's if you go here and we look at -- I can show you on figure 32 if you want to look on your screen for one second.

So on figure 32 you have the data coming in from the left.  Okay.  And then it goes into the scrambler.  And then it goes into this 1 to 10 multiplexer, which basically takes serial data coming in and has a parallel 10-bit output.

It splits that data into 4 bits that go into modulator 32, and 4 bits that go into modulator 34.  So those are two different groupings of data bits.

**THE COURT:**  Yeah.

**MR. GERCHICK:**  And then those 4 bits in 32 are set to produce one corresponding code of 11 chips in length.

And the 4 bits in 34 are a second corresponding code of 11 chips in length.

And the thing that really crystalizes the fact that we're talking about real codes here is in the next, Column 7, Line 16, it says, "In the above example each symbol contains" --

**THE COURT:**  Which column are you at?

**MR. GERCHICK:**  Sorry about that.  Column 7, Line 16.

**THE COURT:**  Yeah.

**MR. GERCHICK:**  "In the above example each symbol contains 10 data bits which are encoded into independent I and Q codes of 11 chips."

Chips are actually code bits.  And bits refer to binary digits.  So, again, we're talking about binary here.  So chips are binary digits.  But they're called chips to distinguish them from data bits.

So what you have is an independent code on the I branch and an independent code on the Q branch.  And if they're independent and on a single branch, that designates them as real codes because they're binary codes.

And the whole system is set up so that you have this extended code set that the patent talks about.  And if you have an extended code set that is a real code set, which is what's disclosed here, it's a set of real codes which is disclosed here in the '958 patent.  It specifically --

**THE COURT:**  When you say "real codes" you mean that each number in the code sequence is a real number?

**MR. GERCHICK:**  That's right.  Each chip is real valued.  It's binary, 0 or 1.

**THE COURT:**  Right.

**MR. GERCHICK:**  I mean that the code as a whole is

binary and can be transmitted on a singular branch of the modulation system, either the I branch or the Q branch.

If you have a complex code which has a real portion and an imaginary portion, that singular code has to be output on both the I and the Q, because --

**THE COURT:** When you say "a complex code" do you mean if you took table -- Table 1, 2, or 3, that that would have complex values in there?

**MR. GERCHICK:** That's right. If I basically took Table 1, 2, and 3 and junked them, and put in a new table that had individual chips with real and imaginary portions, that would be a complex code table.

**THE COURT:** Right. But I thought that we weren't -- that was agreed, that we're talking about real codes, real tables, real values.

**MR. GERCHICK:** I would agree with you that we're talking -- well, and that's what I'm trying to focus is that what I understand LSI to be pointing to consistently to talk about complex, quote-unquote, codes is looking at the carrier signal here at the end and saying that it can be represented with complex notations, and, therefore, what is being transmitted are complex codes.

And I want to focus on what the patent talks about as codes, which are the things that are output by these modulators based on the grouping of data bits that come in.

And that's what the claim is also talking about, when you look at the claim language, grouping a number of information bits based on the grouping selecting a code having N chips from a code set that includes M codes.

So it is focusing there on 32 and 34.  The information bits coming in, selecting a code from the code set.

**THE COURT:**  And the code set consists of chips that are real value?

**MR. GERCHICK:**  Perfect.

**THE COURT:**  Is there a dispute about that?

**MR. SCHUMANN:**  Yeah, there is a dispute about that.

**MR. GERCHICK:**  I'm sorry, one last -- I apologize.

So the other thing is, just so we're clear with respect to Fig. 3 and Fig. 4, you see the modulators in Fig. 3 and Fig. 4, which is modulator 32 and 34 in Fig. 3, and I think it's modulator 54 in Fig. 4, yeah, 54 in Fig. 4.

So each of them -- well, I'll start with Fig. 32, and then maybe I'll pass the baton and allow Mr. Schumann to respond.

But if you look at figure 32 -- I'm sorry, Fig. 3, and look at 32 and 34, they output onto a single branch, the I branch or the Q branch.  32 outputs onto only the I branch.  34 outputs onto only the Q branch.

In order to be a modulator that could handle a complex code you would have to have two outputs coming out of that modulator; one that output onto the I, and one that output onto

the Q.  Because it would be outputting both a real part and an imaginary part.

So you would have, basically, a big box that had two outputs coming out, one onto the I branch and one onto the Q branch, because it would be outputting the real portion and the imaginary portion of the code.

In the patent that's nowhere described or disclosed.

THE COURT:  That's if the code itself, the code set itself contained complex values.

MR. GERCHICK:  Correct.  If they were complex codes.

THE COURT:  You could have the code set represent or encode complex values when you just assigned them a row based on the table, on the code, code set?

MR. GERCHICK:  No.  Those would be real codes.  So they wouldn't represent complex values.

THE COURT:  When you say "represent," do you mean --

MR. GERCHICK:  I'm sorry, go ahead.

THE COURT:  What does that mean?

MR. GERCHICK:  I was responding to you.

What I understand to be said right now is that you have -- so you have usually it's A plus BJ.  And that's complex nomenclature, A being the real part, B being the imaginary number.

Yes, both A and B are -- they're integers so they're real.

THE COURT:  Right.

**MR. GERCHICK:**  But that A plus BJ is a complex code. So it represents a complex -- some phase and magnitude or amplitude.

Here, there is no A plus BJ that's being output on either the I branch or the Q branch.  It's just A.  It's just the real number.

**THE COURT:**  What about what's being inputted into the modulators in the coding process?

**MR. RIBERA:**  Those are just data bits.  They are real numbers, too, 0 or 1, binary digits.

So the data is coming in.  It's binary.  So 10 bits at a time, with respect to Fig. 3.  And it's broken down into one 4-bit chunk that gets converted into a real code, and one 4-bit chunk that gets converted --

**THE COURT:**  Go back to a more basic question.

**MR. GERCHICK:**  Sure.

**THE COURT:**  My understanding is that where you have some phase shifting is where you are required to have some complex value.

Am I wrong?

**MR. GERCHICK:**  I would agree with that.  And that's why the point that I'm trying to make is that phase shifting doesn't happen out of modulator 32 or 34, which is the code --

**THE COURT:**  So how does one express that phase shifting?  You've got some modulation phase shifting on Fig. 3.

What happens in there?

MR. GERCHICK:  Well, it wouldn't happen in Fig. 3 until you got all the way down to the right-hand side, to the actual carrier signal that was being output.  And that carrier signal could be represented with A plus BJ to indicate --

THE COURT:  Where is the carrier signal, where in this -- what number?

MR. GERCHICK:  You won't see it.

It's -- these two arrows coming out of 24 and 26 are basically going to be mixed into a singular frequency transmission that's going to have an inphase portion and a quadrature phase portion.

So there is going to be some phase shift associated with one versus the other there.  But, again, by that point in time you're no longer talking about a code.  You're talking about a carrier signal that is carrying two independent codes, as referenced in the specification in the patent.

THE COURT:  Two independent codes?

MR. GERCHICK:  Yes.  The one that was on the I branch and the one that was on the Q branch, that is referred to in Column 7.

I think about it as you see the big trailers driving down the street carrying cars to the Ford dealership.  Well, the carrier signal is that car carrier.  The two codes would be the Taurus and the Explorer sitting on that car carrier.  You have

two independent codes, and they're two real codes that happen to be put on that carrier signal for transmission across to the receiver.

THE COURT:  All right.  But the Q branch of that output, or whatever you call it, it represents what you referred to as the imaginary value; is that right?  Because it's the sign or the out of phase --

MR. GERCHICK:  Yes, yes.

The only thing that I want to make sure we're very clear about is that that is not what the patent is defining as a code.  So the code would be -- the code is carried on the Q branch, but the code is only carried on a single branch.

THE COURT:  Okay.

MR. GERCHICK:  And you can see that when you go and look at Fig. 9, which is the receiver for this, because when you get to Fig. 9 and you look to figure out what the code is that was transmitted or what the codes are that were transmitted, it's only looking at a single branch.

So, for example, find code block number 94 and correlator 90 are looking for the single code that was --

THE COURT:  You're at Fig. 9.

MR. GERCHICK:  Fig. 9.  Yeah.

THE COURT:  Yeah.

MR. GERCHICK:  So up on the top rail there.  We can call that the inphase.

THE COURT:  Yeah.

MR. GERCHICK:  So number 90, the correlator, is looking at what's coming in only on the I branch.  And it's finding a code based on the information that's transmitted only on the I branch.  Okay.  And that's going to output data bits.

And that outputs the four data bits --

THE COURT:  Yeah.

MR. GERCHICK:  -- that you saw in Fig. 3.

THE COURT:  Right.

MR. GERCHICK:  And then down at the bottom you have the correlator 92 and find code block 96.  And that's looking at only the information on the Q branch.  And that's outputting the separate four data bits we saw on Fig. 3.

THE COURT:  Yeah.

MR. GERCHICK:  So everything that it's looking for to resolve the data is only on a single branch, which is what signifies the code as a real code, even though the carrier signal that was transmitted between the two, they may be able to be identified with complex nomenclature --

THE COURT:  Yes.

MR. GERCHICK:  -- but the information that's on those carrier signals -- that carrier signal is two real codes.  And that is clarified, you know -- it's, I think, consistent throughout the entirety of the specification.

And it also -- I know this isn't binding, but I think it

is instructive and informative, this is what the inventor himself said when he was deposed in this case. He was talking about the '958 patent. He said the -- the question was:

"And the codes you were contemplating here, those were real codes?

The answer was:

"Yes. Those were real codes.

"You would transmit independent codes on the I and Q channels?

"Yes. That's correct."

And this is from page 33, line 6 through 25 of Dr. Van Nee's deposition, which is Exhibit 16 to the Anderson Declaration.

**THE COURT:** All right. Let me hear the response.

**MR. SCHUMANN:** Sure. I have two points, Your Honor.

The first point is I want to respond to this idea that Fig. 3 does not show complex codes, rather only has some sort of concept of a carrier frequency that's complex.

You know, we have two modulators here, 32 and 34. And the patent describes what's put in those modulators as a code pair. That code pair language -- here's the code pair language. This is actually from Lines 10 and 11 of --

**THE COURT:** Hold on. Which column?

**MR. SCHUMANN:** Column 7. It starts on, maybe, Line 9 and goes to 10.

**THE COURT:** Yeah.

**MR. SCHUMANN:** So this says the 10 bit data symbol is encoded into an I/Q code pair. So these boxes that we see here in Fig. 3, which is slide 55, 32 and 34 operate together as a code pair.

Now, the -- I heard Mr. Gerchick talk about how there's no concept of phase in these tables that you see, Table 1, 2, 3, and 4.

Well, the phase comes from the fact that the codes that are in box 34, being modulated with this sign carrier, as opposed to the codes that go into box 32, that are modulated with a co-sign.

Now, the co-sign and sign differ because they are 90 degrees apart in phase.

**THE COURT:** Right.

**MR. SCHUMANN:** That's why we call this an inphase branch on the top and quadrature phase on the bottom.

And I think, as you may recall from the tutorial, and Mr. Gerchick might have alluded to it a minute ago here, is that that quadrature branch is referred to as the imaginary branch of the system.

And so the codes that belong to box 34 are codes that are going to be given that 90-degree phase shift relative to the inphase component. And so those are the ones that signify the imaginary values.

So you have codes representing real values in the top box, 32, because they're going to be sent out the inphase branch. And in the bottom, 34, those codes are going to signify/represent the actual imaginary ones.

THE COURT:  Right.  But the code set that's applied is still a binary code set system.

MR. SCHUMANN:  Yeah, because you only put the coefficients in there.  You only put the B in there.

THE COURT:  Right.

MR. SCHUMANN:  But the codes that are in there, one skilled in the art knows that those are in the imaginary branch.  That's the B belonging to the BI or the BJ part of the A plus BI or BJ of the equation, rectangular equation.

But let me step back for just a moment.  There's a bigger issue here, I think, that we're not talking about.

The claims use the word "code," "code set," "complementary code."  There's nowhere in this claim that says these codes are only real or they're only complex or they're only imaginary. It says they're codes.

Code has a very broad definition in the field.  It's well known.  It just means a representation.  It means converting some number of values to another.

THE COURT:  I'm trying to understand, what is the dispute?

There's not a dispute that the I and the Q branch reflect

inphase and quadrature imaginary values.

It's not in dispute that the actual encoding through the code set use a binary system for each branch.  They may represent and apply, as you call it, nomenclature, imaginary nomenclature, whatever you want to call it.

But I'm not understanding, what's the dispute here?

I understand they represent different things, and the Q branch represents an out-of-phase quadrature value as opposed to the I branch which represents the inphase real value.

But what goes through the code set itself is still a binary operation, isn't it?

MR. GERCHICK:  Yes.

THE COURT:  And I understand that later on you've got to combine to figure out where on that cartesian coordinate thing, based on the amplitude and phase shifting, where you are, but what does that have to do with the word "code"?

Are we complicating --

MR. GERCHICK:  No.  To cut to the quick -- sorry for interrupting.

To cut to the quick, actually, it all comes down to infringement, which is that the code set that's used in the 80211 standard uses complex codes instead of real codes.

And the patent here is premised on real value codes.  The chips in the code are real.  In the standard the chips in the code are complex.  It's a completely different thing.

It may be a QPSK system, and when you ultimately get to the carrier signal they both may be able to be identified with complex nomenclature.  But the individual codes themselves in the patent -- and I would agree, the word "real" is not used in the claims.  The word "real" is not used in the patents.

But everybody of ordinary skill in the art, understanding what is disclosed in the specification and the disclosure of what a specific code is as defined in the patent -- so the code sets in Table 1, Table 2 and Table 3, the description in relation to the data bits coming into a modulator and the code being output by the modulator onto a single branch -- would understand that those are real-value codes.

And so that's really what it comes down to.

I don't mean to bring infringement into this, but that's where the fight is going to be because the code set that's used in the standard does not fall within the scope --

**THE COURT:**  So are you contending, is LSI contending that the codes that are claimed here and the code sets can include complex values, not just binary 1s and --

**MR. SCHUMANN:**  Well, there's two things there.

First, the code set isn't real just because all the values in the table are 1s and 0s.  It depends on what you do with it.

An engineer -- if you take a look at slide 55 one more time, an engineer, one of ordinary skill in the art, who's trying to describe this system would describe the thing in box

34 as being the imaginary component.  So the code set that's in 32 and 34, they would say, is a complex set.  And that's in Dr. Negus's declaration.

THE COURT:  Represents a complex value.

MR. SCHUMANN:  Yes.

THE COURT:  But it itself -- when we say "code" are we talking about anything more than these tables?

MR. SCHUMANN:  Yes.  Well, first of all, these tables --

THE COURT:  I don't mean these in particular.

What is a code other than the application of some table, some code set to inputted data?

MR. SCHUMANN:  So the code is the -- is the -- it's a representation of a symbol.  And what we're using in --

THE COURT:  What does that mean?

MR. SCHUMANN:  So you try and transmit data.  So you take data, and instead of just transmitting the individual bits of the data you use one of these tables to expand it to this 11-digit representation, and you send that out instead because it has the multipath properties.

THE COURT:  So the code is how you expand it, right, into --

MR. SCHUMANN:  Right.

THE COURT:  And you use the tables to apply the code.

MR. SCHUMANN:  Correct.  But if you take one of these

tables and you use it in the quadrature phase branch, it's now imaginary.  It's --

            **THE COURT:**  It represents imaginary values.

            **MR. SCHUMANN:**  Right.

            **THE COURT:**  I understand that because it's 90 degrees out of phase.

            **MR. SCHUMANN:**  Right.

            **MR. GERCHICK:**  But it's a real code.

            **MR. SCHUMANN:**  Can I finish?

            **MR. GERCHICK:**  I apologize.

            **MR. SCHUMANN:**  You had a lot of time to talk.

            **MR. GERCHICK:**  I apologize.

            **MR. SCHUMANN:**  People of ordinary skill in the art have a lot of different ways to represent what's happening in the system.

     Some will say, okay, well, what's being transmitted each code -- each symbol that's coming out of MUX and going into these modulators is A plus I or A plus BJ.  They may describe the modulator in 34 as having an array of Js in it or numbers like that.

     And so the problem we have is we all get the concept that this thing is dealing with complex codes and complex numbers.  But then we look inside the box and say, well, there's only 1s and 0s inside the box so we're going to limit this all to real values and that's it.

That doesn't capture the invention.  And, actually, the --

**THE COURT:**  You would agree that the code sets are based on real binary numbers on a --

**MR. SCHUMANN:**  No, no.

**THE COURT:**  No?

**MR. SCHUMANN:**  What's inside the table is a representation of a code set, right.  But if you take a look at -- actually, the patent itself discloses complex codes in several locations.

Well, first of all, these boxes that you see here are just examples.  They're not the only thing that can be used in the system.

**THE COURT:**  So what would a code set which incorporates complex values look like?

**MR. SCHUMANN:**  It would look just like these tables.

And, in fact, this column here, if you look at Column 5, at the very top, it says, "For example, an extended code set is given below in Table 1, which is derived using complementary Barker codes."

So these tables you see here use Barker codes.  Barker codes are complex.  We have a paper that shows that they're complex.

Additionally, the parent to this patent, the '182 Patent, Barnes & Noble's expert says that patent uses complex codes. So one of skill in the art at the time this was filed, actually

two years before this was filed, knew all about complex codes and how to use them in a system.

And so this patent is nowhere limited to the use of real values only.  And that's what Barnes & Noble's construction attempts to do, is say, no, a code in the system can only represent a real value.  That's the language from their construction.

So we think that part is --

THE COURT:  I'm not sure what that means, "represent." Does that mean the data bits that are coming in?

MR. SCHUMANN:  I think they want to say that something that is transmitted on the imaginary branch can only be real, so you can't transmit on an imaginary branch.

I think that's what they're trying to get at here.  So those would be imaginary numbers otherwise.

MR. GERCHICK:  No.

I don't want to interrupt.

THE COURT:  Well, maybe you can tell me, what do you mean by represents when you say "sequence of chips representing a real value"?

MR. GERCHICK:  Well, I guess the answer to that question is a sequence of chips that are real-value chips.

THE COURT:  That are real value.

MR. GERCHICK:  Yes.

THE COURT:  You say "representing a real value."  That

suggests that you're representing an input side of the data stream or something.

MR. GERCHICK:  Then it is a poor choice of words.

THE COURT:  So, really, you're saying a sequence of chips that --

MR. GERCHICK:  We're saying a sequence of real-value chips, yes, correct.

THE COURT:  And you disagree with that?

I understand that there's two different branches, and what they represent.

Why would code itself be anything other than real-value chips?

MR. SCHUMANN:  Because it's being transmitted on that quadrature branch.  And I think one of ordinary skill in the art would say that's the imaginary component.

THE COURT:  But isn't the encoding still, through this table, a binary process?

MR. SCHUMANN:  I think if you're looking for some agreement I would say -- if you're asking whether the coefficients of a complex notation are only real, then I agree with you.  They are only real.

I think when you look at a system like this and you're talking about what one of ordinary skill in the art -- how they would represent this system, for example, in documents that we may have in discovery, in things we're going to show later in

the case, they're not always going to represent that imaginary branch as just 1s and 0s.

They may say, oh, no, I know that's the imaginary branch because it's being modulated with this sign function as opposed to the co-sign function, so I'm going to write it as an I or write it as a coefficient and a J.  And so that's the issue here.

**THE COURT:**  Comment?

**MR. GERCHICK:**  The point is this:  Just because you put a code on the quadrature phase branch does not make that code complex or imaginary.

Putting a code -- a complex code is a code that needs to be transmitted using both branches, the inphase and the quadrature phase.

Now, if you have a situation where you have a digital modulation system with both an inphase and a quadrature phase branch, for example, as shown in Fig. 3, you can do two things:

You can either transmit two independent real codes because you have two branches available.  But that is one is code A; one is code B.  And they are independent of one another, which is exactly what's described in the patent.

Or you can transmit one complex code, which is a code that the information on the I and the Q relate to one another, okay.  One is the real portion; the other is the inphase portion.

And when it comes time to figure out what the original

data was that was being transmitted, and you go to demodulate on the receiver side, you have to look at the information on both the inphase and the quadrature phase at the same time to get back to the original database.

That is not what is disclosed in the patent.  What is disclosed in the patent, as they stated repeatedly, are independent codes on the I and the Q.

And when you go back to resolve the data bits on the receive side, you only look at the information coming on the I branch in order to get back to the 4 data bits.  And then you only look at the information on the Q branch to get back to the other 4 data bits.

And I just want to make sure that -- I want to clarify one thing because Mr. Schumann referenced Column 5 of the patent, and this reference to Barker codes and saying that Barker codes are complex.

And this Frank paper, which is Exhibit 4, I believe, to -- I think it is Exhibit 4 to the Schumann Supplemental Declaration, discusses the fact that complementary codes can be binary or polyphase.

So in Column 1 of the patent, about -- of this article, about four lines down it says, "Golay first considered binary forms.  Sivaswamy has recently considered multiphase forms."

So there is a distinction between a real or binary code and a complex or multiphase code.  That's point one.

Point two, this is all extrinsic evidence.  The Frank article is not incorporated by reference into the patent.  It's extrinsic evidence anyway.

And when you go through and look at the description in relation to what's being talked about here, the Barker code that's being used to set the table is a binary Barker code in Column 5.

The next point would be with respect to the '182 Patent. First of all, it's not the parent application.

We won't get into the belated incorporation by reference and the impropriety of that.

But I will say that Barnes & Noble's expert acknowledged that the '182 Patent discloses a complex code or an algorithm that can be used to generate a complex code.

At no point did anybody ever indicate that the complex code indicated in the algorithm of the '182 Patent, which is an OFDM system, a completely different transmission system than what is disclosed in the '958, nobody has indicated or explained how one of ordinary skill in the art gets from using the algorithm in the '182 for complementary codes -- I'm sorry, for an OFDM transmission system into the direct sequence spread spectrum system of the '958 Patent, which are the modulation systems shown in Fig. 3 and Fig. 4.

And it wouldn't work.  In the incarnation that is illustrated in Fig. 3 and Fig. 4, where you have a modulator

that outputs onto a single branch, you would have to change your modulation system and change the structure.  And there is no disclosure of how to do that.

Can we switch over to -- sorry about that.

And, again, the inventor himself provides -- first of all, the inventor himself -- again, how is a complex code different from a real code?  And this is slide 17.  How is a complex code different from a real code?

And he says that it has a complex value.  Not just a sign, but also a phase or face other than zero and 180 degrees.

The question was:

"To transmit a complex code" --

**THE COURT:**  Typo, means phase not --

**MR. GERCHICK:**  Yes.

**THE COURT:**  Means 180, not 480 degrees?

**MR. GERCHICK:**  Right.

**"MR. QUALEY**:  To transmit a complex code you have to encode it on both the I and the Q channels simultaneously?

"Exactly."

And that's the point I've been trying to make, which is that you can transmit two real codes, code 1 on the inphase, code 2 on the quadrature phase.  Or you can transmit one complex code where you haves portions of the code on both the I and the Q simultaneously.

The later, this complex code, is not disclosed in the '958

Patent anywhere.  The modulation systems disclosed in Fig. 3, Fig. 4, and Fig. 7 don't show that.  What is disclosed is the transmission of two real codes: one on the I and one on the Q.

And whether you want to call the Q -- you say you can represent it using imaginary nomenclature or what is irrelevant.

What is important is that only a single code is transmitted on each.  And those codes are independent of one another.  That's what makes them real --

**THE COURT:**  You don't contest that the -- that the code applies to the Q branch is one that is meant to transmit -- transmit an imaginary branch out of phase?

**MR. GERCHICK:**  I don't dispute that it's transmitted out of phase from what's on the I branch.

But it's one of those things where -- I hate to do it like this.  It's almost like, you know, you cover one eye and you look with your left, and that's code A.  And you cover the other eye and you look with your right, and that's code B.

They're completely -- they're different from one another. They're separate.  And they happen to be piggybacked on the same carrier signal that is the combination of the branches together.

But, you know, they are two -- two pictures.  It's stereophonic or three dimensional.  You have two individual pictures.  They are still individual pictures.  They happen to

be dropped onto the same carrier signal for transmission.

THE COURT:  All right.  Give you the last word.

MR. SCHUMANN:  Yes, sure.  So three quick points. Could I switch to my slides?

So last point about this figure is that you do have the out-of-phase portion here.  It's the sign branch.

Those codes that are -- and the codes in 34 and 32 are operating as a code pair, as we saw in Column 7.  So in this code pair those coefficients that are sitting in the modulator 34 are the imaginary portion of the complex code that's being sent.

Second point.

So this particular paper, Robert Frank, the '958 Patent discloses complex codes.  This paper discussing polyphase complementary codes deals with complex codes.

Now, it's not incorporated by reference but it says, look, the codes in Tables 1, 2, and 3 are derived from the ones in this article.

So, certainly, one of ordinary skill in the art would think that this paper is important to look at.

THE COURT:  Why would you need complex codes if you have a separate I and Q branch?

MR. SCHUMANN:  Because you're going to represent what's going on the Q branch as the imaginary portion.  That way you can do math on these things.

**THE COURT:**  I'm not sure why it has to be encoded with a complex code in order to accomplish what you need to accomplish, because it already represents a quadrature imaginary branch.

**MR. SCHUMANN:**  Right.  But it's intended to be transmitted or modulated on a branch that's 90 degrees out of phase with the inphase branch.

So the codes that are doing that say, hey, I need to have a 90-degree component right now.

So let's take a look back at the picture here.

So you have codes in -- you have a code pair in 32 and 34. When you have a value in 34 like a 1 it says, okay, I need some of the 90-degree phase now.  When you have a code in the modulator 32, you know, a value that says, hey, 1, I want some of the inphase code now.

So to represent that code set you need both inphase and quadrature, which would be the code set would have to have both a real and an imaginary portion.

**THE COURT:**  The 4 bits, I take it, coming out of block 14 -- why don't you go back to that, Fig. 3, go back to Fig. 3.

**MR. SCHUMANN:**  Let me describe that.

So, actually, what's being encoded here is 10 bits.  So what comes out of -- so a symbol goes into the scrambler.  It comes out.  And if you've got a scrambled piece of data that goes into this 1 to 10 MUX, that gets turned into 10 bits,

okay.

And then four of those bits go into the inphase or real portion of this system, and four of those bits go into the quadrature or imaginary.

THE COURT:  How does that happen?  How do those 4 bits -- how does it determine which four bits go to 32 and which four bits go to --

MR. SCHUMANN:  It just takes the first four, the second four, and then the -- you can see the last two bits down there.  It's just a multiplexer.

THE COURT:  How does it know what's -- one is going to the inphase channel and the other is going to the out-of-phase channel.

MR. SCHUMANN:  That's right.

THE COURT:  So --

MR. SCHUMANN:  But it's going to do the same thing when it decodes it on the other end.

THE COURT:  Right.  Somewhere where it does this multiplexing it's got to know which is -- I guess I --

MR. SCHUMANN:  So it gets the start of the train and it says, okay, you four bits, you're going up to this modulator; the next four bits, you go to this modulator; and these last two bits, we do something different with you.

Then it takes the next chunk of data and says, the first four bits, they go to that top modulator; the second four bits,

they go to the bottom modulator; and these last two bits, we're going to use you down the road somewhere.

And it just keeps doing that over and over again.

THE COURT:  What does the modulator do?

MR. SCHUMANN:  The modulator -- you have four bits. Four bits can represent 16 values, correct?

THE COURT:  Yeah.

MR. SCHUMANN:  So if you remember these tables that are the patent, they have 16 entries of 11 chips.  So it says, hey, I've got -- these four bits correspond to this first one, or whatever.  And so then it replaces those four bits with those 11.

THE COURT:  All right.  So it assigns new code to each bit.

MR. SCHUMANN:  That's correct.  For a value in the set.

THE COURT:  All right.  Go on.

MR. SCHUMANN:  So the last thing I was going to say here -- so here you see that this Frank paper discusses complex value codes and is mentioned in the '958 Patent.  It says that the codes in the '958 Patent are actually derived from these complex codes.

Then the last point I wanted to make was about Dr. Van Nee's testimony -- which is way down in my deck.  All right.  We have to load a different deck.

So what Dr. Van Nee was talking about here, when he said "real codes," was not the '958 Patent, as we've heard over and over.  The question right before this was one about the '958 Patent, which you saw in Mr. Gerchick's slide.  However, here they pivoted quickly to:

"Okay.  Tell me what's in your invention disclosure record."

And he says:

"Well, what's in my invention disclosure record is actually real codes."

He does not make that statement about the '958.

And, importantly, this invention disclosure record didn't even use this Frank paper, and was actually quite sparse.  It is not the same as what ended up getting filed on the filing -- the effective filing date of the patent.

So it's different, and we think that he may have been talking about the IDRs, not the patent.  And we don't think that has particular bearing on --

**THE COURT:**  What's an IDR?

**MR. SCHUMANN:**  Oh, they called it -- at Lucent those were called invention disclosure records.

There's actually three of them in this deposition that they were talking about.  And all three are extremely sparse. They don't have anywhere near the information that's in the -- the actual patents.

And they also were talking about a couple different patents in this particular deposition.

And that's all I have.

**THE COURT:**  All right.

**MR. GERCHICK:**  I apologize.

**THE COURT:**  Very short.

**MR. GERCHICK:**  Very brief.

Can we just pull the switch over real quick?

I just want to respond to the out-of-context characterization.  And this is additional testimony from the inventor when he was asked:

"Why do you think your patent applications or patents weren't relevant to the compromise proposal?"

And this is the IEEE compromise proposal that Dr. Van Nee was working on with Harris at the time.

The patent wasn't disclosed to the standards body.  And the question was why didn't he do that?

"Why do you think your patent applications or patents weren't relevant to the compromise proposal?"

And this is him talking about the patents, including the '958 Patent, when he says:

"The other patents, the ones we just talked about, they were all limited to the use of real codes used separately on the I and Q rail, and this was clearly different because it was the main distinguishing feature

of a complex complementary code, that you did not have to use separate codes on I/Q anymore."

And that's what the inventor had to say.

I have nothing else.

**THE COURT:**  All right.  Thank you.

Let's go ahead and take our break.  I have a matter at 1:15 I have to handle, and so why don't we resume at 1:30.

And we've got the '867, the '420, and the '394.  Is that what I have left?

**MR. EISEMAN:**  Yes, Your Honor.

**THE COURT:**  Good.  Thank you.

(Recess taken from 12:20 to 1:36 p.m.)

**THE CLERK:**  Recalling case C 11-2709, Barnes & Noble versus LSI.

**THE COURT:**  Okay.  I don't know if there's any particular order.  I can take the '394.

Okay.  The first issue has to do with the question about whether the term "multiple antenna communication system" should be construed to require multiple transmitter antennas and multiple receiver antennas.

And I will say that the specification certainly seems to suggest that in that it starts off with the general statement that the invention relates to a wireless radio frequency data communication system comprising two distinct parts: one, a base station with multiple first sets, each first set having at

least one antenna; and, two, multiple second seats, each having at least one antenna.

So it certainly seems to contemplate, the invention seems to contemplate that there would be a system with multiple antennas on both sides of the system.

And so I'm not sure what the problem is with Barnes & Noble's proposed construction.

MR. RIBERA:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. RIBERA:  So the problem with Barnes & Noble's construction is that while the system may allow for implementations where there are multiple receive and transmit antennas, neither the claim language nor the embodiments described in the specification all require the presence of both multiple transmit and multiple receive antennas.  And that's -- that's the main issue with that part of the construction.

So when you look at the claim language itself, I'm presenting on slide 129, the actual claim language does not mention multiple transmit antennas.

And when you look at the last step of the claim, it talks about transmitting on only one antenna.  So there's no requirement from the claim language for where to import the limitation that multiple transmit antennas are required.

When you look at the embodiments described in the specification, specifically in Fig. 3, you can see that the

scenario depicted there is a transmission from a single second set that only has one antenna to a base station that has multiple antennas.

So it envisions a situation or covers a situation where you only have one transmit antenna, multiple receive antennas, and the base station.

And, similarly, when you look at the description in the specification, it's clear that the mobile devices can be provided with at least one second set, which would include just one antenna.

There's also a description at -- I'm on slide 132, Column 4 of the '394 patent, Lines 32 through 43, where it's talking about how, according to the present invention, the benefits of the OFDM on multi-antenna systems can be exercised by a transmission of a single second set.

And it's making reference to Element 14.j in Fig.3, which is a second set with a single antenna.

So throughout the specification and the claim language there are multiple instances in which the invention is depicted as a single second set with a single transmit antenna and a base station with multiple receive antennas.

So the notion that multiple transmit antennas is nowhere required by either the claim language or the specification --

**THE COURT:** Where is 14.j, in which --

**MR. RIBERA:** Fig. 3, Your Honor.

THE COURT:  Fig. 3?

MR. RIBERA:  Yes.  It's sort of a generic number for the second set.  So it has, 14.1 through 14.m on any one second set would be 14.j.

THE COURT:  19 or 14?

MR. RIBERA:  14.  Fig. 3.

THE COURT:  Looking at Fig. 3.

MR. RIBERA:  So if you look at the big box on the left, the one that's in the middle, those three boxes, the one that's in the middle, right above it there's a little squiggly line that says "14.j."

THE COURT:  There it is.  I see.

And the specification that refers to that, again, what's the --

MR. RIBERA:  It's Column 4, Lines 32 through 43.

THE COURT:  Column 4, Lines 32 --

MR. RIBERA:  -- through 43.

And I guess they do start at line -- yeah, what we're quoting here, it starts a couple of lines later, at 36, in short.

That entire block kind of talks about just receiving the benefits of the invention by having a single second set transmitting on a single antenna, which would be a single transmit antenna.

THE COURT:  And the benefit is derived from multi --

multiple antennas at the base station?

**MR. RIBERA:**  Correct, Your Honor.

As you may recall from the tutorial, when you get the multiple signals at the base station you need less error correction, and there's less possibility or a better resistance to multipath fading because you're getting two different paths into the base station that then can be combined together to give you the best signal possible.  So you remove some of the interference provided by the multipath environment.

And that -- obviously, it's a problem with a single set transmitting.  Multipath is a problem that applies to a single set transmitting and the signal, the same signal traveling through different paths.

So it doesn't involve multiple sets or multiple transmit antennas at all.

**THE COURT:**  What do I do with the very beginning of the description here in the specification, where it says, "This invention relates to wireless radio frequency data communication system comprising" and goes on to say "multiple second sets"?

**MR. RIBERA:**  There's no prohibition that you can have multiple second sets.  It's just not a requirement.

There's no clear disavowal anywhere in the specification that says if you have a single set the claim doesn't cover it.

**THE COURT:**  So you're saying this patent has something

to teach even if you don't have multiple second sets?

**MR. RIBERA:**  Correct, Your Honor.

And the claim language itself involves a transmission by a single second set or a single antenna.

**THE COURT:**  Well, that's one antenna per -- per transmitting set.

**MR. RIBERA:**  Correct.

But nothing in the claim requires more than one transmitting set or more than one antenna.

**THE COURT:**  All right.  What's the response?

**MR. GERCHICK:**  We would respectfully disagree with that.

**THE COURT:**  I'm surprised.

**MR. GERCHICK:**  Yeah.

The thing in the claim that requires multiple second sets is the phrase "multiple antenna communication system."  The patent -- I would agree that in the remainder of the claim it's talking about transfer on an antenna.

So the steps in the claim that are being referred to below are talking about the instance in which you have a transmission on at least one antenna.  So you have one second set that's transmitting at a particular time.

But throughout the patent as a whole -- the entire patent is about a system, a multiple antenna communication system that has multiple antennas on the transmit side and multiple

antennas on the receive side.

Everywhere the system is described, it's described with respect to multiple first sets and multiple second sets.  And with respect to -- just so there's no confusion because it had been raised -- can you pop me over.

So there was something raised in the briefing, and just so there's no confusion, it's not Barnes & Noble's position that every second set has to have multiple antennas.

**THE COURT:**  Right.  I understand that.

**MR. GERCHICK:**  It's our position that you have to have multiple transmit antennas and multiple receive antennas in order to have a multiple antenna system.

**THE COURT:**  Well, but isn't there some value in having the base station having a multiple antenna?  That's part of the invention, isn't it?

**MR. GERCHICK:**  Well, it's not part of the invention, it's part of the prior art according to the invention.

Really, what the invention is about is defining a multiple antenna communication system.  And that starts -- and you can see this in Column 1, Line 16, through Column 1, line 40.  It provides descriptions.

And I won't read it all, but it provides descriptions of a base station comprising multiple first steps -- first sets, and multiple second sets.  And then it also provides another description of a wireless radio frequency data communication

system having K1 multiple first groups and K2 multiple second groups.

But then at Line 41 it says, "Wireless radio frequency data communication systems of this type are known and find their application in a variety of fields."

So it's not until you actually get over to Column 2, where it describes what the invention is.  And it starts by describing the object of the invention, in Column 5, "It is an object of the invention" --

**THE COURT:**  Where are you?

**MR. GERCHICK:**  I'm sorry, Column 2, Line 5.  I apologize.

**THE COURT:**  Line 5.

**MR. GERCHICK:**  Yes, Column 2, Line 5.

**THE COURT:**  Yeah.

**MR. GERCHICK:**  "It is an object of the invention to increase the capacity of the wireless communication system per frequency or frequency band used by the system.  The present invention, therefore, provides in a wireless radio frequency data communication system which is characterized in that the signal processing unit comprises information about the transfer functions of radio frequency signals in each of the antennas of the first sets to each of the antennas of the second sets, and/or vice versa, and wherein the transmitters and receivers, both in the first sets and the second sets, operate in

essentially the same radio frequency or radio frequency band."

So that is the multiple antenna communications system of the patent.  It is one in which you have multiple transmit antennas, multiple receive antennas, all of which are capable of transmitting concurrently within the same frequency band.

Then what the patent does is it takes that multiple antenna communication system and it leverages OFDM on top that.

So OFDM itself, again, was something that was known.  And they describe that in Column 9 of the patent.  And this is starting at line 20.

Just let me know when you're there.

**THE COURT:**  Yeah.

**MR. GERCHICK:**  Okay.  "The wireless data communication system as described hereinbefore operates in just one frequency, thereby using multiple simultaneous communications channels in the duplex mode at this frequency for increasing the communication capacity."

And that's what the patent is all about.

"This concept can be exploited at a greater extent by using a system according to the invention which operates at a frequency band.  This concept is particularly suited for being used in combination with the orthogonal frequency division multiplexing method.

"The OFDM method which is known per se is applied in practice for preventing the transmitted symbols from

intersymbol interference effects and for reducing fading effects which occur, strongly dependent on the used radio frequency during transmission."

So what the patent is talking about is this multiple transmit antenna/multiple receive antenna system where you have the prospect and capability of multiple transmissions within the same frequency band.

Not saying that you have to, because it may be that only one station is transmitting at a given time.  And that's what the patent is talking about in the claim.  And I agree with that.

But the multiple antenna communication system is one that has to provide for that ability to transmit within that given frequency band concurrently.  And it does that with the transfer function that they talk about in the patent.

But when they recite "multiple antenna communication system" in the preamble of Claim 1, they are defining this system and then adding in the remainder of the claim the ability to transmit using OFDM within that channel.

And that's the combination of the two things, the multiple antenna communication system using this transfer function and OFDM, that the patent as a whole defines as the invention.

**THE COURT:**  Remind me, give me a reminder about when you say it has two components, transfer system and the OFDM --

**MR. GERCHICK:**  Oh, okay.

So the patent starts by defining this multiple antenna communication system.  And it lays out the multiple first sets -- or the multiple second sets and the multiple first sets, and the ability for these guys, the transmitters, to transmit in the same frequency band concurrently.  So they don't have to round robin and wait their turn.

THE COURT:  Right.

MR. GERCHICK:  So that allows you to keep the data rates up because you have more access to the medium at a particular time.

And then during the course of the specification you hit a point where they say, in addition to that, in order to even further improve the resiliency of the communications in this frequency band, if your communications -- if your transmissions are made using OFDM, you'll have additional benefits against intersymbol interference.

So it's, you know, Reese's Peanut Butter Cup.

THE COURT:  Explain to me how orthogonal frequency division multiplexing method works.

MR. GERCHICK:  So it's basically you take -- you take the data coming in and you spread it out onto a bunch of different subfrequencies in the carrier, which allows you to extend the symbol some and provide increased robustness to the multipath interference that we were talking about before.

THE COURT:  This is in the transmitting end or the

receiving end?

**MR. GERCHICK:**  The transmitting end.

**THE COURT:**  Which minimizes the multipath portion.

**MR. GERCHICK:**  Yeah.

So the ability to -- the way the subcarriers are set up with respect to one another, they're orthogonal so they don't degrade one another.

You can spread it out and transmit this information and, therefore, you have some increased resiliency.

**THE COURT:**  Okay.

So that advantage is obtained regardless of whether you have one or multiple second sets?

**MR. GERCHICK:**  That's true.

That advantage is also something that was well known, which is why they defined it as OFDM -- the OFDM method which is known per se in Column 9.

So, really, what the patent is all about is taking this multiple antenna communication system -- and just back for reference, that's Column 9, at line 28.

So really what the patent is all about is taking this multiple antenna communication system that we just talked about and leveraging OFDM on top of it.  It's not OFDM alone.  It's only OFDM leveraged on top of the multiple antenna communication system that the disclosure is really addressing.

**THE COURT:**  And that assumes, in order to obtain that

benefit, the benefit is obtained only when you have multiple second sets transmitting at the same frequency level?

**MR. GERCHICK:** Right.  You don't have the benefit of the patent's ability to increase data rates by allowing multiple second sets to transmit within that same frequency channel without the multiple antenna communication system that's described in the patent.

But you will have the benefit of improvements against intersymbol interference, whether one transmitter is transmitting or all transmitters are transmitting.

**THE COURT:** And where in the claim -- well, the claim language, I guess --

**MR. GERCHICK:** I would point you to the multiple antenna communication system.

**THE COURT:** Right.

**MR. GERCHICK:** That's specifically defined in the patent as being what we're proposing.

**THE COURT:** When you say "specifically defined," you mean in the specification?

**MR. GERCHICK:** Correct.  Throughout.

And it's characterized as the invention every time it talks about, you know, for example, in reference to Fig. 3, or in reference to Fig. 1, or in reference to just any multiple -- time you're talking about multiple first sets and multiple second sets it talks about the invention.

THE COURT:  So what aspect of this invention obtains when you only have one second set, anything?

MR. GERCHICK:  Nothing -- well, if you are to ignore the ability to have other second sets transmit in the channel at that time concurrently, the only thing you have is what's known in the prior art.

THE COURT:  So there would be nothing new.

MR. GERCHICK:  (Shakes head.)

THE COURT:  So you're saying the only thing new here, and the central teaching of this patent, is really addressing the situation where you have multiple second sets.

MR. GERCHICK:  Correct.  All of which can transmit in the same frequency band.

MR. RIBERA:  If I may address that?

THE COURT:  Yeah, I would like your answer to that question.

MR. RIBERA:  Obviously, that's not the case.

Can we switch back.

There are multiple benefits to the invention.  And, clearly, I pointed to Fig. 4, where it's talking about the invention and how the benefits of the invention are accomplished by having a single second set transmitting to a multiple antenna communication system.  And that's not the prior art.  This is talking about the invention.

And it's different from the prior art because the base

station having multiple antennas provides a benefit that was not available in the prior art, in that using OFDM within multiple antennas it allows you to separate each of the different subchannels and recombine them together in a way that the prior art didn't allow you to do.  So that was not in the prior art.

The specification clearly teaches that you can obtain that benefit with a single second set.  And if multiple second sets were required by the invention, the claim language would talk about multiple second sets.  It doesn't.

**THE COURT:**  All right.  Let me stop you right there.

What about that?  What about the benefit that's described in Column 4?

**MR. GERCHICK:**  Well, so I would respond to that in two ways.

The first way would be to point you to Column 1, Line 41, which we talked about before, which says "Wireless radio frequency data communication systems of this type, including multiple receive antennas."

**THE COURT:**  Where does it say that?

**MR. GERCHICK:**  Right above, where it talks about multiple K1, multiple first groups, and a base station comprising multiple first sets.

So that's Column 1, Line 18, I think.  Yeah, it's 18, talks about the invention relates to a wireless radio frequency

data communication systems comprising a base station comprising multiple first sets and a single processing unit wherein each first set comprises a transmitter and receiver provided with the transmitter and receiver and at least one antenna which is connected to the transmit and receive unit.

If you look at Fig. 1, it will show you those types of units.  But then in Column -- in Column 1, at Line 41, it explains that those systems were known.

So you get to Column 4, which is what we were just talking about, and if you start with Line 32, with the present multi-antenna processing, the probability --

**THE COURT:**  -- of deep phase is greatly reduced.

**MR. GERCHICK:**  Right.  The probability of deep phase is greatly reduced.

The multi-antenna processing they're talking about is this transfer function H that allows you to transmit from multiple antennas on the transmit side to multiple antennas on the receive side.

**THE COURT:**  Why can't that mean only on the receive side?

**MR. GERCHICK:**  Well, the whole purpose for the transfer function is being able to reconcile what is making the transmission.

So your whole system is set up so that you have multiple transmit antennas and multiple receive antennas.  And I'm not

disputing --

THE COURT:  I thought -- as you go down, it talks about a single, a second set, 4.j, that there's some advantages to be obtained because ISI is avoided.

MR. GERCHICK:  Right.

THE COURT:  For the benefit of multi-antenna processing, I would assume, on the receiving side.

MR. GERCHICK:  Right.

It's the combination of multi-antenna processing according to the present invention.  And that multi-antenna processing, again, agreed that there may be at a given time only a single transmission from the transmit side, but this multi-antenna processing that we're talking about is -- is talking about the use of the transfer function, which is only necessary or discussed in relation to the ability to transmit from multiple antennas on the transmit side.

THE COURT:  Right.

My point is, you would concede that there's some benefit to be obtained by this invention just on the multiple -- on the receiving side because even from a single set, 14.j, that you can avoid I more so than if the receiver only had a single antenna.

MR. GERCHICK:  I acknowledge that.  All I'm saying is that that's known in the art.

THE COURT:  Well, where does it say that was known in

the art?

MR. GERCHICK:  So in addition to the two portions in Column 1 and --

THE COURT:  Well, Column 1, you say, "Wireless radio frequency data communication systems of this type are known."

MR. GERCHICK:  Right.  And that's the type that's being described above, from Line 16 to Line 40.

THE COURT:  Well, hold it right here.

So you agree --

MR. RIBERA:  I disagree.

The language that we're pointing to in Column 4 is clearly talking about the invention.  If they want to claim that there is some invalidity argument, we can deal with that later.  But this specification is describing the invention with a single transmitter antenna.

What they are trying to do is have you construe the claims to require multiple transmitter antennas.  But they cannot point to anything in the specification -- I agree that you can have multiple transmitter antennas.

But they cannot point to anything in the specification that clearly disavows a system with a single transmit antenna. And, in fact, there's a disclosure right there in Column 4 that talks about a system with a single transmit antenna.

So if they want to be able to narrow the claims to an embodiment that discloses multiple transmit antennas, they need

to show a clear disavowal.  And, in fact, the specification would contradict that.

MR. GERCHICK:  Well, I would disagree that what is described in Column 4 shows a system with a single transmit antenna.

It says "14.j," but it's also talking about the combination of multi-antenna processing according to the present invention in OFDM for each signal which is transmitted by the second set 14.j has the advantage --

THE COURT:  Well, it can accommodate -- it seems to me there's some benefit to be obtained from the receiving half of this.  There's some additional benefit to be obtained from the transmission side of this, which is part of the teaching of this invention, that you can broadcast or transmit on the same band.

So that argues that, well, that's what's contemplated.  That's a big part of what this patent is about.

So why wouldn't it require that component?

MR. RIBERA:  Well, I'll show you.

For example, Claim 3, in which that aspect of the invention is actually specifically claimed.  So it talks about each of a plurality of transmit antennas to each of a plurality of receive antennas.

If Claim 1 already included all of that, Claim 3 would just say "the plurality of transmit antennas" or "the plurality

of receive antennas."  It doesn't say that.

It's covering a new aspect or a new limitation that is not included in Claim 1.  And that is exactly what claim differentiation would tell us, that you have to presume that Claim 1 is broader so it does not include those multiple receive and multiple transmit antennas.

**MR. GERCHICK:**  Well, no.

It just says that different frequencies -- it says that, "Wherein the receiver processes a received version of said signal comprising K different frequencies based on transfer functions from each of the plurality -- from each of a plurality of transmit antennas to each of a plurality of receive antennas."

This is talking about what the receiver does with respect to processing.  So it's talking about further processing.  I would agree with that.  And I would agree that it's calling for multiple transmit and multiple receive antennas here.

But I'm talking about the processing at the receiver in reference to "from each of a plurality of transmit antennas to each of a plurality of receive antennas."

I would say that that supports our definition of "multiple antenna communication system" to include a plurality of transmit antennas and a plurality of receive antennas because this step is the additional step that's asking for processing at the receiver in relation to those.

**MR. RIBERA:**  We agree with that, that this claim does require multiple transmit antennas.  And this claim is claiming that additional aspect of the invention of realizing a benefit from having multiple transmit and multiple receive antennas.  Claim 1 does not.

**MR. GERCHICK:**  Do you mind if I respond to that small snippet?

**THE COURT:**  Yeah.

**MR. GERCHICK:**  Okay.

So it is a method claim.  So the only structure that's laid out is the multiple antenna communication system that starts in the preamble of Claim 1.

So this method is being performed within the context of that system.  It's referencing each of a plurality of transmit antennas to each of a plurality of receive antennas, which we think is fully defined within the context of the patent as a whole as basically the crux of this multiple antenna communication system itself.

**THE COURT:**  You're saying Claim 1's multiple antenna communication system already encompasses Claim 3's plurality of transmit antennas and plurality of receiving antennas?

**MR. GERCHICK:**  Right.

And Claim 3 recites the additional step of a receiver processing a received version of said signal comprising K different frequencies based on transfer functions from each.

113

THE COURT: That's the basic claim differentiation. It lies in the --

MR. GERCHICK: In the additional step of processing, correct.

MR. RIBERA: If I may respond to that, Your Honor.

THE COURT: Yeah.

MR. RIBERA: That clearly notes that Claim 1 does not require -- while it allows for having additional transmit antennas, it does not require it.

And the fact that the claim language is referring to "a plurality of transmit antennas" indicates that in Claim 1 there is no plurality of transmit antennas; otherwise, it would say "the plurality of transmit antennas." And that's exactly what claim differentiation does.

THE COURT: Are you saying because it says "a" instead of "the"? Is that what you're saying? "A" instead of "the"?

MR. RIBERA: Right.

If the inventors thought that Claim 1 already included multiple transmit antennas, it would say "the multiple transmit antennas of the system." It doesn't say that. It says "a," indicating that it's a new element added by this claim.

MR. GERCHICK: Well, that's just an antecedent basis.

If "a plurality" of transmit antennas actually had been recited in Claim 1, then it would have said "the plurality" in Claim 3.

My argument and what I've been talking about before is that the definition of multiple antenna communication system encompasses the plurality of transmit antennas and --

**THE COURT:**  I know that's your argument.  But we have to look at the language of the claim.  And, obviously, it would have been clear if it said a multiple antenna communication system comprised of --

**MR. GERCHICK:**  Agreed.

**THE COURT:**  -- something.  But it doesn't say that.  But then it does refer to what you believe are its composition elements later on in Claim 3.

So your opponent is arguing, well, that shows, you know, under the doctrine of claim differentiation one does not necessarily encompass the more specific limitations in Claim 3.

And your comeback is, well, no, the claim differentiation lies in the process, the first two lines of that claim, and not in the plurality language.

**MR. GERCHICK:**  Correct.

And the antecedent basis there, the multiple antenna communication system obviously encompasses a lot of the structure.  It has the signal processing unit that's been talked about in the claim as well.  We've been talking about the transmit antennas and the receive antennas.

I would submit that if somebody had actually claimed "from each of the plurality of transmit antennas to each of the

plurality of the receive antennas" they would have gotten a rejection for an antecedent basis problem.

So the thing is, they are specifically calling out two structures within the context of the greater multiple antenna communication system.

And I would agree with Your Honor that my argument is that from a claim differentiation perspective what's being talked about here in the method Claim 3 is the receiver processing a receive version.

So it's talking about the processing step rather than distinguishing the addition of a new structure.

THE COURT: All right. And you would concede that this patent has something to offer with respect to multiple second sets?

MR. RIBERA: Absolutely, Your Honor. And that's what Claim 3 covers.

THE COURT: All right.

MR. RIBERA: Claim 1 does not.

THE COURT: Let's move on to the question about -- I guess there's a dispute here about the language about performing an IFFT on said K signals to generate a signal comprising K different frequencies.

Am I missing something? There's a K for both. What's -- what's the ambiguity here?

MR. RIBERA: So, Your Honor, the claim language uses

"comprising."  And there's a reason for that.  The patent drafter knew that the term "comprising" is an open-ended term and can include other things.

So the K here sets a floor on the number of different frequencies that need to be present in the output signal, but it does not limit the frequencies to be one-to-one corresponding to the input signals.

And that was purposeful because the specification throughout uses the same comprising term.  There's no one instance in the specification that Barnes & Noble's has pointed to that shows a one-to-one correlation between the different frequencies in the output signals and the input signals to the IFFT block.  There's simply no disclosures of that anywhere in the patent.

And the case law on that point is fairly clear that the term "comprising" is presumed to be open ended, whether it's used in the claim or whether it's used in the specification.

I think Barnes & Noble pointed to the *Moleculon Research* case as somehow supporting a contention that, if used, "comprising" in the body of the claim is not open ended or there's no presumption.  But there's nothing like that in this case.

This case actually points out that even if you use "comprising" you can rebut the presumption when the claim language is clear that you cannot have multiple or more

elements than what's claimed.

So in this example -- I have Claim 3 on the slide on the *Moleculon* case -- the claim language itself was talking about eight pieces of a cube.  One step referred to four pieces, and the other step was referring to comprising four cubes.  But because there were a total of eight, and eight were already cited in one of the elements, the only possibility is that only four are left, so that's why that comprising was not open ended.

But there's nothing in this case that says "comprising," when used in the body of the claim, is not given the presumption that it is open ended and can include more elements.

Nothing in the claim language or the specification that Barnes & Noble has pointed to rebuts a presumption that the output signal comprises or can comprise more than K frequencies.

**THE COURT:**  Well, *Moleculon* seems to draw a distinction between when the term "comprising" is used in the body of a claim as opposed to a transitional phrase.

**MR. RIBERA:**  But it doesn't say that the presumption doesn't attach.

**THE COURT:**  Pardon?

**MR. RIBERA:**  It doesn't say that the presumption does not attach.

It's because the claim language here makes clear that they cannot be -- it cannot be open ended, it cannot be other elements.  So it's the claim language itself that leads to the conclusion that "comprising" is not open ended, not that there's no presumption that "comprising" generally when it's used in the body of a claim it's not open ended.

**THE COURT:**  What else in the specification or anywhere else would indicate that what is covered is, as you say, that it generates at least as many frequencies as a number of divided signals?

**MR. RIBERA:**  So if you look at Column 10, Lines 8 to 10.

**THE COURT:**  8 to 10, okay.

**MR. RIBERA:**  So, again, here it's talking about the uplink situation, "The Unit 22.j receives said K signals at its input and performs an inverse fast fourier transform yielding a signal comprising K different frequencies."

Again, they're using the term open-ended term "comprising."  The reason for that is that, as Dr. Negus testified, when you perform an IFFT the output always has more frequencies than the input, you just ignore them.  But if you claim an output that it's 1-to-1 matching in frequencies to the input, that's an impossibility.

So that's why throughout the specification and in the claims the inventors used the open-ended term "comprising,"

because they acknowledge that there can be other frequencies in the output.

THE COURT:  All right.  What's your response to that?

MR. GERCHICK:  We would just respectfully disagree with that reading of *Moleculon* and what this means with respect to the claims.

First of all -- I think we've already spoken about it somewhat today -- I think there's a fundamental disagreement between the parties as to what the term "comprising" allows one to do with respect to a claim in general.

By having "comprising" in a claim as a transitional -- could you pop over.

By having "comprising" in a claim as a transitional phrase that doesn't allow you to go into individual limitations and expand their scope, number one.

Number two, the patent talks about K input signals coming into the fast fourier -- the IFFT block -- and this is at slide 10 -- and then describes, as we just heard, an output yielding a signal comprising K different frequencies.  There's no indication that use of the word "comprising" in the specification has an open-ended meaning.

When you go and look at *Moleculon*, *Moleculon* says "comprising" is not used here as a transitional phrase, and has no special legal effect as such.

That special legal effect that they're referring to in

*Moleculon* is the concept of open endedness associated with a claim that uses "comprising" as the transitional phrase as opposed to "consisting of" or some of the other special language that is used in claim construction to reference to close-ended limitations or closed-ended claims.

**THE COURT:**  What is an example of a transitional of "comprising" as open ended?

**MR. GERCHICK:**  We talked about it, I think, a little bit earlier.

Comprising a chair, comprising a back, four legs and a seat.  Now, if I have a chair like I used to have in elementary school, that had a back, four legs, a seat, and a desk, I would fall within the scope of that comprising claim because I had an extra element, D, which is the desk.  But the claim limitation is open ended.

Now, if I had a chair that had a back, 12 legs, and a seat, that would be a different chair because I've changed the legs limitation from four legs to 12 legs.  That's not comprising anymore.  It's not open ended.  That's a modification of an individual limitation.

And that's what *Dippin' Dots* is talking about because in *Dippin' Dots* you had beads, spherical beads, okay, and that was a claim limitation.  It used "comprising" as the transitional.

And the accused product had aspherical and popcorn-like-shape stuff it mixed in with the beads.  And the

argument was it's comprising so it covers a product that has both spherical and aspherical beads, or both spherical and aspherical -- ah, there we go -- both spherical and aspherical structures.

And in the case, the Federal Circuit said, "'Comprising' appears at the beginning of the claim, comprising the steps of, and indicates here that an infringing process can practice other steps in addition to the ones mentioned."  That's "other steps."

"The presumption raised by the term 'comprising' does not reach into each of the six steps to render every word and phrase therein open ended, especially where, as here, the patentee narrowly defined the claim term it now seeks to have broadened."

So here what we're dealing with is not only is this not a transitional phrase, but they've actually just referenced "comprising" in the nonpatent -- patent claim drafting sense within an individual limitation.

And it falls squarely within what was addressed in *Moleculon*, where it says, "When 'comprising' is not used here as a transitional phrase, and has no special legal effect as such, hence, it should be interpreted according to the normal rules of claim construction.  No analogous word precedes the structure recitation of the number of Q pieces in Steps A and C.  'Comprising' in step C reasonably interpreted means having,

but not having at least."

And we would say that this is squarely on point with that, where the reference to generating a signal comprising K different frequencies would be generating a signal having K different frequencies, not generating a signal having at least K different frequencies.

**THE COURT:**  Well, I'm not sure it's -- that line is so obvious, just looking at the language itself.

What about this point about --

**MR. RIBERA:**  Could I --

**THE COURT:**  I want to hear your response to their expert's point that when you go through an IFFT that the output is always greater than the input frequency.

**MR. GERCHICK:**  Other than it being extrinsic evidence and not what they've actually claimed, I don't really have a response to that.

**THE COURT:**  Well --

**MR. GERCHICK:**  I understand that's what he says.

**THE COURT:**  Yeah.

Now, is there anything impossible -- if this were read as limiting the K different frequencies to K and not equal to or greater than, I mean, are you saying that this --

**MR. RIBERA:**  It would be virtually impossible to do that, Your Honor.

**THE COURT:**  It is impossible to do that?

123

**MR. RIBERA:**  Virtually impossible.

**THE COURT:**  Virtually, or is impossible?

**MR. RIBERA:**  Well, if you have perfect conditions, no noise, and one sinusoidal wave with nothing else, you may be able to get -- if you recall the analogy of the frequency analyzer, when you look at a sinusoid in the frequency analyzer, in an ideal scenario you would just see one line because it's a single frequency.

But that's never -- in reality, that never happens. There's always noise and always harmonics that will create like a peak with multiple frequencies, because it's impossible to have that clean, ideal condition of just having one frequency.

And the point here is they're trying to narrow the claims to something that it's neither described or it's contrary to the way the term "comprising" is usually understood.

And the whole case law referring to not applying the "comprising" as an introductory phrase into the elements of the claim does not apply here.  The term "comprising" clearly applies to what's comprised in the generated signal.  It comprises K frequencies.  It can have K frequencies or more.

**THE COURT:**  Maybe you can tell me, what is this function, again?  When you perform an IFFT on K signals, what happens?

**MR. RIBERA:**  So that's taking the low frequency signals that are coming in from the base band, the information

signal, and it's --

THE COURT:  Say that again.

MR. RIBERA:  Those are the low frequency base band that are going to be transmitted through the radio.  And it's taking those from the frequency domain to the time domain.  So it kind of takes the time signals and converts them to a multi-carrier time domain signal that is actually what gets sent out through the antenna.

So it transforms from the time domain to the frequency domain.  I mean, that transformation you don't have a one-to-one correlation.

THE COURT:  Maybe you can explain the science, again, to me.  I'm not sure -- my memory is short, so ...

MR. RIBERA:  So, basically, an IFFT, we talked about a fast fourier transform and an inverse fast fourier transform.  And those are algorithms that convert signals from the time domain to the frequency domain.

So you have, for example, a sinusoid in the time domain, you're looking at the amplitude and change over time.

THE COURT:  Right.

MR. RIBERA:  And then in the frequency domain you just see the frequency of that sinusoid.

Sinusoid has one frequency.  So, ideally, when you do an IFFT on a sinusoid, you will get a single line which represents that frequency of the sinusoid.

The IFFT does the opposite.  It takes a frequency domain representation of a signal and it converts it to the time domain, which is what you actually would send in an antenna.

THE COURT:  So what you send -- what you transmit is --

MR. RIBERA:  So you take that data signal that comes in, and you split it into K signals.  And then when you apply the IFFT, in essence, you are creating a signal with multiple subcarriers or subchannels.

THE COURT:  Because when you perform the inverse fast fourier you're converting -- is it time domain to frequency or vice versa?

MR. RIBERA:  The opposite, the inverse.

So the IFFT goes from frequency to time.  Because what you want to send through an antenna, it's like a time signal.  It's amplitude and magnitude varying over time through the pulses in the antenna.

THE COURT:  So you're taking something that is inputted into this process that's in a frequency domain, which shows the frequency spread of the --

MR. RIBERA:  Well, by splitting the signals you have multiple information signals coming in.

That's what the splitting into K signal does, is split one information signal, you kind of chop it up, and you have multiple K signals in parallel.  And then you apply the IFFT at

once on all those signals at the same time, to generate this multifrequency output signal.

And that's why that signal has to have at least the same number of frequencies as your input signals, because you have a carrier wave for each one of those.

But in order to only have the same number of frequencies as the input signals, you would only have the ideal situation where you only have one frequency per signal.  But that's not the case.  You have -- they're called subchannels because there's multiple frequencies for each one of those carriers.

So there's never -- it's an ideal condition where you would have only one frequency as the output per signal.  That just doesn't happen.  There's harmonics and there's noise and other things that affect that scenario.

And so you have multiple frequencies that definitely have to have at least as many frequencies as the input K signals because that's the number of subchannels.  But the result, each subchannel will have more than one single frequency.  And that's why the term "comprising" is used.

**THE COURT:**  So each signal is going to have multiple frequencies?

**MR. RIBERA:**  Correct.  Each one of those K signals will have multiple frequencies associated with it.

**THE COURT:**  And when you perform the IFFT, then you generate --

**MR. RIBERA:**  Time domain.

**THE COURT:**  -- time domain.

But what does it mean -- if you're generating a time domain then -- what is a different frequency in a time domain in?  What does that mean?

**MR. RIBERA:**  During the amplitude phase of the signal it will look like a very strange signal.  There will be no clean sinusoidal wave or anything like that.

**THE COURT:**  Right.  So each frequency is a sinusoidal wave?

**MR. RIBERA:**  If you only have one frequency, just one clean frequency, it would be one sinusoidal wave in the time domain and one straight line in the frequency domain.  That's the ideal scenario.

**THE COURT:**  So I guess I'm trying to figure out why the patent drafter would have used K on both sides.

**MR. RIBERA:**  Because you have to have at least K. That corresponds to when you bring in K signals the output has to have at least K frequencies, because that's the number of subchannels.

But each subchannel can have multiple frequencies.  And that's why it says "comprising K different frequencies," because it has to have at least the same number of subchannels, but a subchannel can have multiple --

**THE COURT:**  So it's got to be equal to or greater than

K?

**MR. RIBERA:** Exactly.

**THE COURT:** All right. What's wrong with the science of that?

**MR. GERCHICK:** Well, only that -- and this is document number 270-36, which is Dr. Bambos's declaration that was submitted in response to Dr. Negus, where he says that:

"Dr. Negus bases his conclusion on the assumption that all different frequencies that he admits are routinely ignored by persons of ordinary skill in the art must be counted in determining whether a signal meets the requirement that it be comprised of 'K different frequencies.'

"I disagree. A person of ordinary skill in the art would understand that the scheme used in the '394 Patent (like OFDM) involves transmission of signals that are comprised of a number of different frequency subchannels onto which information may be modulated. A person of ordinary skill would understand that 'performing an inverse fast fourier transform on said K signals to generate a signal comprising K different frequencies' refers to the number of frequency subchannels in an OFDM-type system. Thus, that person of ordinary skill would understand that the requirement of Claim 1 for 'a signal comprising K different frequencies' means that the

claim requires generation of a signal with K frequency subchannels."

I guess all we're really focusing on here is that the IFFT has K signals coming into it.  And that K signal is generated from the information signal.

And when it has output is --

THE COURT:  Output at what --

MR. GERCHICK:  Output from the IFFT.

THE COURT:  From the IFFT?

MR. GERCHICK:  Yeah.

What's output from the IFFT, the data-carrying aspects of what's output from the IFFT are the K different frequencies.

You know, if we're talking about nulls or frequency bands that are not used, which Dr. Negus seems to be referring to, that -- I mean, that seems fine.

But what we're not talking about here is having K frequency subcarriers or K different frequencies being output by the IFFT plus more carrying data.

So you have K data coming in.  The frequency subchannels coming out are -- K of them are carrying data.

This concept of at least K so that you can shove additional information into the IFFT and then output it as part of the frequency band is not what the patent is talking about.

MR. RIBERA:  If I may respond, Your Honor.

THE COURT:  Yes.

**MR. RIBERA:**  The shoving additional information into the IFFT, that deals with the K signals so that's completely different.

If you read closely Dr. Bambos's declaration, he never denies that the output of the IFFT produces multiple other frequencies, not just K.  Instead, he converts to this notion of a subchannel, which is not the number of frequencies that are output but the number of center frequencies that are output.

So it's just on that center frequency, there's information modulated into it that has other frequencies.  So that doesn't address the point that Dr. Negus raised.

**MR. GERCHICK:**  So if we're in agreement that only K signals are used to generate the signal comprising K different frequencies, and what we're talking about with respect to this at least are these null frequencies, effectively, then I think we're in agreement.

**MR. RIBERA:**  We're not agreeing that these are null frequencies.

**THE COURT:**  All right.  Let's go on to the next one. Let's do the '420.

So is the issue here whether the first segment or the second segment of the signal must be distinct and separated?

**MR. RIBERA:**  That's -- it was not distinct, Your Honor.  It's whether it needs to be separated out from the

signal.  I think that's the issue.

MR. ANDERSON:  Agreed, Your Honor.

THE COURT:  And what do I do with the fact, then, that the claim language itself refers to the first segment encoding the first segment with a first channel encoder, and then encoding a second segment with a second channel encoder?

Doesn't that imply that there has to be a separation?

MR. RIBERA:  So there's two points on that, Your Honor.

It doesn't require separation.  It just requires that different groups of bits be encoded with different coding rates by different channel encoders.  But it doesn't mean that the channel encoder cannot be the same hardware as Barnes & Noble implies.

And, in fact, there is disclosure in the specification that addresses this point precisely.  At Column 4, Lines 20 to 23, the specification mentions that the function of blocks --

THE COURT:  Hold on.  Let me get there.

MR. RIBERA:  Sure.

THE COURT:  Column 4.

MR. RIBERA:  Column 4, Lines 20 to 23.

THE COURT:  Okay.

MR. RIBERA:  And if we step back for a second, what Barnes & Noble is trying to do here is limit the claims to a scenario where the first channel coder and the second channel

coder are separate hardware blocks.  And there's just no support for that in the specification.  They're just trying to narrow it to a preferred embodiment.

But the patent describes that the functional blocks that are described throughout the specification represent the use of either shared or dedicated hardware.

So you could either have a first channel coder or a second channel coder that are dedicated hardware for each of them.  Or you could have a single piece of hardware that is shared between both the first and second channel coders.  And the coding can be sort of time shifting between the more significant bits and the less significant bits.

There's also the disclosure of having hardware capable of executing software.  So the software could be what is actually implementing the first channel coder and the second channel coder in a processor, for example.

So the specification provides embodiments and variations to the embodiments that are broad enough to cover a scenario where the signal -- the segments of the signal are not separated out from the signal.  That is an additional element that is not called out by the claims.

This is a method step, and none of the methods is separating the signal into segments.

You've seen some of the other patents have claims where that's an important feature of the invention, and the claims

have separated the signal into multiple signal streams.  Here, Claim 1 doesn't have that language so it should not be added to it through claim construction.

**MR. ANDERSON:**  Your Honor, I'd like to go back to the language of the claims that you started with, and then I'll address counsel's argument about Fig. 4.

**THE COURT:**  Yeah.

**MR. ANDERSON:**  So let me pull up -- going to slide 10. Thank you for bearing with me.

All right.  The first point, which I take it Your Honor just correctly made and wasn't really addressed, the claims themselves, each one of the asserted claims requires a first channel encoder operating at a first rate and a second channel encoder operating at a second rate.

So right there, this point about whether there are other embodiments that don't require two channel encoders, it's irrelevant.  The claims here claim two separate channel encoders.

Okay.  Next point.  Let's look at what's happening in Fig. 4.

Now, this point didn't really become clear what the dispute was until on reply, which is I guess should say Barnes & Noble's --

**THE COURT:**  You said look at Fig. 4?

**MR. ANDERSON:**  Sorry.  Sure.  Let me get that up

there.  Slide 13.  I have it up there.  But we can look at Fig. 4 in the patent as well.

THE COURT:  Yeah.

MR. ANDERSON:  So the first thing I want to make clear, Your Honor, is this specification was used for several different patents.  So it describes three very different embodiments: variable coding, also called VC; variable time, called VT; and variable power, VP.

All of the claims are directed to variable coding.  None of the claims are directed to variable time or to variable power.

THE COURT:  How do we know that?

MR. ANDERSON:  So we know that because if I go back to the claim before -- I'm back to Claim 1.  It's exemplary, but they're all the same.

It says, "Encoding a first segment of the signal with a first channel encoder operating at a first rate."  And, "B, second channel encoder operating at a second rate."  Going on to say, "The second rate being different from the first rate."

That's what the VC method is, different coding rates.  It's not different coding time.  It's not different coding power.  It's different coding rates.

That's how we know that all the claims are directed to the VC embodiment.

THE COURT:  Let me see if there's disagreement with

that, just that point.

**MR. RIBERA:**  There's a little bit of a disagreement because just because the claim requires different encoding doesn't mean that additional other techniques cannot be used in addition to the claim.

**THE COURT:**  In addition.  But it has to include --

**MR. RIBERA:**  It definitely has to include at least variable coding.

**THE COURT:**  Okay.

**MR. RIBERA:**  But if I point you to Column 5, Lines 15 to 19, Your Honor, you can see that the invention there is described as being able to implement unequal error protection with any combination of these methods.

So just because one embodiment of the patent is describing one of the aspects of one of these techniques doesn't mean that everything about that embodiment is irrelevant to the other coding techniques, which is what Barnes & Noble attempts to do here.

**THE COURT:**  All right.

**MR. ANDERSON:**  If I may respond to that?

**THE COURT:**  Yeah.

**MR. ANDERSON:**  Next slide, slide 11.

So whatever the status of that is, Fig. 4 does not use variable coding.  It says so right in the specification.

So I'm looking here.  First off --

**THE COURT:** What are we looking --

**MR. ANDERSON:** I'm looking at slide 11.

**THE COURT:** Yeah.

**MR. ANDERSON:** This is three bits from the specification. The first is Column 5, 42 to 44. That's just where the patent makes clear that Fig. 3 does use variable time.

**THE COURT:** Yeah.

**MR. ANDERSON:** The next is Column 6, 46 to 48. And this says that Figs. 4a through f and h show how a signal is processed as shown in Fig. 3. That's the variable time figure.

And then it repeats it and says "through the variable time modulators, 313 and 315." So now we know Fig. 4 is VT.

And then, lastly, I'll point you to Column 6, at -- I'll start at Line 50. So this is just below what I read.

It says, "The first" -- now, it's referring to Figs. 3 and 4 in the variable time.

"The first channel coder and the second channel coder are each one-half coders. Each rate one-half coders."

In other words, they're using the same rate, not the different rate recited in the claims.

Then it goes on and I'll read at line 55:

"Although the first channel coder 302 and second channel coder 304 are of the same rate," and then it goes on to explain why you would still use them.

So that's how you know that Fig. 4 does not use variable coding.  The specification tells you it doesn't.

So now I'd like to go to what Fig. 4 does show and how it's being used here.

What Fig. 4 walks through is if we start with Illustration A, that's the raw data.  It then shows a channel coding step.  But it's channel coding one bit to two, or one-half rate.

And then the next illustration, D, is the time modulation.  Here it spreads out the time.  And we don't have to talk too much about that.

All right.  Going down further, Illustration B is again raw data.  It's coded again at the same rate, 1 to 2.  So this is not variable coding for this figure.  Illustration B, the variable time modulation is applied.  And that gets us down to F.

And then what happens is it's quite clear when you step through the figure, Illustration G says here's what would happen if there's no variable time or variable rate coding.

So C is just the signal without either.  And G is variable time modulation, but not variable code modulation.

**THE COURT:**  Which one is -- which one is variable time?

**MR. ANDERSON:**  H is variable time.  It's the combination of the two segments; the first segment in E and the second segment in F.

That combines to give you G -- sorry, that combines to give you H.  Sorry.  So H is after variable time modulation.  Illustration G is before variable time modulation.

And just as a final point, if I could correct something on the record, Your Honor.  There's a typo in our brief about this.

**THE COURT:**  G is before variable time modulation?

**MR. ANDERSON:**  Yes.  It's just there for illustration.  This is what if you don't do any of the things talked about in the patent.

**THE COURT:**  And so Fig. 4 pertains, you're saying, solely to variable time?

**MR. ANDERSON:**  Yes.

**THE COURT:**  Not code rate?

**MR. ANDERSON:**  Yes.  That's what it says in the specification.

And you can confirm it in the figure itself because when you move from A to C, that's a rate of 1 to 2.  And when you move from B to D, that is also a rate of 1 to 2.  So it's using the same channel coding rate in both.

**MR. RIBERA:**  May I address that, Your Honor?

**THE COURT:**  Yes.

**MR. RIBERA:**  Could we switch back, please.

**THE COURT:**  Before you do, what is the upshot of that?

**MR. RIBERA:**  I think I'm --

**THE COURT:**  Let him finish.

**MR. ANDERSON:**  So if I can, what's happening here, so there's a series -- there's -- we started out with the language of the claims, and I'll be happy to point you to other highlights in the specification that show you have to separate it out to two channel coders.

LSI's criticism is, wait, let's look at Fig. 4 and some other alternatives that we haven't discussed yet -- and I'll discuss those -- that show that you don't need two channel coders.

Well, first, the claims all say you need two channel coders.

Second, Fig. 4 is talking about what if you don't do variable code?  So Fig. 4 is an unclaimed embodiment.  And under the *LG Electronics* case it's improper to use an unclaimed embodiment to expand the scope of the claim.

And the third point is, if you actually look at the apparatus that is used for the variable time coding -- and I'm now on slide 16, it's Fig. 3 -- even in Fig. 3, which uses variable time but not variable coding, in that embodiment you still separate out the channels.

You have to separate out the channels because in Fig. 3 there's a first variable time modulator and a second variable time modulator.

And this gets back to what counsel was referring to in

Column 8 before.  Column 8 is there on the slide.

It says, yes, if you were doing variable time but not variable coding, then there are alternatives.  You could use a single channel coder.  That's inconsistent with the claims, but you could do it if you were doing variable time and not variable coding.

The specification says you could use no channel coder in the variable time embodiment.  Again, inconsistent with the claims, but you could do it if you were doing variable time only.

But when you look at Fig. 3, you still separate out the streams because you've got a first variable time modulator and a second variable time modulator.  So you separate it out, put it through two different time modulators, and then multiplex it.

So even if we were to look at Fig. 3 and 4 as relevant, you still separate out the streams, so they don't even support LSI's argument.

**THE COURT:**  All right.

**MR. RIBERA:**  Thank you, Your Honor.

First of all, I think what I was pointing to before was Column 4, not Column 8, which it's applied generally to the invention, not to any particular embodiment.

But the point that we're getting into here is it's --
Barnes & Noble argued that the claims need to include the

separating step because Fig. 3 shows two channel encoders.

So this was in their brief.  They point to Fig. 3 and they say if you look at Fig. 3 there's a first channel coder, a second channel coder, just like in the claim.  That requires the segments of the signal to be separated.

In responding to that argument we pointed that Fig. 4, which is described as an illustration of the unequal error protection encoder of Fig. 3, does disclose that the first channel coder and the second channel coder can be a single channel coder that is time shared between the more significant bits and the less significant bits.

So that was our response to them trying to limit the claims to what's disclosed in Fig. 3.

Now, they came back and said, well, Fig. 4, it's all about variable time embodiment; that's irrelevant.  But so is Fig. 3, and they pointed to it to narrow the claims.

So to the extent Fig. 3 is relevant, the additional disclosure in the specification about Fig. 3 is relevant.

And, in fact, this aspect that's described with respect to the encoder of Fig. 3, it's relevant to the claims because it's talking about the encoding of the claim, not the time variation.

So as you can see in Fig. 3, there's element 304.  I think we cut some of the numbers here, but the first variable time modulator and the second variable time modulator here are

elements 313 and 315.  And so that would be the VT aspect of this embodiment.

But there's additional teachings in the description of these system that are equally applicable to other embodiments. And that is particularly what's described here at Column 8, Lines 4 through 8, where it's talking about the channel coder. Not the variable time modulators, but the channel coder and how a single channel coder can be used to apply error protection or coding to different segments of the signal without separating them.

And that's why we were pointing to the disclosure because Barnes & Noble is trying to say that Fig. 3 limits the claims to separating the segments out of the signal, but there's something that actually contradicts that in the specification itself.

And then if you look at the system of Fig. 6 -- you can look at it in the patent -- it also has the same sort of structure of having a first channel coder and a second channel coder, just like in Fig. 3; and, therefore, the description of how those channel coders can be used with respect to Fig. 3, it's equally applicable to Fig. 6.

Then what I pointed to in Column 4 makes the point that the functional blocks, just because they're referred as functional blocks, a first channel coder and a second channel coder, it doesn't mean that has to be a physical different

hardware.

The patent contemplates that you can implement those blocks even in software.  You can have hardware-executed software.  And that will not necessitate having the segments separate out --

THE COURT:  Is that Barnes & Noble's claim here, you have to have a physical separation?

MR. ANDERSON:  Thank you, Your Honor.

The Column 4 discussion is irrelevant because it's about processors.

Do you have column 4?

THE COURT:  Answer my question.  What is the contention here?  What separation is it that you contend is required?

MR. ANDERSON:  There has to be a separation.  The signal has to be separated physically at some level for it to go into two different channel encoders.

That's -- I didn't hear any dispute, the claims recite two channel encoders.  There's got to be --

THE COURT:  So it can be done on one piece of hardware?

MR. ANDERSON:  No.  This patent does not teach that.

The patent teaches doing it on one piece of hardware, specifically with respect to Fig. 4, Figs. 3 and 4, which are a VT embodiment that don't use variable coding as I just

explained.

THE COURT:  But the separation, you're saying, is required by the claim?

MR. ANDERSON:  Yes.

THE COURT:  Can that separation occur within the bounds of one dedicated hardware?

MR. ANDERSON:  The -- it's -- I'm sorry, Your Honor, I'm struggling a little bit about what we mean by "one hardware" because I want to make it perfectly clear we are not conceding that the patent envisions one channel encoder doing the variable coding claimed in the claims.

That's not what the claims allow, and there's no disclosure of doing variable coding with one channel coder in the patent.

THE COURT:  What does a channel encoder do?

MR. ANDERSON:  So this is -- this is -- I'm just speaking, now, from the general understanding.  I don't think this is particular to the patent.

Channel coding is just the idea that you should code the bits to protect them from the kinds of interference they're going to see on the channel.  The channel in this case being the wireless medium.

So the channel coder just says let's code these bits in a way that will help protect them as they go across the channel.  And it's prior art.

THE COURT:   When we say a "channel," what does that mean?

MR. ANDERSON:   The channel is just, I mean, a generic reference to the medium between the two antennas.  It's just you're going across that channel that might be a frequency channel, would be, I think the natural way to understand it.

But I think it's a very -- channel coder is a very general term.  We're just coding because we're going to have to send this data across a channel that's noisy and complicated, and we have to protect it.

So if I may, Your Honor, I want to be clear we're saying there has to be two channel encoders.

THE COURT:   Yeah.

MR. ANDERSON:   Whether it's done in software or a more powerful processor, that's fine.  The signal literally has to be separated out, still.  It's got to go one place in the processor.  The first segment has to go one place in the processor, and the second signal has to go to a second place.

Now, in particular, if we could look at Column 4, that counsel has cited, I believe it starts at 17, you'll see that what it says is, "For clarity of explanation, the illustrative embodiments of the present invention are presented as comprising individual functional blocks, including functional blocks labeled as, quote, processors.  The functions these blocks represent may be provided through the use of either

shared or dedicated hardware, including but not limited to hardware capable of executing software.  Use of the term, quote, processor should not be construed to refer exclusively to hardware capable of executing software."

Then it goes on to say, "Illustrative embodiments may comprise digital signal processor DSP hardware," et cetera.

So what the patentee is saying in 4 is, By processor I don't want to get limited to being just DSP processor.  I don't have any particular processor in mind.

And there isn't any dispute before the Court about processor.  We're not asking the Court to construe processor. We're not asking the Court to use processor in any construction.

So with that clarification, I want it say there isn't any dispute you can use one processor, another processor; you can have bigger processors; the processors could execute software; they could not be capable of executing software.  None of that's is at issue.

And if I may, Your Honor, may I address Fig. 3?

**THE COURT:**  Yeah.

**MR. ANDERSON:**  All right.  Here's how we got started on Fig. 3.  And let me just say at the outset, and I will repeat it, Barnes & Noble is not relying on Fig. 3 for construction.  But here's how it got started:

So the patent specification goes through variable time,

variable coding, variable power.  As it turns out, it starts with variable time, which is not what's claimed in this patent. But the specification starts with variable time.  So some of the terms are defined in the context of variable time.

That's what's happening at Column 6, Lines 26 to 36 on this slide.  And I'll just read it out from the patent itself.

The key point here is that at --

**THE COURT:**  What lines are you at?

**MR. ANDERSON:**  So I am at 31.

It begins, "One less significant portion of the voice data."

**THE COURT:**  Yeah.

**MR. ANDERSON:**  Then it continues, "The at least one or more significant portion is also referred to as a first segment."

Now, that's the claim language that's in dispute here, "first segment."

So that's why we started looking at this paragraph because the patentee tells you what first segment means.

It also goes on to say, "The at least one less significant portion is also referred to as a second segment."

Now, if you go to see what this more and less significant portion is, let me read from the start, on Line 24.  "Referring to Fig. 3 the input voice data interface 300 separates the signal," for example, voice data, "into the first data stream

and the second data stream."

THE COURT:  What line are you looking at?

MR. ANDERSON:  I'm sorry, Your Honor.  26.  Referring to Fig. 3.

THE COURT:  Okay.

MR. ANDERSON:  And it starts off saying, "The interface separates the signal into the first data stream and the second data stream."

So here we have a signal coming in.  And it gets separated into first and second data streams.

The specification then says, "The first data stream comprises at least one more significant portion of the voice data."  So now we've got first data stream with the more significant bits.  "And the second data stream comprises at least one less significant portion of the voice data."So you've got a second stream with les significant bits.

And then the specification says those more significant portions are referred to as a first segment.  The less significant portions are referred to as a second segment.

So there's the patentee telling you what he means by first and second segment.  It means the first data stream separated out from the signal is the first segment, and the second data stream separated out from the signal is the second segment.

Now, the reason we don't have to rely on Fig. 3 is because there isn't any difference between the figures that actually

show the variable coding method.  So that's Fig. 6.

So if we look at the patent, Fig. 6, this is the one that does talk about the variable coding method.  And on the slide, I've colored where the first data stream is and where the second data stream is.

So we don't have to rely on Fig. 3.  We can say here in Fig. 6 it's perfectly clear there's no dispute that Fig. 6 shows two channel coders and two streams.

And the other figure in the variable coding method of the specification is Fig. 9.  That shows the receiver side.

So some of the claims are on the transmitter side, and some of the claims are on the receiver side.  There's not -- this dispute crosses equally both receiver and transmitter side.

**THE COURT:**  How do we know Fig. 6 deals with variable coding as opposed to some other method?

**MR. ANDERSON:**  So if you look at where it is introduced, Your Honor, I'll give you that cite, it's Column 10, Line 35.

This is -- this is -- this is where the patent first discusses a VC embodiment.  And it says, "The UEP-DS-CDMA transmitter:  The VCUEP method and device."  And it goes on to say, "Fig. 6 shows a detailed block diagram of a UEP-DS-CDMA transmitter 108 that may be used with the VC method."

And then --

THE COURT: Okay.

MR. ANDERSON: If you just follow the specification, then it tells you that Fig. 7 and Fig. 8 and Fig. 9 all also refer to the VC method.

And then at the bottom of 12, when you get to 12, Line 54, then you move on to the VP method, Figs. 10 and 11.

THE COURT: And so the -- your contention is that Claim 1 is about variable code?

MR. ANDERSON: Yes, it is.

THE COURT: Only. And, therefore, the -- the discussion at Column 8, talking about use of a signal channel coder that's time shared, et cetera, et cetera, only pertains to variable time, not variable code?

MR. ANDERSON: And I think that makes perfect sense, Your Honor.

If you're using variable time and not variable coding, you could potentially use only one channel coder, or none, if you wanted to.

If you weren't doing channel coding, what's the point of having two channel coders? That's all it's saying.

But the claims say you are doing variable channel -- sorry, variable code method.

THE COURT: All right.

MR. RIBERA: May I respond?

THE COURT: Last word, and then we're going to move

on.

**MR. RIBERA:**  So the first point on the description on Column 4, counsel attempted to distinguish it as only applicable to processors.  Two points there.

The language is clear it talks about the functional -- the function of these blocks represented may be provided through the use or either shared or dedicated hardware --

**THE COURT:**  That doesn't address whether you separate out the signal and process it within the same piece of hardware.

**MR. RIBERA:**  There's no question that to process -- the way we're construing "segment" is a group of bits.  So, obviously, you have to apply the coding to separate the group of bits.

**THE COURT:**  Right.

**MR. RIBERA:**  The point is, they argue in their reply brief, you need to physically separate the groups of bits into separate data streams and provide them as input to different hardware blocks.

That's just not --

**THE COURT:**  Well, the different channel encoders.

**MR. RIBERA:**  But the channel encoder could be implemented in software.  So you could have a processor.

For example, if you look at Column 12, which counsel was pointing to you --

**THE COURT:** I thought the point was counsel wasn't as concerned about the physical aspects as it does require electronically that the signal be split and separated and sent into two different channel encoders.

**MR. RIBERA:** Well, that's actually also incorrect, because if it's done in software it doesn't require that you physically split the channel and send it to separate places.

The software is executed in the processor. The processor would read the four bits. And if it's applying like a half-rate code, it would replace each bit with two bits. And then if it has to apply a higher encoding rate, it replaces each bit with four bits.

So it can be done by the same hardware, the same processor, without sending it to different places. And that's what Column 4 talks about.

And if you look at Column 12, counsel pointed you to the embodiment described there. In Lines 12 to 23, it's talking about an unequal error protection processor 802. So that's talking about a processor. And even if you claim that Column 4, it's only talking about processors, that would apply to the processor described there.

But Column 4 is not limited to processors. It talks about any of the functional blocks and how they can be implemented in the same piece of hardware. They can be implemented in a processor-executing software.

So there's no requirement in this patent that you must separate physically the segments of the signals.  That's just not required.

Even though some of the embodiments may describe that separation, the claims don't require it.  And there is disclosures in the specification that allows for them not to be separated.

And to the point of Barnes & Noble not relying on Fig. 3, if you look at their brief at page 18, they spend about 20 lines talking about this element, ten of which are a reference to Fig. 3.

And so they attempted to rely on Fig. 3 to limit the claims to a scenario where you have to separate the signals. And when we pointed out that there's an alternative to Fig. 3, where you don't actually have to separate the segments of the signal, then they backtrack and try to say, well, it's not relevant, and all these other things.

But the point is Fig. 3 shows the first channel coder --

**THE COURT:**  So you're saying that variable code method can be -- even get a first segment and a second segment without separating?

**MR. RIBERA:**  Without physically separating them from the data signal, yes, Your Honor.

**THE COURT:**  How do you do that?

**MR. RIBERA:**  So you have a stream of bits coming into

a processor.  The first four bits, for some reason, are the more sensitive bits.

So the processor applies a routine that applies a higher encoding rate.  And so you, for example, change every bit of the four bits with five bits.

Then the next four bits are less sensitive to noise.  They come into the processor, and then the processor replaces each bit with two bits.  So that's a lower encoding rate.

So you don't have to split the segments and send them to separate parts.  You have a stream of bits going into the processor.

**THE COURT:**  You started doing it in series, as opposed to parallel?

**MR. RIBERA:**  Exactly.

**THE COURT:**  Is that scientifically possible?

**MR. ANDERSON:**  It's scientifically possible, well, with one qualification.

But, first, let me point out, you notice you didn't see where in the specification it talks about that.  That's counsel's opinion about how it could be done.  It's not a disclosure in the specification.

Second, if you want to say that in software the signal could be separated, and in software you could have a first channel encoder and a second channel encoder, our point is it's separate.  That's what the patent claims, and that's what the

patent teaches, that it's got to be separated.

It just turns out there isn't any, you know --

**THE COURT:**  What does it mean "separated"?

Because now he's saying within one stream of bits, I mean, you separate it out serially but not sort of --

**MR. ANDERSON:**  You put, for example -- again, we're not talking about the patent anymore.  But if we're talking about what is possible, you could have a block of memory where you put the first segment and a block of memory where you put the second segment.  You could run the first segment through a piece of software.  That's the first coder.  You could run the second segment from the memory into a second piece of software.  That's the second coder.

Now, maybe that's all happening on a chip.  That's neither here nor there.  The point is they've been separated out.  And it just can't happen without there being some physical separation.

But the point is, the notion -- I don't think that's really what we're fighting about.  And I think we're trying to get drawn into this question about whether there's multiple processors or how much hardware is required.  And that's not the dispute.

The dispute is the claims say there's one signal, it's separated into a first segment that goes into a first channel encoder.  There's a second segment that goes into a second

channel encoder.

Now, whatever that means about hardware, that's what the claims say and that's what the patentee should be limited to.

MR. RIBERA:  Your Honor, just real quick.

The claim doesn't say separating anything.  The claim talks about having a signal that has different segments to which different error protection is applied.  That's it. There's no separation requirement.

MR. ANDERSON:  By going into two separate channel encoders.

THE COURT:  And that comes back to my very first point.

How do you deal with it when it does talk about -- the claim does refer to a first channel encoder and a second channel --

MR. RIBERA:  The first channel encoder could be a software routine called first channel encoder.  And the second channel encoder could be a software routine called second channel decoder.

Each of them applies a different error protection. There's no need to separate the signals to do that.

MR. ANDERSON:  One further response to that, Your Honor, if I could switch over.

THE COURT:  Okay.

MR. ANDERSON:  And I'm going to try to get up Fig. 6.

Got it.

So Fig. 6 shows us the variable code method.  And it has a first stream coming into the first channel coder, second stream coming into the second channel coder.

Let's look at what happens after that.  They go into a multiplexer.  And then from the multiplexer, once they're combined, they go into an interleaver.

Now, why do you have a multiplexer and an interleaver there?  Because you've got two signals and you have to combine them.

Then let's see what happens on the receiver side.  So here we are at Fig. 9, variable code method on the receiver side.

The signal comes in through the antenna, goes down, received, demodulated, despreaded.  Then it's through a deinterleaver.

Again, why do you use a deinterleaver?  Because you're trying to get out two separate segments.

Goes into a demultiplexer.  What does the demultiplexer do?  Well, it has one come in, and then two data streams come out.  The first channel decoder and to the second channel decoder.

So there's really no question about what the patent actually discloses.  It discloses separate streams.

        **MR. RIBERA:**  If I may, Your Honor, for example, they are again trying to narrow the scope of the claim to one

particular embodiment.

Secondly, the interleaver and the deinterleaver doesn't require two separate signals. They kind of shift bits around so you can get all their -- the same part of the signals. Has nothing to do with multiple separated segments.

THE COURT: All right. Let's go on to the last one.

(Reporter asks for recess.)

(Recess taken from 3:12 to 3:19 p.m.)

THE COURT: Before we go on, let me just ask you, back on the '420, to take a totally layperson's view and understanding of this, can one analogize this to quality control on a conveyor belt?

You put things through. And if things are deserving of one treatment, you could take it off and put it on another belt. And if they're deserving of a higher or lesser treatment, you put it on another belt. And they get processed in their own ways.

And it sounds like what LSI is arguing, well, you can keep it all on one belt. And if it stays on that one belt you just give it a different label, depending on what it is; it never leaves the belt.

Is that a --

MR. RIBERA: That's a fair analogy, Your Honor.

MR. ANDERSON: I think it's an analogy. And our point is the only thing the patent teaches is using two separate

159

belts.

THE COURT:  Okay.

MR. RIBERA:  And our point is that the claims are not limited to that, even though some embodiments may describe that.

THE COURT:  Yeah, well, I understand that.

All right.  I'm going to have to take a closer look, then, at the claim language as well as the specification.  We all know that specifications that set forth a preferred embodiment, generally, can't impose limits on the terms.

On the other hand, if there's a whole specification sort of permeated and it's not just describing an embodiment that's simply exemplary, it's to be given some significant weight.  So I'll look at it.

All right.  Let's talk about the --

MR. ANDERSON:  Your Honor, if I may, I have one housekeeping issue.

THE COURT:  Yeah.

MR. ANDERSON:  It doesn't require your attention but, for the record, I wanted to point out we discovered a typo in our response brief.

THE COURT:  Okay.

MR. ANDERSON:  And I'll just read into the record. It's at page 18, line 22.  We referred to "Fig. 4," and we should have referred to "Fig. 4g."

**THE COURT:** Okay.

**MR. ANDERSON:** I apologize for that typo. I didn't want that to cause a problem.

**THE COURT:** All right.

Last and perhaps not least, or least.

**MR. RIBERA:** Not quite yet, Your Honor.

**THE COURT:** What?

**MR. RIBERA:** We have a couple more to go.

**THE COURT:** We have a couple more?

**MR. RIBERA:** Yes, Your Honor.

**THE COURT:** Patents, I mean.

**MR. RIBERA:** We have the '552.

**THE COURT:** Oh, well, I'll tell you right now, I don't think that needs construction. We can skip that one. I don't need to hear anything on that.

**MR. RIBERA:** Could we quickly address that, Your Honor?

**THE COURT:** In one minute.

**MR. RIBERA:** So the problem with not providing a construction is that Barnes & Noble, it's become clear that they intend to interpret the claim or have the jury interpret the claim as a physical impossibility, which makes the claim inoperable.

By requiring that the crossing of the threshold and the increasing of the rate happened at the same time, that's just

physically impossible.  And that's not what the specification describes.

There's many steps that happen between the backlogged data in the buffer crossing a threshold and the actual coder increasing the encoding rating.

THE COURT:  Yeah, and I understand that.

So that's why "at the time" or "exact time" is problematic, from your perspective?

MR. RIBERA:  That's correct, Your Honor.

THE COURT:  And from their perspective, your general word "after" is problematic too.

My inclination is to say after is after.  I mean when is when.

I'm not sure how much more specificity that needs.

MR. RIBERA:  As long as they're not allowed to argue that it requires simultaneity, I think that would be okay with us, Your Honor.

THE COURT:  All right.  I'll let you say one minute's worth, but I want to move on.

MR. ANDERSON:  Your Honor, all I want to say is in our brief we specifically pointed out we had no intention of arguing simultaneous action.  It's our response brief page 20, Footnote I.

THE COURT:  Okay.  All right.  I guess we've settled that.  That's excellent.

**MR. RIBERA:**  Thank you, Your Honor.

**THE COURT:**  Thank you.

Okay.  Let me get my -- maybe, again, you can remind me in terms of what n means in this context, in the counter.

**MR. SCHUMANN:**  Certainly.

I think n is a number that the counter counts up to.  I think --

**THE COURT:**  And then starts all over again?

**MR. SCHUMANN:**  Yes.

**THE COURT:**  All right.

**MR. SCHUMANN:**  I think the primary dispute here is whether that number n is actually equal to the interval between transmission signals.  I think that's the key dispute here with regard to the parties' constructions.

**THE COURT:**  Well, and so the transmission occurs somewhere between 0 and n?

**MR. SCHUMANN:**  That's right.

**THE COURT:**  And there's some inherent -- putting aside the busy signal, there's some inherent delay, right?

**MR. SCHUMANN:**  Uh-huh.

**THE COURT:**  And so when the receiver receives it, as I recall, the gist of the invention is that in order to keep them synchronized you don't want one to then reset where the 0 is different from the 0 from the transmitting?

**MR. SCHUMANN:**  Yeah.

I think the idea is that you want -- actually, let's go to this flow chart.

If you take a look at Fig. 4, Your Honor.

So what happens -- sorry.

THE COURT:  Yeah.

MR. SCHUMANN:  So what happens in Fig. 4 is it's showing what happens when the transmitter is going to -- is -- actually, I'm sorry, it shows what the access is going to do when the entity is going to start transmitting.

So at start the counter starts.  Then we have this medium busy check.  So as we described before, the devices will listen on the channel to see -- to see what's happening.  And if -- if there's another device talking, then it does this little loop you see on the top, where it says "Wait for busy medium to end."

THE COURT:  "It" being the transmission part of the --

MR. SCHUMANN:  Yeah, whatever is transmitting.

THE COURT:  Yeah.

MR. SCHUMANN:  Then if the medium is busy, it has this random amount of time it waits.  That's called the back off. And then it goes and checks for medium busy again.

If the medium is no longer busy -- if the medium is no longer busy, then it goes through these other activities.  It has a request to send.  It waits for a clear to send.  It sends a header.  And then that's the point at where the timestamp is

taken.

So that takes some number of counts.  That number of counts is what is put into the timestamp and transmitted to the other side in order for the other side to synchronize its timer.

THE COURT:  And this occurs within the span of 0 to n?

MR. SCHUMANN:  Not necessarily.  Actually, it depends on how long this medium busy is.  If the medium busy is very long then it could be multiple n's.  In fact, I have an explanation here.

THE COURT:  The n that's by the arrow below medium busy, what is that n?

MR. SCHUMANN:  That means no.

THE COURT:  That means no.

MR. SCHUMANN:  Yes.

THE COURT:  Yes and no.  Okay.  Got it.

MR. SCHUMANN:  So if you take a look, this is from Mr. Diepstratne, who is the inventor of this patent.

You can see here, he's being questioned, says:

"Well, what if the receiver receives a timestamp of 113 and it's told that n equals 100, then the MAC delay would be roughly equal to 13?"

The MAC delay being the tallest delay that's been counting.

And if you go down to the bottom he says:

"The answer is maybe you can change the example a little bit.  For instance, if the value is 1213, if that's what's received," that's the timestamp, "and the period is 100, then the offset would be 13."

The timestamp there is, you know, some multiple of the actual transmission period.

THE COURT:  TIM is -- you said the TIM period --

MR. SCHUMANN:  That's the transmission.  The time that was sent in the TIM message for the interval between transmissions.

THE COURT:  Say that again.

MR. SCHUMANN:  Yeah.  So, you know, when the system starts up it assumes a time between transmissions.  And that number is what's in the TIM interval field or TIM periods of 100.

So in the example that Mr. Diepstratne is using here, he's saying, look, the TIM period is we're going to try and transmit something every 100.  Whatever a hundred is.

THE COURT:  Yeah.

MR. SCHUMANN:  So you can see here that the timestamp value is actually much larger than the TIM period n.  It's 1213 --

THE COURT:  Because it took so long.

MR. SCHUMANN:  Right, because it was waiting and waiting and waiting.

**THE COURT:**  Is n equal to the time period between transmissions?

**MR. SCHUMANN:**  It does not have to be.  And it's just a number that the counter counts up to and resets.

And that's apparent by the claims.

**THE COURT:**  So you can have various transmissions -- within 0 to n you can have multiple transmission times?

**MR. SCHUMANN:**  You could, yes.  You could have a timer -- that's true.  N is an arbitrary number.

**THE COURT:**  Okay.

**MR. SCHUMANN:**  So if we take a look at Claim 1 here, we see the timestamp has been recited in this claim.  And what you'll notice here is it says, "The timestamp having a value m," that's that 1213 number we just talked about, "for synchronizing receiving timer with the transmitter timer wherein the timestamp represents a value within a count sequence of the timer and the transmitter."

It doesn't say this is that TIM period or this is the interval between transmissions.

And if we take a look at the claim language here or the claim that we're trying to construe one more time, and you look at Barnes & Noble's construction of "timestamp" what you see there is "a timestamp representing value m" and they inserted in here "within the range 0 and n in the counter of the transmitter where n represents the interval between

transmission signals."

So the problem with this construction is you could never have a timestamp that's bigger than n, yet that's precisely what Mr. Diepstratne is discussing in his testimony.

If I may go on.

THE COURT: Yeah, because you can have a delay --

MR. SCHUMANN: You could have --

THE COURT: -- that's multiples of the count?

MR. SCHUMANN: Right. You could have -- you know, that the delay could have been 1200 or something.

MR. GERCHICK: Do you mind if I respond to that for a second?

THE COURT: Yeah.

MR. GERCHICK: So, first of all, Mr. Diepstratne's testimony, again, it's unclear because I don't have the entire transcript in front of me, but he seems to also be talking about his patent in relation to the standard when he starts talking about MAC delays.

So that's him characterizing his invention in relation to the standard, and him intending -- yeah, him intending to address the standard in relation to his patent, which would be extrinsic evidence.

And the inventor's testimony shouldn't be used to expand the scope of the claims. If it's inconsistent with or expands the scope beyond what's claimed, then it shouldn't be relied

upon, number one.

Number two, the characterization with respect to this concept of multiple successive periods of n and the delay falling outside the scope of that really isn't what's addressed within the patent itself.

If you can go and pull up the '867 Patent, they provide an example here on Column 4, at Line 7.  They say, "The timer interval between successive TIM packets transmitted from the access point 14 is 200 milliseconds."  So it's transmitting that TIM message or at least attempting to transmit that TIM message every 200 milliseconds.

Then at 13, Line 13, they talk about "The TIM packet medium access delay is between 0 and 5 milliseconds."

So the delay you're talking about here is 5 milliseconds in relation to a successive attempt to transmit of 200 milliseconds.

Now, the characterization that Barnes & Noble is reading of value n -- I'm sorry, reading the value m as falling within the range between 0 and n, I would disagree with that and say that all we're doing is responding to exactly what the applicants stated during prosecution.

And this is slide 7, where the applicants state, "The term 'timestamp' is well defined in applicant's specification," and provide three examples.  "The timestamp represents a value m within a count sequence of the counter 22 of the transmitter 20

at a time of transmission of a TIM packet."

And there is an asterisk there which footnotes down to the bottom, where it says, "The count sequence rages from 0 to n, where 0 is less than m is less than n."

So the applicants themselves state that m falls between this range 0 and n.

And the timestamp that they've well defined, they point to three locations in the specification.  And those three locations all state --

THE COURT:  Where are you now?

MR. GERCHICK:  I'm on slide 8 now.

THE COURT:  Is that one of the figures from the --

MR. GERCHICK:  This is -- this correlates -- so this correlates to the specification at Page 10, Lines 14 through -- I'm sorry, this correlates to the specification at Page 8, Lines 19 through 22, that are referred to in that prosecution history statement we talked about.

And this slide 8 is from Column 5, Line 45 through 48 of the patent.  I'm sorry, wrong slide.

This is from Column 5, lines 1 through 11 of the patent.

And it identifies the timestamp field in which it loaded a so-called timestamp, and identifies that as "the value of the modulo n counter in the transmitter at the time of transmission of the TIM."

So that's the definition they provide in the

specification, and that's what applicant said during prosecution is well defined.

The next example that they provide is from page -- this corresponds to Page 10, Lines 14 through 15, referenced in slide 7.

And now we're talking about slide 9.  I'm sorry for jumping around on you.

**THE COURT:**  Where in the patent are we looking?

**MR. GERCHICK:**  Column 5.

**THE COURT:**  Column 5.

**MR. GERCHICK:**  Yes.

I'm sorry.  I'm trying to correlate what they said -- they identified three page ranges in the prosecution history, and I'm just trying to correlate that back to the patent.

But this is the other location, Column 5, Lines 45 through 58, again, that they identified as the well-defined timestamp. And here they say "the so-called timestamp," in quotes, "i.e. the value of the modulo n counter 22 at that predetermined time," referencing up to the sentence before where they talk about that being the exact time at which the TIM packet will be transmitted.

And, finally, the third location that they identify is from Column 7, Line 6 through 19, where they say the time -- "The TIM packet carries a timestamp value m representing the value of the modulo n counter and the access point at the

actual time of transmission of the TIM packet."

And so all we're doing, Barnes & Noble, with respect to the proposed construction is to tie back to the language that's used in the patent and that's used in the prosecution history where they set it out as the timestamp being well defined to indicate that it represents a value m within the range 0 to n in the counter of the transmitter.

And I would agree with counsel that where an n represents the interval between transmission signals -- we're referring back to the description of the timer interval, which is defined.  And you can see it in slide 8.  So the timer interval which indicates the value of n with the modulo n counter in the transmitter.  And that is the time at which transmissions are attempted.

And so I would acknowledge that when we say in our proposed construction "where n represents the interval between transmission signals," we mean where n represents the interval between attempted transmission of transmission signals, because the whole patent is about what happens when there are delays.

But the patent clearly defines that there are attempts to transmit a transmission signal at a particular interval.  And if the transmission cannot be made at that time, then the value of the delay is incorporated into the timestamp.

And that's all we're trying to lay out here with this claim, that value m falls within a range from 0 to n as defined

by the inventors during prosecution.  And it's consistent with the specification as a whole.

THE COURT:  Again, maybe I don't understand this, but it seems to me that the counter, which goes from 0 to n, simply recycles.  Once you reach n it goes back to 0, doesn't it?  It repeats like a clock.

MR. SCHUMANN:  Sure.

THE COURT:  So even if the timestamp is 12,000 or 1200, it still falls within -- at the point when it's finally successful in being transmitted and receives a timestamp, it will be some multiple of the n's but it will still be within a 0 to n range; wouldn't it?

MR. SCHUMANN:  Correct.

But the language that's here -- can I get my slides.

The problem isn't -- this isn't just about whether the timer resets at n or not.  I mean, n can be any arbitrary number.  I can think of a timer that's really huge, right.

But the problem with Barnes & Noble's construction, it says "where n represents the interval between transmission signals."  And Mr. Gerchick just clarified that and said that's intended transmission signals.  So if it's not made, then, you know, it doesn't happen.

But the problem is that language, you know, requiring that n is the interval between transmission signals is not anywhere in these claims.

If we look at Claim 1, it doesn't say anything about that you have to have a timer that counts to n, and n has to be the number in between transmission signals such that the timestamp can only be a value within the transmission signal.  It doesn't say that.  There's nothing in there.

And if you look at the other flavor of claims here, you'll see this one has a receiver counter that counts up to n counts.  But nowhere in this claim does it say that -- that n is the -- is the interval between intended transmission signals.

THE COURT:  Putting aside that second element, so I don't know what the problem is of saying that the timestamp would have a value m that's within the range of 0 to n.  It's greater than 0 but less than n.

MR. SCHUMANN:  If n is not tied to the interval between intended transmission signals then, yes, it can be between 0 and n.

THE COURT:  You said that n could be an arbitrary number.  It's a clock, a counter.

MR. SCHUMANN:  Well, it's a clock.

In one system that clock may have 10,000 counts.  In another system that clock may have 16,000 counts.

THE COURT:  And it doesn't necessarily relate to the interval between transmission or attempted transmission signals?

MR. SCHUMANN:  That's correct.

In fact, the TIM packet that Mr. Gerchick pointed to actually says that you can change the interval. The access point could say, you know what, instead of you guys all sending transmissions to me every 100 counts, let's do it every 50 counts.

THE COURT: Without changing n.

MR. SCHUMANN: Right.

THE COURT: The counter still continues. The actual counter goes to 200 --

MR. SCHUMANN: Exactly. It's going to keep going up. So you're going to say, okay, at 50 I'm going to try; I'm going to try at 100; I'm going to try at 150.

So we don't see that notion in any of these claims.

And the portion of the specification that Mr. Gerchick pointed you to is actually an embodiment. And in order to read that one embodiment into all these claims that don't have this notion at all, there has to be a manifest or explicit disavowal of this type of scope. And it's just not in here.

And, in fact, if you look at the '867 Patent, starting in -- you don't need to read this, but starting at Column 2, at Line 45, all the way through, you know, Column 4, at 51, that's a general description of the -- it's a general description of the invention without any tying it to a specific embodiment.

And then when we go to the portions that Barnes & Noble is relying upon, it starts, "Fig. 2 illustrates a transmitter for

use in an" --

**THE COURT:**  What are you looking at?

**MR. SCHUMANN:**  This is Line 52, of Column 4.

This is where they get the "modulo n counter" language from.  It says, "The transmitter includes a modulo n counter." And it goes through discussing that this modulo n counter you can have it just -- the n can be the actual intended interval, and it's an easy way to do it.

But it's not the only way.  And there's nothing -- actually, if you look over at Column 2, where it says -- explains what Fig. 2 is, it says, "Fig. 2 is a block diagram of a transmitter for use in an apparatus embodying the invention."

It's just an embodiment.  It doesn't touch any of the general description that you see in Columns 2, 3, and a portion of 4.

And so requiring the timestamp to have language in it such that the n must -- or timestamp n must -- let me go back to the claim language.

So in Barnes & Noble's construction here requiring this language where n represents the interval between transmission signals, that limitation is not found anywhere.  It's found in an embodiment, but it's not found in any of the claims and, therefore, it shouldn't be in here.

Again, to discuss a little bit about the prosecution history, I only have two more points.  To discuss a little bit

more about the prosecution history, those statements, again, were generally speaking about this particular embodiment that's in here.  It actually repeats a lot of the same language.

None of that says, you know, this is the -- none of that rises to the level of a manifest or explicit statement that they're disavowing any other kind of counter scheme, you know, that n can't be, you know, whatever the width of the counter is and then you can set the actual intended interval at something less than that n.  And that's what we see in these claims.

My last point is, I think Mr. Gerchick had pointed you out this section of the spec that discusses the timer interval field in Column 5, starting on Line 5, and I think goes to 6. It says, "A timer interval field which indicates the value of n of the modulo n counter in the transmitter."

That's, again, part of this embodiment, not part of the general discussion of the invention.  But it also is something that shows up in other claims, not these claims.

So if we take a look here at Claim 34, Claim 34 is the one that we just looked -- sorry.  It's very similar to 20. Claim -- but claim --

THE COURT:  What is "timer interval field"?

MR. SCHUMANN:  That's how you change the intended transmission interval, as we were discussing before, is you would send it in that field.

Again, it's an example of how this would work.

But that's actually in this dependent Claim 35 here, you can see.  It's not in 34, which just uses the time stamped field language generically, as we're trying to construe it.

So to require the timestamp to also include this concept of resetting or having intervals that are only equal to n would basically be taking that dependent Claim 35 and grafting it into 34, which would be improper.

So, again, I think the bottom line here is none of these claims require the timestamp to actually have language that requires n to be equal to the intended interval between transmission signals.

And, you know, most of the specification doesn't require that either.  There's an embodiment in there that uses an example of a modulo n counter, where n is the intended transmission interval, but that's just an embodiment.  And there's no explicit or manifest disavowal of claim scope present in the patent.

**MR. GERCHICK:**  My turn?

**THE COURT:**  Yeah.

**MR. GERCHICK:**  Okay.  So, first, Columns 2 through 4, which Mr. Schumann had pointed us to, they don't discuss the timestamp at all.  They lay out, basically, the system that has the problems that the timestamp is intended to address.

So there is no description of what the invention is in Columns 2 through 4.  They're just laying out, basically --

effectively, the prior art system and the issue that is being addressed.

THE COURT:  Yeah.

MR. GERCHICK:  With respect to -- can we switch over? I'm sorry.

With respect to the timer interval field, you had asked before about, basically, divorcing this interval between transmissions and this resetting cyclical counter.

THE COURT:  Yeah.

MR. GERCHICK:  If you look at the definition of the timer interval field that they provide, "the timer interval field which indicates the value of n of the modulo n counter of the transmitter."

So if you're changing this period of transmission n, you're changing the value of the modulo n counter as well. They're tied to one another in this definition.

The next point is with respect to Claim 35, I appreciate that that is a dependent claim.  And it says "wherein the transmission signal further includes a timer interval field."

There's nothing in our proposed construction that requires a timer interval field.  All we're saying is that the attempted transmissions are at a particular interval.

And so it's irrelevant.  We're not grafting the requirement for a timer interval field from Claim 35 into Claim 34 or any other claim.

**THE COURT:** What does Claim 35 add? What new limitation --

**MR. GERCHICK:** It adds a specific field into the transmission signal, the timer interval field.

We're not -- and our proposed construction has nothing to do with a timer interval field. We're just saying that this 0 to n value -- okay. This range within 0 to n, that n is the period of attempted transmissions.

**THE COURT:** So the attempted transmission then is tied to the length of the cycle of the counter?

**MR. GERCHICK:** Correct.

And that corresponds to, again, what the applicant said during prosecution.

I'm on Slide 7 right now.

The whole patent, when you look at the claims, it's all about synchronization of a transmitter timer and a receiver timer so the receiver wakes up at the appropriate time.

So the transmitter timer and the receiver timer, to maintain synchronization, they're working together on the same clock.

And that's what they say down here at the bottom of this paragraph, "As a result, the two counters 22 and 58 remain in synchronization as they cyclically count up to value n."

They're both working on the same thing.

**THE COURT:** Yes, I understand that, but what does that

have to do with transmission?

You can have -- why can't you have five transmissions within the 0 to n cycle, as long as everybody is on the same clock, the 0 to n clock?

**MR. GERCHICK:**  That's not explained anywhere in the patent.

**THE COURT:**  The thing you just read, I don't see what that adds to the debate.

You can keep them in sync.

**MR. GERCHICK:**  Right.

**THE COURT:**  Two clocks in sync, the receiver and the transmitter, correct?

**MR. GERCHICK:**  Correct.

**THE COURT:**  What does that have to do with how often you transmit?

**MR. GERCHICK:**  Everything about the patent is you transmit at 0.

**THE COURT:**  Oh, is that right?

**MR. GERCHICK:**  Yeah.  At 0 you transmit, unless there is a delay, in which case you don't transmit then.  When you do transmit, the length of that delay m is placed into the timestamp.

And that's shown here in Fig. 7.

**THE COURT:**  Okay.

**MR. GERCHICK:**  At the top of Column 7 it talks about

the access point 14, and that's up at the top.

THE COURT:  Okay.

MR. GERCHICK:  "Activity indicates the transmission of the first five TIM packets and the last TIM packet of a 150 packet series, and the first five TIM generation signals, 74 through 82, generated each time the modulo n counter in the access point reaches its value n," so when it's turning over.

THE COURT:  What were you just reading from?

MR. GERCHICK:  I'm sorry, Column 7, Line 1 through 6.

So you see at the top of Fig. 7 there are two lines. There's the access point activity and counter output?

THE COURT:  Hold on a second.

MR. GERCHICK:  Sure.

THE COURT:  Say that again now.

MR. GERCHICK:  There are two lines up at the top, the access point activity and the counter output.

THE COURT:  Yeah.

MR. GERCHICK:  So what -- what the lower line is, 74, so 74, 76, 78, 80, 82, that is showing when the counter, the modulo n counter hits n and tries to make a transmission of a TIM packet.

So each of those ticks shows a value n and an attempt to make a transmission of the TIM packet.

What shows in the line above, at 64, 66, 68, 70, and 72, that's actual transmission of the TIM packet.

THE COURT:  Okay.

MR. GERCHICK:  So you can see the first one, 64, there was a busy signal so there was a delay.

THE COURT:  Yeah.

MR. GERCHICK:  And that value m is the delay.  And that's what gets put into the timestamp.

The other ones, 66, 68, 70, and 72, those are transmitted on time.

THE COURT:  Okay.

MR. GERCHICK:  So the way it would work down at the bottom -- and this is done for illustrative purposes, but the way it would work down at the bottom, because here they have the receiver station going to sleep for a period of time, but the way it would work down at the bottom is when the receiver receives that first TIM packet with the timestamp m, it uses that to begin counting from m up to n.

THE COURT:  Yeah.

MR. GERCHICK:  So it wakes up for the next TIM message.

THE COURT:  Yeah.

MR. GERCHICK:  And if the next packet it receives or TIM message it receives has 0 or no value in the timestamp because it was sent on time, then it knows to just cycle back to 0 and start its count.

And this is confirmed in Column 4 of the patent as well,

Line 57 through 61, which talks about this TIM packet generation and says --

THE COURT:  Line --

MR. GERCHICK:  I'm sorry 57 -- Column 4, line 57.

THE COURT:  Yeah.

MR. GERCHICK:  "The modulo n counter 22 functions as a timer.  And when the count value reaches n a TIM function generator is triggered by way of an interrupt signal 25 indicating that the next Tim packet should be constructed and transmitted by way of radio modem 26."

THE COURT:  Okay.

MR. GERCHICK:  So that's what it's trying to do.  This modulo n counter is setting this resetting count.  And every time it resets, it tries to transmit a TIM message.

THE COURT:  Right.

MR. GERCHICK:  And if it can't transmit a TIM message because there is a delay of some sort, the timestamp is there to hold a value indicating the amount of delay that is then used by the receiver to make sure that it stays in synchronization on its counter --

THE COURT:  I got that.  All right.  So now I see the connection.

I'll give you the last word.

MR. SCHUMANN:  Sure.  So this -- you know, all the parts we just heard are part of the example of the one

embodiment that's in the patent.

And as we discussed, there are other ways to create timers such that, you know, they don't have to reset at the timer interval.

As we talked about before, you could have a timer that counts up to a thousand, yet you could have a transmission interval of 100. And, you know, the n would be a thousand, the hundred some fraction of that.

And all of these examples that we've just seen, again, are from an embodiment. And the claims themselves don't have any of these limitations in them. And to read these limitations from this embodiment into the patent, I think, invites error because these aren't the only way you can do it, and it's not an explicit or manifest disavowal of claim scope.

**THE COURT:** All right. That's helpful. Thank you. That's enlightening. Appreciate it.

So what I'm going to do, I'm going to tentatively set a status conference in the hopes --

**MR. SCHUMANN:** Your Honor, we have one more term.

**THE COURT:** What's that?

**MR. SCHUMANN:** "Counts for delay."

**THE COURT:** I know what I'm going to do with that.

**MR. SCHUMANN:** Okay.

**THE COURT:** Thank you.

I know you want more terms construed. But my view is

this:  Once we get out the claim construction order in this case, which I hope to do in the next matter of weeks, hopefully sooner, you will have some 13 claims, I think, covering at least the nine patents in one way or another.

I understand it's not complete.

You also have some data points.  You've got other decisions.  You've got the IDC.  You've got the *Geary* decision.  So it's not like you're totally at sea with this thing.

And I want to --

(Interruption.)

**THE COURT:**  I will be there shortly.

I'm needed.

So I want to talk when we come back -- maybe we can set one now for four weeks out, or something like that -- about where we go from here.

And I do want you to talk about an ADR process based on what, hopefully, by then you'll have a claim construction order at least on some of these claims, and to see what we can do to if not to resolve this case at least get this case narrowed.

Because it's -- you know, I said it before, we're not going to go to trial on nine patents and how many claims you have.  I forget how many there are.

I understand the need, your desire to have some additional terms construed, but as you can see this is a lot of work here just on these.

**MR. EISEMAN:**  Your Honor, from Barnes & Noble's perspective we very much thank the Court for its patience today, number one, and for entertaining the additional three terms.

And sitting here right now, until we see Your Honor's claim construction order and see if LSI decides to drop more patents once the order issues, we're not asking you for further claim construction.

Let's see the order; let's have a case management conference; let's try to find a way to narrow this case.

**THE COURT:**  That's what I want to do.

**MR. EISEMAN:**  All right.

**MS. MORROW:**  Your Honor, with regard to the terms that are left to be disposed of, I wanted to make one suggestion to the Court, which is that we have argued that Barnes & Noble has waived any constructions with regard to eight terms.

These are spelled out on pages 13 and 18 of our notes.  We briefed all of the terms.  Barnes & Noble didn't provide any opposing brief.

I can't see any reason at all why they would be entitled to anything other than having waived objections to LSI's claim construction on those eight terms.

And then that would narrow things down so that the remaining terms that are still in dispute would be yet fewer.

And I think that would be fair, given that the Court has

given the parties, as counsel noted, a very ample and appreciated opportunity to address the matters.

**MR. EISEMAN:**  And, Your Honor, two points on that.

One, the reason we didn't brief certain of the claims is page of the page limits.  And we understand why the Court entered those page limits.

But there still is a dispute about the meaning of those claim terms, and we believe under *02Micro* that that's a dispute that Your Honor would have to resolve if those claims are still at issue and we go to trial in this case.

**THE COURT:**  Well, they may have to be construed.  I have to look at those.

The question is whether you'll have another opportunity to weigh in and submit further briefing, having at least arguably foregone the opportunity here.

That's a decision I'm not going to make at this point. I'm going to reserve that.

Let's deal with these, what we've got, and then let's get back together.

But I do want you to think about an ADR process and what we can do to make this case more efficient and move this along, okay.

**MS. MORROW:**  Thank you, Your Honor.

**THE CLERK:**  So the next CMC is April 22nd, it's a Tuesday, at 9:30.

MS. MORROW: That's fine.

THE COURT: Great. Is that all right?

MR. EISEMAN: I'm thinking. I may be on the East Coast. Well, no, April 22nd will be fine.

THE COURT: Okay. Good.

Thank you, counsel.

(Counsel thank the Court.)

(At 4:01 p.m. the proceedings were adjourned.)

- - - -

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Tuesday, April 8, 2014

_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter